EXHIBIT

A

JENNIFER E. STREANO
Assistant Public Defender
Office of the State Public Defender
Major Crimes Unit
Helena, MT 59601
(406) 444-9262

Attorneys for Defendant

FILED SEP 28 2010

SHIRLEY E. FAUST, CLERK
By_____
Deputy

SEP 28 2010 PM 3:0

MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

STATE OF MONTANA,                    )
                                     )      Cause No. DC-10-160
            Plaintiff,               )      Dept 3
                                     )
      v.                             )      **MOTION TO PRODUCE**
                                     )      **DISCOVERY**
KATIE IRENE GARDING,                 )
                                     )
            Defendant.               )

    The Defendant Katie Irene Garding, through undersigned counsel, moves this

Court for an order directing the State of Montana Crime Lab to produce all notes,

information, testing, recordings or materials with regards to Lab Case# FSD-08-000020

involving victim Bronson David Parsons.  Pursuant to § 46-15-322, MCA, the State is

required to produce the requested information to the Defendant.  This office attempted to

contact Deputy County Attorney Jennifer S. Clark on September 24, 2010, but has not yet

received a response.

    DATED this 28th day of September, 2010.


                                     Jennifer E. Streano
                                     Attorney for Defendant

1

## CERTIFICATE OF SERVICE

2    I hereby certify that I caused to be mailed a true and accurate copy of the

3  foregoing Motion to Produce Discovery, postage prepaid, by U.S. mail, to the following:

4              JENNIFER S. CLARK
               Deputy County Attorney
5              200 West Broadway
               Missoula, MT  59802
6

7

8  Dated: _September 28, 2010_          _S. T. McKl̲l̲_

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PCR EXHIBIT 0002



EXHIBIT

B

JENNIFER S. CLARK
Deputy County Attorney
FRED VAN VALKENBURG
Missoula County Attorney
200 West Broadway
Missoula, Montana 59802
Attorneys for Plaintiff



FILED SEP 30 2010

SHIRLEY E. FAUST, CLERK
By _____
Deputy

MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

STATE OF MONTANA,                    Dept. 3

           Plaintiff,                    Cause No. DC-10-160

    -vs-                                    **RESPONSE TO DEFENDANT'S**
                                        **MOTION TO PRODUCE**

KATIE IRENE GARDING,

        Defendant,

    COMES NOW JENNIFER S. CLARK, Deputy County Attorney of

Missoula County, Montana, and respectfully moves the Court to deny the

motion at this time. The reason is the state is checking with the crime lab to

see if there are any reports that have not been received in the case. Further,

it is the policy of the crime lab and not to release notes, information, testing,

recordings or materials. These items are available at the crime lab for review

and the state requests defendant to make an appointment to do so.

    Under Mont. Code Ann. § 46-15-322, it is the duty of the prosecutor to

make available for examination and reproduction all written reports or

32

statements of experts.  The duty does not extend to their notes, testing, recordings, or other materials.  The state has produced the reports that have been completed from the crime lab as required.

DATED this 30th day of September, 2010.

JENNIFER S. CLARK
Deputy County Attorney

CERTIFICATE OF SERVICE

I certify that on 30th day of September, 2010, I emailed a true and accurate copy of the foregoing Motion to JENNIFER STREANO.

1   JENNIFER E. STREANO
    Assistant Public Defender
2   Office of the State Public Defender
    Major Crimes Unit
3   Helena, MT 59601                               FILED OCT 0 4 2010
    (406) 444-9262
4                                                     SHIRLEY E. FAUST, CLERK
    Attorneys for Defendant                           By_____
5                                                                 Deputy

6

7

8        MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

9   STATE OF MONTANA,              )      Dept. 3
                                   )
10               Plaintiff,        )      Cause No. DC-10-160
                                   )
11      v.                         )      **REPLY TO STATES RESPONSE TO**
                                   )      **DEFENDANT'S MOTION TO**
12  KATIE IRENE GARDING,           )      **PRODUCE EVIDENCE**
                                   )
13               Defendant.        )

14       The Defendant Katie Irene Garding, through undersigned counsel, herby replies to

15  the States response to defendant's motion to produce evidence.  The State has asked this

16  Court to deny defendant's motion based on the fact the State claims it is against the crime

17  lab's policy to release notes, information, testing, recordings or materials.  However, this

18  contradicts what has been represented to the defense regarding what the crime lab is

19  willing to provide.  For instance, defense counsel recently spoke with Julie Long, Quality

20  Manager of the State Crime Lab, who indicated their policy is to  provide its entire case

21  files, including notes, to either the prosecution or defense, as long as there is a court

22  order.  (Attached is a copy of State Crime Lab's policy regarding Confidential

23  Laboratory Information.)

24       In addition, the Crime Lab is a neutral State agency not represented by the

25  Missoula County Attorney's office.  The county attorney's office has no standing to

26  object to, or interfere with, the discovery of materials for which the Crime Lab is willing

27  to provide.

**MOTION TO PRODUCE DISCOVERY**
**PAGE 1 OF 3**

33

PCR EXHIBIT 0005

1    Therefore the defendant respectfully requests this Court to grant its motion to

2  produce evidence.

3

4

5    DATED this _4th_ day of October, 2010.

6

7

8                       Jennifer E. Streano
                         Attorney for Defendant

**MOTION TO PRODUCE DISCOVERY**
**PAGE 2 OF 3**

PCR EXHIBIT 0006

1

## CERTIFICATE OF SERVICE

2       I hereby certify that I caused to be mailed a true and accurate copy of the

3   foregoing Motion to Produce Discovery, postage prepaid, by U.S. mail, to the following:

4                        JENNIFER S. CLARK
                         Deputy County Attorney
5                        200 West Broadway
                         Missoula, MT  59802
6

7

8   Dated:  _October 4, 2010_          _C. J. McNeil_

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION TO PRODUCE DISCOVERY
PAGE 3 OF 3

PCR EXHIBIT 0007

# Montana Forensic Science Division Laboratory
## D-125-B
## Dissemination of Confidential Laboratory Information

Administrator Approval & Date: D McAlpin 1-19-10   Quality Manager Approval & Date: J Long 1-19-10

## PURPOSE
The policy outlines the dissemination of confidential criminal justice information.

## SCOPE
This policy governs all case knowledge (written or verbal), laboratory reports and all supporting casework documentation in the laboratory case file *that is considered confidential criminal justice information.* Casework communication documents fall into this category when they contain communication specific to analytical results, examinations to be performed or not performed, etc.

Technical procedures and staff curriculum vitae are not case specific and, therefore, are not considered confidential criminal justice information. Those documents are excluded from this policy. Curricula vitae can be provided upon request (verbal, written or electronic). Uncontrolled copies of technical procedures can also be provided upon written request (written or electronic) but should not be distributed outside the laboratory without prior notification to the Quality Manager.

## AUTHORITY
Montana Code Annotated 44-5-103; 44-5-302; 44-5-303; 44-5-304; 44-5-305; 44-5-311; 44-5-401; 44-5-402; 44-5-403; 44-5-404; 44-5-405; 46-15-322.

## RECIPIENTS OF LABORATORY REPORTS: No Court Order Required
Copies of laboratory reports are disseminated to the submitting agency following current office practice. Prosecuting attorneys and the defense attorney of record will receive a copy of the laboratory report and the evidence submission form upon request (written or electronic). Dissemination of this information should be documented in the case file for reference purposes. Division staff may contact the county attorney or the clerk of court to verify the identity of the defense attorney of record, if necessary.

## COURT ORDERS REQUIRED
Supporting casework documentation contained in the case file will be provided to either the prosecution or defense upon receipt of a copy of a court order which is signed or stamped by the judge or clerk of court. A subpoena duces tecum is not considered a court order unless signed or stamped by a judge or clerk of court. To be honored, the court orders must be delivered personally or via mail carrier.  Fax and electronic court orders will not be honored and are considered informational only. The order should outline the specific documents that are requested and allow a reasonable time frame in which to respond (e.g. two weeks for large case files).  Attorneys should be encouraged to contact the laboratory prior to drafting a court order to ensure that the order accurately reflects the requested information. Attorneys may view case file contents in the presence of the examiner, as in a pre-trial conference, but copies of confidential documents will not be provided without a court order as previously described. A judge's request during trial qualifies as a court order. In that instance, the analyst should encourage the court to make copies so that the original documents are retained in the Division case file.

## CIVIL CASES
See Division Policy "Civil Cases".

UNCONTROLLED COPY

EXHIBIT

C

FILED OCT 05 2010

SHIRLEY E. FAUST, CLERK
By _____
Deputy

SEP 28 2010 PM 3:04

MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| STATE OF MONTANA, | ) | **DEPT. No. 3** |
|---|---|---|
| Plaintiff, | ) | Cause No. DC-10-160 |
| v. | ) | |
| | ) | **ORDER TO PRODUCE** |
| KATIE IRENE GARDING, | ) | |
| Defendant. | ) | |

A motion having been filed by the Defendant, and good cause appearing;

IT IS HEREBY ORDERED, that the Montana State Crime Lab shall provide a copy of all their notes, testing, information, recordings or materials in Lab Case# FSD-08-000020 involving victim Bronson David Parsons to counsel for the Defendant *and to Counsel for the State*

DONE this 5 day of ~~September~~ *October*, 2010.

_____
DISTRICT COURT JUDGE

ORDER

PCR EXHIBIT 0009



MONTANA FOURTH JUDICIAL DISTRICT COURT,
MISSOULA COUNTY

**KATIE IRENE GARDING,**

                    **Petitioner,**

         -v-

**STATE OF MONTANA,**

                    **Respondent.**

**AFFIDAVIT OF
JENNIFER STREANO  (I)**

STATE OF MONTANA )
                          : ss
County of Missoula      )

Before the undersigned, a notary public for the State of Montana, personally

appeared Jennifer Streano, who, having been duly sworn, on her oath deposes and

says that this affidavit is made on her personal knowledge, and that if she were to

appear as a witness in the above-captioned matter, she would competently testify

as follows

   1.   My name is Jennifer Streano and I reside in Missoula, Montana.

   2.   I have a B.A. in Political Science from the University of Washington

(2001); and a J.D. from the University of Montana School of Law (2005).

3.      I have been licensed to practice law in Montana since 2005.

4.      I have been employed with the Office of the Public Defender, State of Montana since 2006.

5.      The exclusive nature of my law practice is criminal defense.

6.      In my capacity as a Public Defender I represented Katie Garding, who was charged with Vehicular Homicide; Leaving the Scene of a Fatal Crash; Tampering with Evidence; and Driving a Motor Vehicle without a Valid License. The case went to trial in October 2011, and she was convicted of all but Tampering with Evidence. See *State of Montana v, Katie Garding*, No. DC 10-160.

7.      On September 28, 2010 I filed a Motion to Produce discovery, requesting that "this Court issue an order directing the State of Montana Crime Lab to produce all notes, information, testing, recordings or materials with regards to Lab Case # FSD-08-000020 involving victim Bronson David Parsons."

8.      On September 30, 2010  the State responded, arguing that while it was "not the policy of the crime lab to release notes, information, testing, recordings or materials," the State would check with the lab "to see if there are any reports that have not been received in the case."

9.      On October 5, 2010 the Court granted the Motion and issued its Order to Produce.

10.    Prior to trial I received medical discovery from the County Attorney's Office. That information consisted of:

a.    CD labeled "Medical Examiner and Coroner photos"
b.    CD labeled "Photos of vehicle 9-28-10"
c.    Coroner's report form for the death of Bronson David Parsons (DOB 5-9-82, DOD 1-1-08)
d.    Report postmortem examination by Dr. Gary Dale, State Medical Examiner
e.    Montana Highway Patrol Criminal Offense Supplemental report

11.    I forwarded these materials to Dr. Thomas L. Bennett, M.D. and requested that he review the materials and prepare a forensic medical and pathological report.

12.    By letter dated October 17, 2010 Dr. Bennett acknowledged receipt of the materials and submitted his report based upon them.

13.    In February 2015 I was advised by the Montana Innocence Project that it had requested, and received, medical records and information from Dr. Gary Dale of the State Crime Lab. I was provided a copy of the materials.

14.    The materials included important medical records of the deceased, Branson Parsons, which were not disclosed to me prior to trial. Specifically, the information included:

a.    Head, neck, chest, abdomen and pelvis CT scan reports
b.    Cerebral blood flow scan report
c.    AP chest film report
d.    Radiographs (X-Rays) of lower leg

15.    These materials contain material, valuable, and favorable information

which would have been extremely useful to me in the defense of my client Katie Garding. Had I received these materials, I would have immediately forwarded them to Dr. Bennett, and perhaps other physicians, for review and analysis. The new information casts doubt upon and undermines the State's case. I have reviewed the June 15, 2015 Affidavit of Dr. Thomas Bennett, and the May 19, 2015 Affidavit of Dr. Peter Stephens. These Affidavits clearly indicate that Katie Garding's vehicle could not have caused the specific injuries and/or tissue damage to Bronson Parson (including the slight hairline fracture revealed in the X-Ray photograph). Thus, the information is both exculpatory and impeaching in nature. *Strickler v. Greene,* 527 U.S. 263, (1999); *Perez v. United States,* 968 A.2d 39 (D.C. 2009).

16.     Had I received these materials, my strategy for defending Katie Garding would have changed. I would have placed greater emphasis on the medical aspects of the case. Dr. Bennett would have utilized the information and provided a stronger, more effective report for the benefit of my client. Such information, when included in his report, would have solidified his opinions and conclusions, and would have had a persuasive effect on the jury, to the benefit of my client. Without this information, the jury was not told the entire medical story at issue in this case.

17.     The failure of the State to provide me with the complete medical

information set forth above, whether intentionally or unintentionally, is not only a violation of the Court's Order dated October 5, 2010, but a violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *Brady* holds the "the suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."

18.   *Brady* violations are not technicalities. The *Brady* rule is a rule of fairness. The motivating force behind the decision was the belief that "society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady,* 373 U.S. at 87.

19.   The remedy for a *Brady* violation is a new trial for the defendant.

FURTHER AFFIANT SAYETH NOT.

_____
Jennifer Streano

SUBSCRIBED AND SWORN TO BEFORE ME this _13ᵗʰ_ day of
_____Aucust_____, 2015

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year hereinabove first written.

_____
Notary Public, State of Montana
Residing at _Missoula_, Montana
(notarial seal)              My Commission expires: _12-17-2017_

CRAIG A. MCKILLOP
NOTARY PUBLIC for the
State of Montana
Residing at Missoula, MT
My Commission Expires
December 17 2017

PCR EXHIBIT 0014

EXHIBIT

_E_

MONTANA FOURTH JUDICIAL DISTRICT COURT,
MISSOULA COUNTY

1
2
3
4

**KATIE IRENE GARDING,**

                      **Petitioner,**

      -v-

**STATE OF MONTANA,**

                      **Respondent.**

Dept. No.
Cause No.

**AFFIDAVIT OF
THOMAS L. BENNETT, M.D.**

5

6   STATE OF MONTANA    )
7                             : ss
8   County of Missoula     )
9

10        Before the undersigned, a notary public for the State of Montana,

11  personally appeared Thomas L. Bennett, M.C., who, having been duly sworn, on

12  his oath deposes and says that this affidavit is made on his personal knowledge,

13  and that if he were to appear as a witness in the above-captioned matter, he

14  would competently testify as follows:

15        1.     My name is Thomas L. Bennett and I reside in Billings, Montana.

16        2.     I graduated from Drake University in 1974 with a B.A. in Biology.

PCR EXHIBIT 0015

3.      I graduated from the University of Iowa College of Medicine in 1978, and was invited to join Alpha Omega Alpha, the medical school Honorary Society.

4.      I currently hold the following appointments:

- Forensic Pathologist for the Coroners of Montana and Wyoming (6/98 to present).
- Associate State Medical Examiner for Montana.
- Consulting Pathologist, St. Vincent Healthcare, Billings, MT
- Consulting Pathologist, Billings Clinic, Billings, MT
- Adjunct Professor of Pathology, Lagos State University, Nigeria, 2005 to present.
- Member, Board of Directors, Nebraska Institute of Forensic Sciences, 2003 to present.
- Medical Director, Laurel Volunteer Ambulance, Laurel, MT.

5.      I have formerly held the following forensic positions:

- Assistant Chief Medical Examiner, Office of the Chief Medical Examiner for North Carolina (7/81-6/82).
- Forensic Pathologist, D-MORT 7 region for FEMA (1990-98), and DMORT-8 region (12/04 to 12/14).
- Iowa State Medical Examiner, Des Moines and Sioux City, IA (3/83-4/85 and 10/86-10/97).
- Mississippi State Medical Examiner, Jackson, MS (4/85-10/86).
- Deputy Iowa State Medical Examiner, Des Moines, IA (10/97-5/98).
- Associate Montana State Medical Examiner, Billings, MT (6/98 to present).
- Member, Montana State Trauma Care Committee, 1999 to 2003.

6.      I am currently licensed to practice medicine in Montana and Wyoming. I am Board Certified in Anatomic Pathology, Clinical Pathology

2

PCR EXHIBIT 0016

1  and Forensic Pathology by the American Board of Pathology (6-4-83).

2      7.     I belong to the following professional associations:

3      &bull; American Academy of Forensic Sciences (AAFS), member:
4           o Program Director, Scientific Session for Annual Meeting,
5             Pathobiology Section, Seattle 1993.
6      &bull; National Association of Medical Examiners (NAME):
7           o Board of Directors member, 1986-92,
8           o Member of board of editors for American Journal of Forensic
9             Medicine of Pathology, 1989-92.
10     &bull; College of American Pathologists (CAP), fellow.
11     &bull; American Society of Clinical Pathology (ASCP), fellow.
12     &bull; American Professional Society on the Abuse of Children (APSAC),
13       member (1996 to present).
14     &bull; International Association of Coroners and Medical Examiners
15       (IAC&ME), member (2011 to present).
16     &bull; Montana Medical Association, member.
17     &bull; American Medical Association, member.
18
19 8.     In my practice I have performed over 11,000 autopsies. I have

20 conducted hundreds of hours of professional presentations (including motor

21 vehicle crash-related deaths). I have been qualified as an expert and presented

22 expert testimony over 1,000 times in civil and criminal cases, in state and federal

23 courts, in the majority of the states.

24     9.    In 2011 I testified in the criminal case of *State of Montana v. Katie*

25 *Garding*.  In that case I testified for the defense.  A key witness for the

26 prosecution was Dr. Gary Dale, then State Medical Examiner for the State of

27 Montana.

28     10.   As part of my preparation for *State v. Garding* in October, 2010, I

3

PCR EXHIBIT 0017

1   was provided certain materials prepared and collected by Dr. Dale. Those

2   materials consisted of:

- A CD labeled "Medical Examiner and Coroner photos;"
- CD labeled "Photos of vehicle 9-28-10;"
- Coroner's report form for the death of Bronson David Parsons (DOB 5-9-82, DOD 1-1-08);
- Report postmortem examination by Dr. Gary Dale, State Medical Examiner;
- Montana Highway Patrol Criminal Offense supplemental report

11       11.    I relied upon these materials and utilized them in preparing my

12   report, which was dated October 17, 2010.

13       12.    This report formed the basis of my testimony, offered in my expert

14   capacity, at the *Garding* trial in 2011.

15       13.    I was not permitted to testify to anything that was outside the scope

16   of my written report.

17       14.    In February, 2015 I was contacted by the Montana Innocence

18   Project (MTIP).

19       15.    MTIP advised that it had received materials from Dr. Dale relating

20   to the *Garding* case, and asked me to compare these materials with the materials

21   I had been supplied with in 2010.

22       16.    I reviewed the Dale materials and determined that I had never seen

23   some of the information before. Specifically, I had not received or reviewed

- Head, neck, chest, abdomen and pelvis CT scan reports

4

PCR EXHIBIT 0018

1    • Cerebral blood flow scan report

2    • AP chest film report

3    • Radiographs (X-Rays) of lower leg

4    17.    At MTIP's request, I was asked to render an opinion as to the

5    significance of the new materials. Specifically, MTIP asked whether the new

6    materials would have impacted my findings and conclusions in any way.

7    18.    I state confidently that the new materials would have made a

8    significant difference in my report and trial testimony in this matter. These

9    materials contain valuable material and favorable information which would have

10   been extremely useful in responding to allegations in the defense of Katie

11   Garding. I understand that these materials were not provided to Ms. Streano

12   prior to the initial trial. If I had received these materials, I would have

13   immediately reviewed and analyzed them for additional factual information. The

14   information included in these materials casts doubt upon and undermines the

15   State's case. Specifically, the X-rays show a slight hairline fracture of the

16   deceased's lower left leg. Katie Garding's vehicle, outfitted with a unique steel

17   bumper, would have caused far more extensive damage to the leg had it struck

18   the victim. Further, the materials indicate that the injuries to the deceased's

19   lower leg, including the skin markings, deep muscle and bone injuries, were less

20   severe than would be expected had Katie Garding's vehicle impacted the

5

1    deceased at a significant rate of speed. Also, the locations and features of the

2    injuries to the deceased do not correspond to the specific front of Katie

3    Garding's vehicle. If I would have had access to this information my opinion

4    about it would have been included in my pre-trial report.

5

6                         FURTHER AFFIANT SAYETH NOT.

7
8                         _Thomas L. Bennett, MD_ (signature)
9                         Thomas L. Bennett, MD
10
11   SUBSCRIBED AND SWORN TO BEFORE ME this 15th day of June, 2015.

12
13            IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
14   official seal the day and year hereinabove first written.
15
16
17                         _Ashley Neutgens_ (signature)
18                         Notary Public, State of Montana
19                         Residing at Billings, Montana
20   (Notarial Seal)       My Commission expires: Jan 22, 2019
21
22
23       ASHLEY NEUTGENS
         NOTARY PUBLIC for the
         State of Montana
         Residing at Billings, Montana
         My Commission Expires
         January 22, 2019

6

AFFIDAVIT OF PETER J. STEPHENS, M.D.

**EXHIBIT**

F

State of North Carolina)

                        : ss

County of Yancey)

       Before the undersigned, a notary public for the State of North Carolina, personally appeared Peter J. Stephens, M.D., who, having been duly sworn, on his oath deposes and says that this affidavit is made on his personal knowledge, and that if he were to appear as a witness in *State of Montana v. Katie Irene Garding*, Cause No. _____, or in any related post-conviction matter he would competently testify as follows:

      *1.* My name is Peter J. Stephens. I reside in Burnsville, North Carolina.

      *2.* I am a graduate of the McGill University of Montreal, Canada (B.Sc. 1961).

      *3.* I am a graduate of the McGill University Medical School (M.D., C.M. 1965).

      *4.* I completed extensive postgraduate training, including residency, in Pathology at the Medical College of Virginia and the University of Western Ontario, London, Canada, from 1966-1970.

      *5.* I have received extensive and continuing education by the American Academy of Forensic Sciences since 1988.

6. I am a member of the American Medical Association; the College of American Pathologists; the American Academy of Forensic Pathologists; the National Association of Medical Examiners; and the EBMS Group.

7. I have authored numerous articles in various professional publications and journals.

8. I am a forensic pathologist who has had approximately 40 years experience in the practice of both hospital and forensic pathology.

9. I became board certified in anatomic and clinical pathology by the American Board of Pathology in November 1970. I became board certified in the subspecialty of forensic pathology in 1984.

10. Pathology is the science of understanding the mechanisms of human diseases of all types.

11. Pathologists are not normally treating doctors, and that is true in my practice as well. During my practice I worked frequently as a consultant to non-pathologist, medical examiners in several Mid-Western states and performed multiple autopsies and advised the non-pathologists as to the proper medical findings based on the science of pathology.

12. My autopsy experience included fatalities based on head injury.

13. I was an FAA-designated Senior Aviation Medical Examiner from 1974 through 1991. That required me to do physical examinations on pilots,

air traffic controllers and flight attendants on a regular basis.  I also received

training on aircraft accident investigations.

14.     I left full time practice of anatomic and clinical pathology in

2001 and since have practiced as a consultant in forensic pathology.

15.     I have during my forensic career testified as an expert for both

prosecution and defense, and in both criminal and civil cases.

16.     A true and correct copy of my Curriculum Vitae is attached.

17.     I have been asked to give an expert opinion in the matter of

*State of Montana v. Katie Irene Garding*. At the request of Larry D. Mansch of the

Montana Innocence Project I have reviewed the following materials relating to that

case:

Medical examiner reports (2)
Autopsy report signed by Gary Dale, M.D., including photographs and
imaging studies
Trial testimony of Gary Dale, M.D., and Thomas L Bennett, M.D.
Letter from Thomas L Bennett, M.D. to Mr. Larry Mansch dated 4
March, 2015
CD containing the complete medical file of Dr. Gary Dale as regards
Brandon Parsons
Montana State Highway Patrol traffic investigators crash report
Diagram of scene
Report of accident reconstruction by Harry Townes, PhD
Site surveillance and dash cam footage
Testimony of Judith Hoffman
Total station report
Total station spreadsheet
Testimony of trooper Hader
Testimony of trooper Novak

18.        Summary of facts situation:

At approximately 1:41 AM on 1/1/2008 Bronson David Parsons was walking on Highway 200 E. in East Missoula, Montana when he was struck by a vehicle which apparently left the scene of the accident. The type of vehicle involved in the accident was unknown at the time of the accident, but was believed to be either an SUV or a pickup. Weather conditions were light snow and temperature in the lower 20s. The road was mostly dry and bare. A witness who was walking with Mr. Parsons believed that Mr. Parsons had been carried on the hood for a significant distance before falling off. He also believed that the vehicle involved should have major front-end damage. Three beer cans, two shoes and broken glass were found on the highway at the scene of the accident.

Mr. Parsons was taken to St. Patrick's Hospital in Missoula where he was pronounced brain-dead at 8 AM that morning. The clinical cause of death was basal skull fracture with sheared carotid arteries and he became an organ donor. Organ donation took place on the morning of 1/2/2008 and autopsy was performed by Dr. Dale at 4 PM on the same day.

Dr. Dale's autopsy diagnosis was that the cause of death was blunt force injury to the head sustained while he was a pedestrian and struck by a motor vehicle. Mr. Parsons' blood alcohol (collected at 0220 on 1/1/2008) was 247 mg/dL. Blood collected near the time of admission to St. Patrick's Hospital

showed 5.5 ng/mL of THC in his blood with THC metabolite and caffeine also detected. In addition blunt force injury to the head was noted. There were contusions over both ankles and calves, located between 9 to 17 inches above the heels. A postmortem radiograph revealed a slightly displaced left fibula fracture 11 inches above the heel. Dr. Dale's report indicates that the manner of death is undetermined, pending receipt of additional information.

Based on my review of these materials, my opinions are as follows:

19.       This accident is a typical "run under" accident involving a pedestrian being impacted by a vehicle while walking. While I do not keep exact statistics, I estimate that I have been involved in several dozen such cases during my career as a forensic pathologist and medical examiner. In these cases, the examination of the vehicle becomes as important, or more important, than the autopsy examination of the deceased and the injuries found at autopsy must be correlated with damage seen in the vehicle. My experience in these cases is consistent with that of Dr. Townes in that I have not seen a similar case in which there has been no damage to the vehicle. Common sites of vehicle damage due to pedestrian impact include the bumper, radiator grill, hood, windshield wipers, windshield, and juncture of the roof with the top of the windshield. None of these sites in the Garding vehicle show typical impact damage. In addition, there are

features specific to Mr. Parsons' injuries that are completely inconsistent with impact with the nonstandard front bumper of this Chevy Blazer.

20.      As is common in many of these accidents when the deceased is impacted from the rear, injuries to the lower leg are noted. Dr. Dale's autopsy indicates similar injuries on the posterior surfaces of both lower legs without evidence of laceration of the overlying skin, and without evidence of a transversely located contusion (bruise) that would be expected if the back of both legs was impacted by a steel bar having a square cross-section and 90° angles. The presence of similar injuries on the backs of both legs is typical of both feet being positioned on the ground at the time of impact.

21.      In addition, other than minor "road rash" abrasion on Mr. Parsons' right flank, Dr. Dale's autopsy showed no evidence of flank or back injuries. This abrasion is minor in comparison and indicates only minimal horizontal contact with the road surface. Minimal abrasion on the back of the head indicates minimal horizontal travel along the ground or, put differently, his body descended essentially straight downward in a vertical fashion.

22.      The 3" bumper on the Garding vehicle has 90 degree edges that are relatively sharp and, as such, would be expected to cause a transversely oriented bruise at lower speed, or more probably, either a patterned injury or a

laceration at higher speed. As noted by Trooper Hader's observation, Mr. Parsons' bruising was more vertical or oblique and not horizontal.

23.     A vertically oriented bumper/radiator surface, such as is typical of an SUV, would be expected to leave skin markings on the back with underlying severe muscle contusion. The low height of the calf injuries above the ankles, together with absence of defined flank or back injury, is far more consistent with a fairly steeply sloping hood in a vehicle low to the ground, such as a sports car or sedan in which the initial impact is low to the ground with upward and rearward acceleration of the body with a comparatively short distance fall onto a sloping hood. In short, almost any vehicle except an SUV like the one Katie Garding was driving with modified nonstandard bumper would have caused these injuries to Mr. Parsons.

24.     The severe impact to the back of Mr. Parsons' head resulting in extensive skull fractures would be expected to cause a major dent in the hood of any vehicle that hit him (depending on the travel speed of the vehicle). This dent would be closer to the windshield at the estimated speed of 30 to 50 mph and would likely have involved the windshield wiper blades or, more probably, to have left an essentially circular depressed eggshell type fracture in the windshield on the passenger side of the vehicle. Such fracture patterns are typical of impact of the human head against either the internal or external surfaces of windshield glass.

The Garding vehicle shows neither a dent in the hood, bent wiper blades, nor the typical eggshell fracturing that is seen when the human head hits windshield glass.

25.     In trial testimony, Dr. Thomas Bennett testified at two separate occasions (page 1385, line 21; and page 1408, line 25 in the transcript) that x-rays are typically relied upon in evaluating calf injuries in pedestrian accidents. This is correct and is commonly recognized to be useful information in many pedestrian accidents, especially in hit-and-run accidents. However, Dr. Bennett never testified that he was able to review the x-rays and it is clear from a reading of his letter to Mr. Mansch dated 4 March, 2015 that they were not provided to him. Therefore, because Dr. Bennett never received x-rays of Parson's lower leg, he was deprived of a significant piece of favorable evidence that would have undoubtedly bolstered and further supported his opinion.

26.     In a letter to Ms. Streano dated October 17, 2010, Dr. Bennett identified the pieces of evidence he received from Dr. Dale. These items consisted of: (1) CD labeled "Medical Examiner and Coroner photos;" (2) CD labeled "Photos of vehicle 9-28-10:" (3) Coroner's report form for the death of Bronson David Parsons; (4) report postmortem examination by Dr. Gary Dale, State Medical Examiner; and (5) Montana Highway Patrol Criminal Offense supplemental report. Dr. Bennett did not receive Mr. Parsons' medical records from St. Patrick's Hospital identified as SKMBT 50115021711030.pdf, which Dr.

Dale disclosed to MTIP on February 17, 2015. These medical records include, among other things, numerous x-ray reports made at St. Patrick's Hospital of Parsons' head, neck and trunk. Additionally, Dr. Bennett was not provided with x-rays of Parsons' calves and ankles, which were taken by Dr. Dale during his autopsy examination. Clinical pathologists must compare a victim's pre-death records, including the x-rays, to the autopsy in order to fully understand and interpret the autopsy report. Because Dr. Bennett was not provided with these materials, he was unable to fully explain why Katie Garding's SUV could not have caused the injuries to Parsons' calves. This would have been significant testimony that would have been favorable to Katie Garding's case.

27.    If Garding's SUV struck Parson in the manner proposed by the State, he would likely have suffered a severe or compound fracture(s) and extensive soft tissue damage in his lower leg. This kind of injury is not shown on the victim. The recently-disclosed x-rays, referenced above, establish that the leg wounds to the victim could not have been caused by Katie Garding's vehicle. Indeed, the wounds would have been far worse if Katie Garding's vehicle had struck the victim.

28.    The injuries shown in Mr. Parsons' autopsy are not suggestive of an impact with an SUV but are more consistent with Dr. Dale's apparent initial suggestion of a vehicle with a sloping hood. Further, the medical records,

including x-rays of the victim, that were not disclosed to the defense would have been favorable and provided significant support and bolstered Dr. Bennett's opinions. Therefore, I conclude, based on the injuries found at autopsy and all the materials provided to me, that the Garding vehicle did not impact Mr. Parsons.

Further affiant sayeth not.

Peter J. Stephens, MD. Forensic Pathologist

Sworn to and subscribed before me, this the _19th_ day of _May_,
2015

Sharyn M. Dunn

Notary Public
My commission expires: _04/30/2020_

North Carolina
Yancey County

# *Harry W. Townes, PhD*

*Professional Mechanical Engineer*

285 Montana Highway 55
Whitehall, Montana 59759-9736

Business: 406-287-3565
Mobile:    406-491-7636
Email: hwtownes@hughes.net

January 26, 2015

Mr. Spencer Veysey
Montana Innocence Project
Missoula, MT

RE: State of Montana vs. Ms. Katie Garding

Dear Mr. Veysey,

As per your request I have reviewed the information in this case. The major and obvious flaw in the State of Montana's case against Ms. Garding is the total lack of damage to the front of the Garding Blazer of the type which could be attributed to impact with a pedestrian. The rationale presented by two of the State's witnesses for the lack of damage is incorrect and will be addressed.

## Opinion # 1

It is beyond a reasonable doubt that the 1994 Chevrolet S10 Blazer 4DR[1] owned by Ms. Katie Garding on January 1, 2008 did not strike Mr. Bronson Parsons.

## Basis for Opinion # 1

There is no damage to the front of the Garding vehicle which can be attributed to striking a pedestrian[2]. The arguments that the damage was reduced due to various causes, implies that there was some damage done during the collision. The fact is that there was no damage at all[3], so there was no damage to be reduced[4].

I inspected the Garding vehicle[5] on June 25, 2014 and took photographs. The visual inspection showed no damage which could be attributed to a pedestrian collision.

The photographs of the Garding Blazer which I have taken or received are assembled in the sub directory **Garding Vehicle Photographs** with sub directories by source. The photographs, other than my own, were provided by Mr. Spencer Veysey of the Montana Innocence Project (MTIP). All photographs are included for inspection; three are shown here.

---

[1] VIN 1GNDT13Z2R2141802
[2] There was prior damage below the grill to the bumper.
[3] Troopers Hader and Novak testified there was no damage to the front.
[4] The rationalizations of Troopers Novak and Hader will be addressed later in detail.
[5] Also inspected the exemplar vehicle VIN 1GNDT13W4R2148532

1



Fig. 1 Photograph **DSCHF0015 08-0020.JPG** Garding Blazer (MTIP)



Fig. 2 Photograph **DSCF0012.JPG** Garding Blazer (MTIP)

PCR EXHIBIT 0032



Fig. 3 H. W. Townes Photograph **048.jpg** Garding Blazer

The reader will note that some of the photographs show that samples have been cut from the Blazer hood, as is the case in the last shown taken by hwt. The removal of sample material was done by the Montana Crime Laboratory.

There was prior damage to the Garding vehicle, below the level of the grill, to the front bumper. A quick, crude but serviceable replacement bumper was installed by an unknown previous owner and in place at the time Ms. Garding acquired the vehicle. The replacement bumper is a length of 3x3 inch square steel tubing welded to the vehicle frame, and is not a custom bumper.

There is a small dent in the in the top of the hood just to the right of center shown in photograph **H W Townes\48.jpg**[6] which is not due to pedestrian impact and not mentioned in the testimony of Troopers Hader, Novak or Strauch . The cause of this dent is unknown.



Fig. 4 Photograph **DSCHF00021 08-0020.JPG** Garding Vehicle

---

[6] And other photographs of the Garding vehicle.

PCR EXHIBIT 0033

Fig. 4 shows that there was no damage to the right side of the vehicle or right side rear view mirror.

In his Court Testimony Trooper Hader affirms no damage to front end on the Harding Blazer.

535:16

> Q. Okay. And did you note any damage to her vehicle when you examined it?
>
> A. I did not.

535:21

> A. You know, I don't remember if the light was broken
> or not. What was in my mind was on that was I was going to
> have a vehicle with heavy front-end damage and **that didn't
> have any damage up front[7].**

535:25 – 532:1

> Q. Okay. So you didn't note anything, any damage of her vehicle, correct?
>
> A. Yeah. I do not recall about the light.

On 543:7

> Q. And then your -- based on your observations of Mr.
> Parsons, you then changed your idea about what the damage to
> the vehicle would be; is that right?
>
> A. Yes.
>
> Q. So instead of looking for a heavy front-end
> damage, you're now looking for minor front-end damage.
>
> A. Correct.

Trooper Hader testified in three instances that he observed "no damage" to the front end of the Garding vehicle, and then changes to looking for "minor damage." If there is "no damage" then there is no "minor damage" as well. The lack of any damage whatsoever to the front of the Garding vehicle attributable to a pedestrian impact is a critical flaw in the assertion by Troopers Hader and Novak that the Garding vehicle struck Mr. Parsons.

There were two ways that Trooper Hader worked around this flaw, the first was by asserting that the front bumper struck only Mr. Parsons' left calf.

496:3

> Q. And how were the injuries suffered by Mr. Parsons different from full-frontal impact injuries?
>
> A. **Basically all I saw on Mr. Parsons was a bruise on his left calf.[8]** He had some road rash
> around his flank area and then obviously it appeared that his -- his head injury that -- happened
> when he hit the pavement. If you strike a -- a square vehicle, even a round front-end vehicle,
> you're going to have some form of impact whether it's broken ribs or more bruising and that, and
> there was nothing that indicated that his body struck anything that way.

497:16

> and in this case it appears that the only thing that was struck on Mr. Parsons was his left calf[9]

A postmortem examination of Mr. Parsons was done by Dr. Gary E. Dale, MD, State Medical Examiner and the results of the examination documented in Medical Examiner Report 2.pdf, dated 08-01-04 (January 8, 2004). The following quote is from Page 3, Paragraph 3 of the Report:

> "Slightly swollen 3-4 inch hematomas are distributed over the medial malleoli. Faint blue-purple
> bilateral calf contusions are distributed between 9 and 16 inches above the heel. Bilateral calf
> incisions extending to the popliteal fossae reveal subcutaneous fat contusions, primarily between
> 11 and 19 inches above the heels, with extensive subaponeurotic hemorrhage throughout the
> length of the incisions. Between 14 and 17 inches above the heels are lacerations of the
> gastrocnemii and soleus muscles. A postmortem radiograph reveals a slightly displaced left fibular
> fracture 11 inches above the heel."

---

[7] Emphasis added by hwt.
[8] Emphasis added by hwt.
[9] Trooper Hader is indirectly saying that Mr. Parsons was moved at least 90 ft approximately when struck only on the left calf.

4

PCR EXHIBIT 0034

It is clear that Dr. Dale is describing injuries to both calves, which included a left fibular fracture.

Trooper Novak consulted directly with Dr. Dale and disputes Trooper Hader's left calf only theory.

1190:16

> Q. Was that consistent with the injuries sustained to Mr. Parsons' calf muscles?

> A. The injury described to me by Dr. Dale, both at the time and in his report that I referenced and read, there was something he described as an area of -- of injury, very significant injury, that was 3 inches wide across the back of **both**[10] of Mr. Parsons' calves.

**Based on the postmortem report of Dr. Dale, it is my opinion that the "left calf only" vehicle strike testified to by Trooper Hader is invalid and the pedestrian/vehicle overlap was sufficient for the bumper of the vehicle which struck Mr. Parsons to contact both of Mr. Parsons calves[11].**

Trooper Novak describes an impact with contact with both calves, which should have produced front end damage on the Blazer, damage which is not there.

Both Troopers Novak and Hader further incorrectly attribute the lack of front end damage to the vehicle turning or swerving.

Hader 497:11

> Q. Trooper Hader, if this was a swerving-type impact, how would that affect the damages that you would see on the vehicle itself?

> A. Your vehicle damage is going to be minimal, especially if you're swerving in -- in what part of the body, and in this case it appears that the only thing that was struck on Mr. Parsons was his left calf. So you're going to eliminate -- and then you put the fact that you have a big steel, aftermarket bumper on this vehicle, and you're going to minimize the damage to the front end of this vehicle again.

Hader 497:22

> Q. Trooper Hader, was it these two facts then, the injuries to Mr. Parsons' body and the fact of the tire marks indicating a swerving vehicle, that caused you to change the scope of your investigation?

498:1

> A. It was.

Trooper Novak rationalizes the lack of damage by saying that the vehicle was turning back towards the road and the collision was "more of a clip." When both calves of the pedestrian are involved, the collision is not a "clip."

Novak 1156:8

> Q. What did you formulate was the damage that you were looking for?

> A. I felt I should be looking for a vehicle with minor front-end damage on the right side.

> Q. And did Dr. Dale agree with you?

> A. Not initially.

> Q. Was there some information that you shared with Dr. Dale that changed his opinion on what you were looking for?

> A. I believe so, yes.

> Q. What do you believe that was?

> A. Oh, I told him we had several witnesses who described it as a dark SUV, and when I first talked to him, he said he thought it was probably a small car.

> Q. Did he say why?

> A. Not that I recall.

> Q. Did you share with him any information that you learned from Mr. Barry about the path of travel of the

---

[10] Emphasis added by hwt.
[11] Referred to as a "full-frontal impact" in the testimony.

PCR EXHIBIT 0035

1157:1

vehicle that impacted his opinion?

A. Yes.

Q. What did you share?

A. <u>Shared the fact that it was steering back towards the road. It was -- it was in the middle of the turn, I guess, a slight turn you could say.</u>[12]

Q. Did that -- did he think then it was feasible that an SUV could be involved?

A. Yes. To -- to describe the -- the type of collision that I felt we -- had occurred, <u>I described it to Dr. Dale as more of a clip I guess you could say.</u>[13]

Q. And he felt that that scenario was consistent with the injuries that he observed?

A. Yes.

Neither Trooper Hader nor Novak presented any **quantitative** information to support their theory that turning was responsible for the lack of damage. The next section will show, with quantitative values, that the turning theory is incorrect.

## Turning and Vehicle Damage, Quantitative

The turning of the vehicle falls far short of having any effect on vehicle damage, even in the best case favoring the opinions of the two Troopers. The physical theory of the Troopers for the turning of the vehicle mitigating or completely eliminating damage apparently is that the front of the vehicle moves to the side during turning (to the left in this case in a left turn) and thus at least partially bypasses or sheds the pedestrian, thus mitigating or eliminating entirely damage to the vehicle.

The downfall of the turning theory is that the side motion due to turning is very small compared to the forward motion of the vehicle. Damage to the vehicle starts before the completion of the first forward foot of motion after contact is made with the pedestrian, well before any significant side motion due to turning takes place.

The next two "photographs" are frame grabs taken from the high speed video (1000 frames/sec) of the Karco crash test. The first, **Fig. 5 Camera View-09 Frame 0 0 ft Contact**, is the initial contact with the left leg of the Anthropomorphic Test Dummy (ATD). The second, **Fig. 6A Camera View-09 Frame 19 - 1 ft Forward Motion**, shows the vehicle and ATD after 1 ft. of forward motion of the vehicle past the initial contact. The third, **Fig. 6B**, is an enlargement of contact region of Frame 19 and shows that damage to the vehicle hood has begun.

The speed of the test vehicle was 35.31 mph which is 621.5 in/sec. At Frame 19, 0.019 sec after contact the vehicle has moved 621.5 in/sec x 0.019 sec or 11.81 in. At the next Frame 20, the forward movement is 12.43in.



Camera View-01

Frame # 0

---

[12] Emphasis added by hwt.
[13] Emphasis added by hwt.

PCR EXHIBIT 0036

Fig. 5A Camera View-09 Frame 0 - 0 ft Contact



Fig. 5B Enlargement Camera View-09 Frame 0 - 0 ft Contact



Fig. 6A Camera View-09 Frame 19 - 1 ft Forward Motion

7

PCR EXHIBIT 0037



Fig. 6B Enlargement Camera View-09 Frame 19 - 1 ft Forward Motion

Fig 6B, Frame 19 shows that the hip region of the ATD has moved well into contact with the front of the hood after the vehicle has moved forward 1 ft past the initial contact of Frame 0. At this point in time, 0.019 sec after initial contact, the front hood of the vehicle is being damaged.

Consider the following hypothetical and impossible situation, chosen only because it most heavily favors the theory that turning mitigates/eliminates damage to the vehicle. The side motion of the vehicle front during turning is a maximum for a given forward travel distance when the turning circle diameter of the vehicle is a minimum, a full lock turn. The minimum turning circle diameter for the Blazer is 35 ft[14], and for a 1 ft forward motion of the vehicle, the front[15] moves to the left 0.37 inches relative to the initial position.

For a turning circle diameter of 430 ft[16], which is closer to that of the track in the snow, the front moves to the left 0.028 inches relative to the initial position for the same 1 ft forward motion.

See the file **Mathcad - Vehicle Y Motion Turning.pdf** for the calculations. Appendix B shows the development of the equations used in the Mathcad file.

The side motions of 0.37 and 0.028 inches are insufficient to mitigate, much less eliminate, damage to the vehicle during the first foot of motion, at the completion of which, damage has occurred and is increased by further forward motion of the vehicle.

Fig 7A, Frame 60 shows the position of the ATD for approximately 3.1 ft of forward motion of the vehicle after contact. Damage to the front and top of the hood is occurring. The side motion of the vehicle is 3.6 and 0.27 inches respectively for the two cases, too small to have any effect on the damage to the vehicle even after 3.1 ft of motion beyond the initial contact.

---

[14] From Expert Auto Stats data sheet shown in "SUV-1994_CHEVROLET_BLAZER_S10_4_DOOR_4X4.txt"
[15] At the approximate position of the ATD.
[16] The 430 ft is from the determination of the profile of the track in the snow, recovered by using photogrammetry from a frame grab of the video in Trooper Novak's vehicle.

PCR EXHIBIT 0038



Fig. 7A Camera View-09 Frame 60 - 3.1 ft Forward Motion.jpg



Fig. 7B Enlargement Camera View-09 Frame 60 - 3.1 ft Forward Motion.jpg

The bumper does nothing to mitigate damage to the front and top of the hood as can be seen in Figs. 5, 6 and 7.

Had the Garding Blazer struck Mr. Parsons there would have been damage to the front of the hood, but as booth Troopers testified, there was no damage. The Garding Blazer did not strike Mr. Parsons.

PCR EXHIBIT 0039

## Collision Speed

The collision speed of the vehicle, in a vehicle/pedestrian collision, can be determined by using correlations for the relationships between vehicle speed, the total travel distance of the pedestrian from impact to rest and in some instances the friction coefficient of sliding for the pedestrian. The two references used by the author are:

1. "Equations and Formulas for the Traffic Accident Investigator and Reconstructionist," Second Edition. C. Gregory Russell, Lawyers & Judges Publishing Company, Inc., Tucson, Arizona, ISBM-13: 978-0-913875-69-8.

2. "Pedestrian and Cyclist Impact", Ciaran Simms & Denis Wood, Solid Mechanics and It's Applications, Volume 166, Series Editor G.M.L. Gladwell, 2009 Springer Science+Business Media, B.V.

The full details of the calculations for the vehicle speed are shown in the MathCad files **Mathcad - Vehicle Speed Russell.pdf** and **Mathcad - Vehicle Speed Simms.pdf**. The total distance from impact to rest was set at 90 and 150 ft.

At the 99.9 percent confidence level the means and ranges are:

|  | ---------- 90 ft --------------- | | ------------150 ft ------------ | |
| --- | --- | --- | --- | --- |
|  | Mean [mph] | Range [mph] | Mean [mph] | Range [mph] |
| Russell | 37 | 16-58 | 49 | 23-76 |
| Simms &Wood | 40 | 27-53 | 52 | 35-68 |

An additional consideration is that the speed of the vehicle must be sufficient to produce a fatality. The fatality rate for pedestrians vs. the vehicle speed was examined in the paper "Pedestrian fatality risk as a function of car impact speed", Erik Rosén, Ulrich Sander, Accident Analysis and Prevention 41 (2009) 536–542. Their data base consisted of 490 vehicle-pedestrian collisions with 36 fatalities. Equations (2) and (3) of the paper are regression equations for the fatality rate vs. the vehicle speed. The following table was constructed using Equations (2) and (3).

| Speed [mph] | Percent Fatal | Percent Fatal @ 25 yrs |
| --- | --- | --- |
| 30 | 7 | 3 |
| 35 | 14 | 6 |
| 40 | 25 | 12 |
| 50 | 58 | 39 |

Trooper Novak in his trial testimony estimated 150 o travel distance from collision to rest, the minimum would be 90 ft, the distance from the beer cans to rest.

1205:22

> A. My apologies. That would be roughly 150 feet.
> Q. Okay. So from -- just to be clear. So from the tire tracks that you most likely think are from the run vehicle to where the body ultimately laid is about 150 feet.

1206:1

> A. I would say yes.

With a 90 ft travel distance the mean speeds shown above are 37-40 mph and at 150 ft are 49-52 mph. The collision speed selected for the Karco collision test was a nominal 35 mph which is below minimum mean speed of 37 mph at 90 ft and well below the mean speeds for the 150 ft distance. Note also that the 35 mph speed has a mean 6 percent probability of fatality for a 25 year old.

## Karco Collision Test

On October 17, 2014 a Vehicle to Pedestrian Impact was run by KARCO Engineering, LLC located in Adelanto, CA. The complete information can be found in the subdirectory **Karco Test output**.

The exemplar vehicle used in the test was a 1994 Chevrolet S10 Blazer 4DR, VIN 1GNDT13W4R2148532. The front bumper of the exemplar was replaced with a 3x3 in steel tube to match that of the Garding Blazer.

PCR EXHIBIT 0040



Fig. 8 Photograph DSCF0012.JPG Front of Garding Blazer (MTIP)



Fig. 9 Karco Photograph 019.jpg Front of Exemplar Vehicle Before Crash Test[17]

---

[17] The tow chains release before contact with the ATD.

PCR EXHIBIT 0041



Fig. 10 Karco Photograph 020.jpg Front of Exemplar Vehicle After Crash Test

The setup and results for the test are documented in "TR-P34165-01-NC Complete Report.pdf."

Had the Garding Blazer hit Mr. Parsons at approximately 35 mph the damage to the front would be similar to that shown Fig 10. The Garding Blazer shows **no damage** due to a pedestrian impact.

In the development of this disclosure I utilized my educational background and experience in collision reconstruction. Other information reviewed or used, which has not been previously referenced, included:

1. The MHP report, photographs and videos, total station data.
2. The trial testimony of Troopers Hader and Novak.
3. Other information supplied by the Montana Innocence Project.
4. My inspection of the scene and photographs taken at that time.
5. My inspection of the Garding Blazer, the exemplar Blazer and photographs taken.
6. The Karco collision test and report.
7. The computer programs Mathcad, Design CAD 3DMAX and PhotoWinPro (photogrammetry).

Sincerely,

Harry W. Townes

Harry W. Townes

PCR EXHIBIT 0042

## Appendix A    Photogrammetry

Photogrammetry is a method for obtaining reliable dimensional information from one or more photographs. In this case the "photograph" used was a frame from the video camera in Trooper Novak's vehicle. Fig.11 below shows the frame used in the photogrammetric dimensional analysis.



Fig. 11 Frame Trooper Novak's Video

Fig. 12 shows the same frame with the points used in the photogrammetric analysis. Points 91-95 were used to find the radius of curvature along the track in the snow. The computation is shown in the file **"Mathcad - Radius of Curvature Tire Track Points 91-95.pdf."**

Other points in the photograph include control points, the beer cans and the fog line which have known or partially known coordinates and serve to "scale" the photograph.

13

PCR EXHIBIT 0043



Fig. 12 Photogrammetry Points

The tire track points shown in Fig. 12 were transferred to the drawing **"Scene Drawing hwt.pdf."**

PCR EXHIBIT 0044

# Appendix B    Geometry of Turning

The following shows the development of the equations used in the file **Mathcad - Vehicle Y Motion Turning.pdf**.  Fig. 13 is a drawing of point motion in a turn.  The angle is much exaggerated in order to show distances; the equations remain the same for large or small angles.



Figure 13 Geometry of Turning

The distance O-A is the radius of the turning circle, R.  The point starts at A and moves along the circumference of the circle to B, the distance in the Mathcad program represented as FD with an arc length of 1 ft.

The angle is equal to FD/R with units of radians and represented in the Mathcad program as theta.

The line B-C is perpendicular to the line O-A.  So the distance O-C is R*cos(theta).

The distance A-C (YD in the Mathcad program), the side motion, is then R − R*cos(theta), or R*(1-cos(theta)), which is the equation used in the Mathcad file.

In the case of the turning radius of approximately 215 ft, and a forward motion of 1 ft, the angle is 0.27 deg and the distance A-C (YD) side motion is 0.028 in.

PCR EXHIBIT 0045





**FRIEDMAN RESEARCH CORPORATION**

# Analysis of Claimed Garding Pedestrian Impact

## Preliminary Report

### PREPARED FOR

**Spencer Veysey**
Montana Innocence Project
http://www.mtinnocenceproject.org/

December 19, 2014

<u>**CONFIDENTIAL**</u>

# I. QUALIFICATIONS

Keith Friedman has been involved in the field of research and development of transportation safety for over 35 years. Since graduating from Cornell University's Engineering Physics Department, he has been a project and test engineer for Minicars, Inc., and President of Kinetic Research, Inc., MCR Technology, Inc., and now of Friedman Research Corporation.

He has published over 80 research papers on the subject of improved vehicle design and automotive safety engineering, and has presented his findings at conferences in Austria, Australia, Ireland, France, Germany, Japan, Greece, and Italy, as well as in the United States. He holds active membership in the Society of Automotive Engineers (SAE), the Institute of Electrical Engineers, the American Society of Mechanical Engineers, and the American Association for the Advancement of Science.

He is a member of SAE's Impact and Rollover Test Procedure Standards Committee among others and is a peer reviewer for numerous national and international conferences and journals related to vehicle design, accident reconstruction, crash analysis, vehicle electronics, restraint design and evaluation, fires and crashworthiness.

In the last 15 years, he has conducted over 400 detailed systems analyses of catastrophic injury accidents in accordance with a protocol published by SAE.

He has extensive experience with vehicle to pedestrian impacts including having conducted both physical and virtual vehicle to pedestrian impact tests as part of research and development work for the U.S. Department of Transportation in addition to real world crash investigations.

His work has included most kinds of automotive related tests including component tests, sled tests, anthropometric dummy tests, and full scale vehicle tests representing impacts in the front, side and rear and rollover impact modes, pedestrian, large animal, and bicyclist impacts. In addition, his research has included extensive computer modeling and simulation of dummy, human, vehicle, and component impacts, as well as cadaver testing and live subject testing.

PCR EXHIBIT 0047

His studies have involved the protection of occupants of cars, pickups, SUVs, vans, buses, heavy trucks, as well as pedestrians, bicyclists, motorcyclists, during impact events and covered sizes of people ranging from infants to adults.

He is the author of numerous reports and safety studies for the United States Department of Transportation involving, among other things, statistical analyses of crash conditions and their relationship to injuries, effects of recent design changes on vehicle safety performance, passive restraint performance in passenger vehicles, dynamic crash testing, static crush testing and crashworthiness.

Mr. Friedman's CV is contained in Attachment "A".

PCR EXHIBIT 0048

## II. APPROACH

For the purpose of characterizing our opinions and the basis for them, we use an established scientific systems analysis method.  Systems analysis is a rational approach to crash and injury investigation that considers all aspects of the automotive system throughout the full crash sequence.  This analysis enables us to assess various hypotheses related to an impact event.

Our traditional systems analysis uses well-established methodology and protocols. This analysis focuses only on relevant information and the performance of systems operating in accordance with experimental evidence and the laws of physics.

Our opinions integrate all currently available, relevant information.

PCR EXHIBIT 0049

## IV. MATERIALS REVIEWED

- Montana Highway Patrol Fatal Crash Report, East Missoula Fatal Hit and Run, Case #010108-45, Fatal Crash #0800017820101, January 1, 2008.
- Police accident scene photographs.
- Coroner Photographs
- Accident and Exemplar vehicle photographs
- Exemplar and Surrogate inspection photos
- Missoula County Sheriff's Department, County Coroner Report for Entry No: 3176, Decedent Name: Bronson David Parsons
- Forensic Science Division, Department of Justice, State of Montana, Crime Scene Analysis, Agency Case # 0800017820101, Lab Case # FSD-08-000020
- Testimony of  Alice Ammen
- Testimony of Dr. Gary E. Dale
- Testimony of Judith L. Hoffmann
- Testimony of Trooper Richard Hader
- Testimony of Trooper Robert Strauch
- Transcript of Tape Recorded Interview of Daniel Dean Barry, recorded on January 1, 2008.
- Friedman Research Corporation Crash Test Photographs
- Karco Pedestrian Impact Test, October 17, 2014
- Karco Pedestrian Impact Test Report TR-P34165-01-A
- Karco Pedestrian impact Test Video
- Vehicle specification information various sources Decodethis, Autostats, etc.
- Exemplar vehicle and parts
- Discussions with other experts
- References
- Bibliographies 1-7

PCR EXHIBIT 0050

## III. DESCRIPTION OF ACCIDENT EVENT

On January 1, 2008 Mr. Bronson Parsons and Mr. Dan Berry were walking in the direction of traffic along the side of Highway 200 East Road in Missoula, Montana. Mr. Parsons, who was closest to the road, was impacted by a vehicle and carried along until he fell off the hood of the vehicle. The striking vehicle did not stop and Mr. Parsons subsequently died from his injuries.

PCR EXHIBIT 0051

# V. POLICE ACCIDENT REPORT

## Summary of report

| Document Title | Montana Highway Patrol Fatal Crash Report, East Missoula Fatal Hit and Run<br>Date January 1, 2008 |
|---|---|
| Date and Time of Accident | January 1, 2008, ~1:40am |
| Location | North shoulder of Old Highway 200 East (FAU 8112) at milepost 1.7 in East Missoula.  Impact point ~335 feet east of Clyde Street |
| Description of Roadway | East/West two lane highway. Both east and west bound lanes have an improved shoulder.   Paved asphalt highway. Area where accident occurred is flat with no curves and no lights illuminating the highway. |
| Conditions | Night, clear, dry roadway, plowed shoulder |
| Vehicle Description | Dark Pickup or SUV |
| Pedestrian Information | Mr. Bronson David Parsons, DOB: 5/9/1982<br>Mr. Daniel Berry |

## Police Diagram



*Garding Case Analysis*
7 of 31  CONFIDENTIAL

PCR EXHIBIT 0052

# VI. GARDING VEHICLE

VIN:                      1GNDT13W4R2148532
Year/Make/Model:          1994 Chevrolet Blazer
Body Style:               Sport Utility Vehicle, 4WD
Engine Type:              4.3L V6 OHV 12V
Manufactured in:          United States
Vehicle Weight:           3,776 lbs (Curb weight)
  * Information from manufacturer's VIN plate on vehicle  ** Information from www.decodethis.com

PCR EXHIBIT 0053

# VII. MONTANA HIGHWAY PATROL ACCIDENT RECONSTRUCTION

The right front of the vehicle impacted Mr. Parsons[1].

The vehicle impacted Mr. Parsons as it steered back toward the roadway.[2]

The vehicle would have extensive front end damage.[3]

Mr. Parsons came to rest approximately 150 feet from the point of impact[4].

Mr. Parsons came to rest approximately 90 feet from the point of impact[5].

---

[1] Trial Transcript Pg. 1139 Line 17
[2] Trial Transcript Pg. 1140 Line 7
[3] Trial Transcript Pg. 490 Lines 3-9
[4] Trial Transcript Pg. 1205 Line 22
[5] Trial Transcript Pg. 1204 Line 7- 14, Pg. 1279 Line 25

PCR EXHIBIT 0054

# VIII. INJURIES

**Bronson Parsons – Pedestrian 1**

| Age | 26 years old | Missoula County Sheriff's Department, County Coroner Report for Entry No: 3176, Decedent Name: Bronson David Parsons |
|---|---|---|
| Height | 6'1" | Missoula County Sheriff's Department, County Coroner Report for Entry No: 3176, Decedent Name: Bronson David Parsons |
| Weight | 200 lbs | Missoula County Sheriff's Department, County Coroner Report for Entry No: 3176, Decedent Name: Bronson David Parsons |



Fatality – Basal skull fracture with sheared carotid arteries

Basal Skull Fracture with sheared carotid arteries

Bruising on and around right eye

Abrasions – stomach area

Abrasions - lower back and above buttocks

Abrasions on right calf and knee
Bruising on right calf

Bruising on left calf

PCR EXHIBIT 0055

# IX. PEDESTRIAN IMPACT ANALYSIS

The analysis of an impact between a person of the stature of Mr. Parsons and a vehicle like Ms. Garding's consisted of several steps.

1. Accident reconstruction information was obtained
2. Pedestrian information was obtained.
3. Information on Ms. Garding's vehicle was obtained.
4. Virtual testing of a pedestrian impact between Ms. Garding's vehicle and a pedestrian like Mr. Parsons was conducted
5. Physical testing of a pedestrian like Mr. Parsons and a vehicle like Ms. Garding was conducted.
6. Comparison of the vehicle damage observed in both virtual and physical testing with Ms. Garding's vehicle

## 1.     Accident reconstruction information obtained and reviewed

Accident reconstruction information was obtained from Mr. Townes.  Ultimately his conclusion was that the vehicle that impacted Mr. Parsons did so at a velocity between about 27 and 53 mph.

Police pictures and various videos from the time of the accident were reviewed.

Police report information and trial testimony were obtained and reviewed.

Testimony from various witnesses was obtained and reviewed.

## 2.     Pedestrian information was obtained

Mr. Parsons was approximately 6'1" and 200 lbs. He was wearing running shoes, jacket and jeans at the time of the accident.  He was 26 years old.

Medical examiner reports and testimony were obtained and examined.

PCR EXHIBIT 0056

### 3.    Information on Ms. Garding's vehicle was obtained.

Ms. Garding's vehicle was a 4 wheel drive 1994 Chevrolet S10 Blazer with a square tube bumper welded to front of the vehicle. Pictures of the vehicle taken more than a year after the accident are shown below.



<u>4.</u>



*Garding Case Analysis*
12 of 31  CONFIDENTIAL

PCR EXHIBIT 0057

## 4.   Virtual testing of a pedestrian impact between Ms. Garding's vehicle and a pedestrian like Mr. Parsons was conducted

Virtual testing was conducted utilizing the industry standard finite element simulation software, LS-DYNA[6].

A Hybrid III finite element dummy was scaled to be consistent with Mr. Parsons height and weight.

The Garding vehicle is a 1994 Chevrolet Blazer, which is based on the Chevrolet S10 pickup from the front end to the B-pillar (behind the driver). A finite element model of a 1997 Chevrolet S10 was found to be similar to the front end of the 1994 Chevrolet Blazer. The virtual model was modified to incorporate a square tube[7] that was consistent with the tub that was present on the Garding vehicle.

The height of the vehicle was adjusted to be approximately that reported to be present on the Garding vehicle.

Various pedestrian positions were examined. Three conditions were explored, involving 1) the dummy centered on the right front of the vehicle with legs together, 2) legs walking apart with the dummy centered on the right front, and 3) legs walking apart with the dummy moved to the extreme right hand side of the front end of the vehicle as shown here.



Impact simulations were conducted at speeds of 25, 30, 35, 40, 45, 50 mph for condition 1, while exploratory impacts at 35 mph were conducted for impact configurations 2 and 3.

---

[6] LS-DYNA Users Manual Version 971, Livermore Software Technology Corp., 2007
[7] Dimension of the Garding vehicle bumper was 3" x 3", the modeling used a 74 mm (2.91" x 2.91") bumper.

PCR EXHIBIT 0058

## Results

In all cases significant and notable damage to the vehicle was observed.

Example results showing the damage that resulted to the vehicle are illustrated for condition one, two and three below.

20 mph



25 mph



PCR EXHIBIT 0059

30 mph



35 mph



PCR EXHIBIT 0060

40 mph



45 mph



PCR EXHIBIT 0061

50 mph



35 mph on far right side of truck



PCR EXHIBIT 0062

As can be seen substantial damage was always observed in these impacts that would have been readily apart to an observer of the vehicle after an impact with a pedestrian.

Example illustration of the pedestrian kinematics shown below, illustrate that the pedestrian will deform the hood and then impact the windshield.







PCR EXHIBIT 0063

## 5.   Physical pedestrian impact testing using a vehicle like Ms. Garding and a dummy of similar size to Mr. Parsons was conducted.

To further illustrate the virtual testing analysis results a physical test was conducted. In this test a 1994 Chevrolet Blazer was modified to incorporate the square tube in place of the production bumper. The vehicle was loaded with 3 occupant simulators with the estimated respective masses that would have been present if the vehicle had been in a pedestrian impact with Mr. Parsons.

A Hybrid III dummy[8] was modified to have a height and mass within the reported range of Mr. Parsons height and weight. The standing dummy was positioned on the test track so as to be centered on the right front of the Blazer. The dummy was supported by light supports until the time of impact.



The 1994 Chevrolet Blazer was brought to speed of 35 mph and then allowed to impact the dummy from behind with the right front of the Blazer. The dummy was first contacted by the tube bumper, followed immediately by the contact between the hip/femur area of the dummy and the vehicle hood. The dummy rotated rearward such that the dummies back contacted the hood and its head impacted the windshield. The dummy was carried along for a distance, eventually falling of the vehicle and coming to rest about 120 feet from the point of impact. Substantial damage occurred during the impact with the hood and windshield as shown below.

---

[8] The Hybrid III is the standard anthropometric dummy utilized by the government for certification impact testing

PCR EXHIBIT 0064



PCR EXHIBIT 0065

Pedestrian kinematics similar to the virtual testing results were observed.




PCR EXHIBIT 0066

# X. REVIEW AND ANALYSIS OF PREVIOUS TESTIMONY

Two different policemen testified at the trial and presented two different descriptions of what happened in the accident that killed Mr. Parsons.

**Highway Patrol Scenario1** – Hit from behind in both legs by the bumper and never hits the body of the truck, and flies forward 90 feet, car swerves around the body so that they don't drive over the body

This scenario violates the laws of physics and impact mechanics as we have seen from both the virtual testing and the physical crash test results. A pedestrian impact between the bumper and both legs and somehow avoiding any contact with any other part of the vehicle causing the body to fly forward 90 feet, is a physical impossibility and violates the laws of physics and impact mechanics. An impact involving both legs and the bumper will necessarily involve impact of Mr. Parsons body with the hood and most likely the windshield. Impacts sufficient to cause Mr. Parsons to fly forward 90 feet would leave significant damage on the hood and windshield of the vehicle as we have shown through both virtual and physical testing.

**Highway Patrol Scenario 2** – Hit in just left leg and it is more of a clip and the Highway Patrolman bases that idea on the injuries he sees in the funeral parlor, the body is projected forward approximately 90'

This scenario violates the laws of physics and impact mechanics as we have seen from both the virtual testing and the physical crash test results. A pedestrian impact between the bumper and the lower left leg and somehow preventing any contact with any other part of the vehicle would not be sufficient to project the Mr. Parsons forward 90 feet. If one were to construct an impact in which only the left leg is impacted and no other part of the body contacts the truck, the leg, if not separated from the rest of his body, would move out of the way and rotate about the Mr. Parsons center of mass, leaving Mr. Parsons in a location very close to the point of impact.

**Eye witness - Dan Berry - Scenario 3 -** Mr. Parsons was hit from behind in both legs and is carried along by the car; says it slides off the side/A pillar on onto the ground; head and upper shoulders where the hood and windshield meet; body comes off the side of the vehicle and lands on the ground.

PCR EXHIBIT 0067

This scenario is consistent with the results of the crash test and virtual testing conducted in which the dummy was centered on the right bumper in a walking position. The dummy ended up about 120 feet from the point of impact.

PCR EXHIBIT 0068

## XI BACKGROUND LITERATURE

The literature from the 1970s to the present consistently report that fatal impacts involving adult pedestrians produce damage on the vehicle involving the hood and windshield areas.

In 1974, Schneider reported on about 100 pedestrian accidents. After comparing injury patterns of pedestrian impact with dummy tests and mathematical modeling, they concluded that experimental results may be applied to the analysis and reconstruction of actual automotive pedestrian collisions. General characteristics in virtually all crashes shown indicated clear vehicle damage when an adult serious or fatal pedestrian impact occurred.

In 1979, Ashton and Mackay reported that the pedestrian impact outcomes could be characterized by mostly survivable to mostly fatal accident outcomes. The graph below illustrates the transition to a greater than 50% probability of fatality at about 33 mph (~53 km/h).



Also in 1979, Danner reported on analysis of 2500 pedestrian impacts with cars in Germany with about 800 involving serious to fatal injuries. They found that where serious and fatal injuries were received, there were contacts with the hood, roof or windshield with the torso being fully accelerated after the initial impact.

PCR EXHIBIT 0069

In 2012, Peng studied 43 pedestrian impacts and utilized computer simulation to analyze head impacts into the windshield.



The literature reviewed indicates that fatal adult pedestrian impacts are likely to show significant damage to the hood, windshield and/or roof structure.

PCR EXHIBIT 0070

In 2003, Rooij reported that 4882 pedestrians died and 78000 were injured in the United States in 2001 during impacts with vehicles while there may be as many as 615,000 pedestrian fatalities worldwide. They reported that the bumper area generally causes lower limb injuries while contacts with the hood and windshield produce injuries to the thorax, head and neck. They used computer simulation for their analyses investigating pedestrian impacts of interest and comparison between accident and simulation damage.



In 2007, Cuerden reported on crashes in the United Kingdom and provides an example of pedestrian impact damage.



PCR EXHIBIT 0071

# XI. CONCLUSION

Within a reasonable degree of engineering certainty, Ms. Garding's vehicle was not the vehicle that impacted Mr. Parsons. The damage present on Ms. Garding's vehicle is in no way consistent with a pedestrian impact sufficient to kill a walking adult person.

Ms. Gardings vehicle was not involved in a fatal pedestrian impact as occurred with Mr. Parsons, because:

- The vehicle does not show evidence of a significant impact on the hood as we have shown would occurred in a fatal pedestrian impact with this vehicle front end

- The vehicle does not show evidence of a significant impact on the windshield as would likely have occurred in a fatal pedestrian impact with this vehicle front end

The testimony by the policemen in this case regarding pedestrian kinematics that would have occurred during an impact with the front end of this vehicle is incorrect. Their testimony regarding the interaction between Ms. Garding's vehicle and Mr. Parsons, violates the laws of physics given the front end design of this vehicle and Mr. Parsons body characteristics.

The claim by Dr. Dale that the leg injury is consistent with this vehicle because of the height of the bumper, does not show that this vehicle front end was involved in this crash. The height of bumper on this vehicle is consistent with virtually every other vehicle bumper in the United States, because the height of bumpers is mandated by the National Highway Traffic Safety Administration. The leg injury ascribed to the height of the bumper could have occurred from virtually any other bumper in the United States.

I have also investigated this matter sufficiently to be able to conclude that the research and facts reviewed show that Ms. Garding's vehicle was not involved in a fatal pedestrian impact on January 1, 2008.

The representation that Ms. Gardings vehicle was involved in the death of Mr. Parsons, was based on testimony that relied on an incorrect understanding and characterization of the physics involved in a pedestrian impact.

PCR EXHIBIT 0072

The basis for these opinions is my investigation, analysis, and testing associated with this accident, my 35 years of vehicle research experience, my investigation of hundreds of other accidents, knowledge of industry documents regarding pedestrian impacts, the application of the Live Subject Safety Research methodology, my pedestrian impact research and development work, and my analyses of pedestrian impact experiments and analyses conducted by manufacturers and research around the world.

As additional information becomes available my opinions may be revised and/or expanded.

_____

Keith Friedman

PCR EXHIBIT 0073

## Notes

All of the referenced documents, approaches and concepts mentioned in this document are expected to be used or demonstrated in trial exhibits. In addition, Mr. Friedman will reference demonstrative exhibits and illustrations to explain the vehicle's defective design and applicable mitigation approaches.

PCR EXHIBIT 0074

# REFERENCES

Schneider, H., Beier, G., "Experiment and Accident: Comparison of Dummy Test Results and Real Pedestrian Impacts," Society of Automotive Engineers, Paper 741177.

Danner, M., Langwieder, K., Wachter, W., "Injuries to Pedestrians in Real Accidents and Their Relation to Collision and Car Characteristics," Society of Automotive Engineers, Paper 791008.

Ashton, S J; MacKay, G M. "Some characteristics of the population who suffer trauma as pedestrians when hit by cars and some resulting implications", Proceedings of the 4th IRCOBI Conference 1979.

Van Rooij, L., Bhalla, K., Meissner, M., et al., "Pedestrian Crash Reconstruction Using Multi-Body Modeling With Geometrically Detailed, Validated Vehicle Models and Advanced Pedestrian Injury Criteria," The 18th Experimental Safety Vehicle Conference, Paper Number 468, 2003

Cuerden, R, Richards, D, Hill, J, "Pedestrians and Their Survivability at Different Impact Speeds", Enhanced Safety Vehicle Conference, 07-0440, 2007

Peng, Y., Deck, C. et al., "A Study of Kinematics of Adult Pedestrian and Head Impact Conditions in Case of Passenger Car Collisions Based on Real World Accident Data," IRCOBI Conference 2012, Paper IRC 12-82, pages 766-778.

PCR EXHIBIT 0075

# ATTACHMENT A

PCR EXHIBIT 0076



**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

# Keith Friedman
## Curriculum Vitae

Keith Friedman has been in the field of research and development of transportation safety for more than 35 years and currently is president of Friedman Research Corporation (FRC), with offices in Austin, Texas and Santa Barbara, California.  FRC performs accident reconstruction, vehicle design, and blast-protection research and development, with the vision of supporting industry by applying real-world injury investigations to the development of new products and design approaches.

## EXPERIENCE SUMMARY

- <u>Friedman Research Corporation,</u>
  Founder & President, 1992 to present

- <u>MCR Technology, Inc. 1979-1987</u>
  President, 1984-1987
  Vice-President, Kinetic Research Division, 1979-1984

- <u>Kinetic Research, Inc. 1976-1979</u>
  President, 1976-1979

- <u>Minicars, Inc. 1973-1976</u>
  Project and Test Engineer, 1973-1976

Extensive experience in transportation safety research, including:
- Accident analysis, reconstruction and simulation
- Occupant and restraint-structure impact simulation
- Analysis of occupant injury measures
- Analysis of crash conditions and relationship of injuries to crash conditions
- Advanced occupant protection system design, development and testing, including airbags,  air-belts and passive interiors
- Child seat, helmet and pedestrian impact testing, evaluation and countermeasure design
- Evaluation of safety design trends and the effects of alternative restraint-structure performance characteristics on occupant protection
- Relationships of dummy injury measures to human injury probabilities
- Unrestrained occupant protection systems
- Wide-ranging work in computer-based system design and software development, computer analysis, and dynamic impact modeling and simulations
- Extensive experience in crash testing and instrumentation

## EDUCATION

- <u>Cornell University</u>, B.S. Engineering Physics, 1973

 1508-B Ferguson Lane, Austin, TX 78754
81 David Love Place #216, Goleta, CA 93117

TEL: 512.247.2277
TEL: 805.683.1300

FAX: 512.727.5504
FAX: 805.880.8889

PCR EXHIBIT 0077

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

## MEMBERSHIPS

- American Association for the Advancement of Science
- American Society of Mechanical Engineers
- Institute of Electrical and Electronics Engineers
- Society of Automotive Engineers (SAE)
- International Society of Biomechanics
- National Association of Fire Investigators
    - Certified Fire Investigator
    - Certified Vehicle Investigator

## COMMITTEES

- Truck Crashworthiness Committee, SAE
- Body Engineering Committee, SAE
- Fire Safety Committee, SAE
- Impact and Rollover Test Procedures Standards Committee, SAE
- CMH-17 Crashworthiness Working Group, Composite Materials Handbook

## PUBLICATIONS and PRESENTATIONS

Friedman, K. RSV Phase II Accident Analysis Techniques, U.S. Department of Transportation 6th International Experimental Safety Vehicle Conference, Washington, D.C., 1976 (580-92)

Friedman, K. & Klimko, L. A. Some Considerations on Automotive Safety Ratings, U.S. Department of Transportation International Automotive Ratings Symposium, 1980

Friedman, K. & Klimko, L. A. Evaluating the Crashworthiness of Small Cars Using Accident Data, U.S. Department of Transportation 8th International Experimental Safety Vehicle Conference, Wolfsburg, Germany, 1980  (787-98)

Friedman, K. Relating Dummy Injury Measures to Human Injury, Transportation Research Board Summer Workshop, 1980

Friedman, D. & Friedman, K. D. Roof Collapse and Risk of Severe Head and Neck Injury, U.S. Department of Transportation 13th ESV Conference, Paris, France, 1991 (753-65)

Friedman, D. & Friedman, K. D. The Safe Road to Fuel Economy, Center for Auto Safety 1991 (1-31)

Friedman, D. & Friedman, K. Effectiveness of Current and Alternative Helmet Materials in the Prevention of Head and Neck Injuries as Measured by Biomechanical Parameters, U.S. DOT 19th International Workshop on Human Subjects and Biomechanical Research, 1991 (133-42)

Friedman, D., Friedman, K. D., Ditlow, C. M. & Nelson, D. C. The Relationship Between Safety and Fuel Economy, SAE Government/Industry Meeting, 1992

1508-B Ferguson Lane, Austin, TX 78754         TEL: 512.247.2277      FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117      TEL: 805.683.1300      FAX: 805.880.8889

PCR EXHIBIT 0078

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

Friedman, D. & Friedman, K. D. Head and Neck Injuries in LTV Rollovers and What to Do About It, U.S. Department of Transportation 20th International Workshop on Human Subjects and Biomechanical Research, Seattle, WA, 1992 (126-35)

Friedman, D. & Friedman, K. Mitigation of Head and Neck Trauma, ASME Biomechanics of Trauma Conference, 1993

Friedman, D. & Friedman, K. D. Frontal Offset and Angled Impact Passive Protection, Society of Automotive Engineers International Congress SAE 930637, 1993 (23-38)

Friedman, K., Friedman, D., Forrest, S., Meyer, S., Herbst, B., Chng, D. & Wang, P. Restraint Effectiveness During Rollover Motion, International Research Council on Biomechanics of Impact Conference, Dublin, Ireland, 1996 (303-09)

Friedman, K. & Friedman, D. Improved Vehicle Design for the Prevention of Head and Neck Injuries to Restrained Occupants In Rollover Accidents, International Enhanced Vehicle Safety Conference, 1996 (856-65)

Herbst, B., Forrest, S., Wang, P., Chng, D., Friedman, D. & Friedman, K. The Ability of 3 Point Safety Belts to Restrain Occupants in Rollover Crashes, International Enhanced Vehicle Safety Conference, Melbourne, Australia, 1996 (856-65)

Friedman, D. & Friedman, K. Upper Interior Head, Face and Neck Injury Experiments, International Enhanced Vehicle Safety Conference, Windsor, Ontario, Canada, 1998 (1772-77)

Friedman, D. & Friedman, K. Roof Crush Versus Occupant Injury from 1988 to 1992 NASS, Society of Automotive Engineers International Congress, SAE 980210, 1998 (15-17)

Friedman, K. & Friedman, D. Human Drop Tests of Restrained Occupants in a Small Passenger Car Compartment, ASME, Anaheim, California, 1998, Vol. G01077 (143-44)

Friedman, D. & Friedman, K. Contradictions in the Risk of Head and Neck Injury in Front, Side, Rear and Rollover Accidents, Third World Congress of Biomechanics, Sapporo, Japan, 1998

Friedman, K. & Mobrem, M. Vehicle Structural Design Utilizing Optimized Finite Element Modeling, Society of Automotive Engineers International Congress SAE 981013, 1998 (137-44)

Friedman, K., Gaston, F., Bish, J., Friedman, D. & Sances, A. Jr. An Investigation of Hybrid III and Living Human Drop Tests, Critical Review in Biomedical Engineering 26.5-6, 1998 (341-42)

Friedman, K. & Bish, J. Vehicle Design Crashworthiness Evaluation, International Symposium on Automotive Technology and Automation, Vienna, Austria 1999 (311-18)

Friedman, K., Gaston, F., Bish, J. & Sances, A. Jr. Mathematical Analysis of State Accident Data. 12th International Conference on Mathematics and Computer Modeling and Scientific Computing, Chicago, Illinois, 1999

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277      FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117      TEL: 805.683.1300      FAX: 805.880.8889



www.FriedmanResearch.com

Friedman, K., Gaston, F., Bish, J. & Friedman, D. Experimental Comparison of Inverted Dummy and Living Human Drop Tests, ASME Summer Bioengineering Conference, Big Sky, Montana, 1999 (149-51)

Friedman, K., Bish, J., Rogers, C. & Mobrem, M. Improvements in Vehicle Crashworthiness Through the Use of Optimized Finite Element Modeling, International Symposium on Automotive Technology and Automation, Vienna, Austria, 1999 (69-76)

Friedman, K., Gaston, F., Bish, J. & Sances, A. Jr. Seat Failure in Rear Impacts, International Mechanical Engineering Congress & Exposition, Nashville, Tennessee, 1999 (275-76)

Sances, A. Jr., Friedman, K. & Friedman, D. Human Inverted Drop Studies, Proceedings from the 7th Annual Rachidian Society Meeting, Kona, Hawaii 1999

Sances, A. Jr., Friedman, K., Gaston, F. & Bish, J. Serious Injury in Rear Vehicular Impacts, Biomedical Engineering Society, Engineering in Medicine and Biology Society, 1st Joint Conference, Atlanta, Georgia, 1999

Sances, A. Jr., Friedman, K., Gaston, F., Bish, J. & Rogers, C. Experimental Investigation and Finite Element Analysis of Vehicle Restraint Systems, ASME Summer Bioengineering Conference, Big Sky, Montana, 1999 (153-54)

Mobrem, M., Friedman, K. & Bish, J. Design Optimization of Vehicle Structures in Nonlinear Regions, National Agency of Finite Element Methods and Standards World Congress, Newport, Rhode Island, 1999 (441-52)

Bish, J., Friedman, K., Khadilkar, A. & Sances, A. Jr. Airbag Protection in Low and Moderate Impact, Advances in Bioengineering, ASME 2000 (249-50)

Friedman, K., Bish, J., Rogers, C., Hutchinson, J., Sances, A. Jr., Kumaresan, S. & Carlin, F. Finite Element Modeling of Protective Head Gear, 28(S1)T4,50 Annals of Biomedical Engineering, 2000

Friedman, K., Bish, J. & Sances, A. Jr. Mathematical Analysis of Accident Data Using Police Coded Injury and Medical Record Based Injury Coding, Mathematical Modeling and Scientific Computing, Vol.10, 2000 (375-79)

Friedman, K., Gaston, F. & Bish, J. An Investigation of Hybrid III and Living Human Drop Tests, Critical Reviews in Biomedical Engineering, 28.1-2, 2000 (219-33)

Sances, A. Jr., Carlin, F., Herbst, B., Forrest, S., Meyer, S., Khadilkar, A., Friedman, K. & Bish, J. Studies of Vehicular Padding Materials, Association for the Advancement of Automotive Medicine 44th Annual Proceedings, Chicago, Illinois, 2000 (134-45)

Hutchinson, J., Rogers, C., Bish, J., Friedman, K., Sances, A. & Kumaresan, S. Finite Element Analysis of a Bicycle Helmet, 10th International Conference on Biomedical Engineering, Singapore, 2000

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117          TEL: 805.683.1300          FAX: 805.880.8889

PCR EXHIBIT 0080

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

Sances, A. Jr., Kumaresan, S., Carlin, F. & Friedman, K.  Effectiveness of Airbags in Low and Moderate Impact, 10th International Conference on Biomedical Engineering, Singapore, 2000 (p 599)

Friedman, K., Kenney, T., Bish, J. & Kemal, A. Effects of Front Seat Performance Failure on Rear Seat Occupant Injuries in Rear Impacts, Advances in Bioengineering, ASME 2000 BED, Vol. 48 (251-52)

Sances, A. Jr., Carlin, F., Herbst, B., Forrest, S., Meyer, S., Khadilkar, A., Friedman, K., Bish, J., Vehicular Padding and Head Injury, FISITA World Automotive Congress, Seoul, Korea, 2000

Friedman, D., Nash, C., Friedman, K. & Sances, A. Jr. Mathematical Analysis and Review of Vehicular Rollovers, Mathematical Modeling and Scientific Computing 13.1-2 (94-97), 2001

Friedman, K., Hutchinson, J., Friedman, D. & Sances, A. Jr. Finite Element Analysis of Vehicle Roof Intrusion Velocity in Rollovers, Mathematical Modeling and Scientific Computing, 13.1-2 (169-75), 2001

Kumaresan, S., Sances, A. Jr., Hutchinson, J. & Friedman, K.  Biomechanical Analysis of Pediatric Impact Head Injury: A 3-D Finite Element Modeling Approach, ASME International Mechanical Engineering Congress and Exposition, BED-23102, Pp 1-2 New York, New York, 2001

Friedman, K. Comparison of Upper and Lower Hybrid III Dummy Neck Compression Forces under Vertical Loading, ASME International Mechanical Engineering Congress and Exposition, New York, New York, 2001

Hutchinson J., Rogers, C., Bish, J., Friedman, K., Sances, A. Jr. & Kumaresan, S. Finite Element Analysis of a Bicycle Helmet, Mathematical Modeling and Scientific Computing 13.1-2 (128-32), 2001

Kumaresan, S., Sances, A. Jr., Hutchinson, J. & Friedman, K.  Finite Element Analysis of Pediatric Head Injury, Fifth International Symposium on Computer Methods in Biomechanics and Biomedical Engineering, Rome, Italy, October 2001

Friedman, K. & Hutchinson, J.  A Study of the Effects of Roof and Restraint Characteristics on Injury Potential from Roof Impacts During Rollover, Fifth International Symposium on Computer Methods in Biomechanics and Biomedical Engineering, Rome, Italy, 2001

Friedman, K., Ireland, D. & Feraboli, P.  Strength Behavior of Metal-to-Metal and Metal-to-Composite Joints, IBEC 2001 International Body Engineering Conference, Paper 2001-01-3083, 2001

Feraboli, P., Masini, A. & Friedman, K.  Considerations on 6 Fiber Architectures of a Carbon/Epoxy Composite in the Design of a Vehicle Body, International Body Engineering Conference and Exhibition, Paris, France, 2002

Saczalski, K., Burton, J. L., Lewis, P. R. Jr., Friedman, K. & Saczalski, T. Study of Seat System Performance Related to Injury of Rear Seated Children & Infants in Rear Impacts, ASME International Mechanical Engineering Congress & Exposition, 2002

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117          TEL: 805.683.1300          FAX: 805.880.8889

**FRIEDMAN
RESEARCH
CORPORATION**

www.FriedmanResearch.com

Sances, A. Jr., Kumaresan, S., Daniels, D. & Friedman, K. Pediatric Airbag Injuries, ASME International Mechanical Engineering Congress & Exposition, New Orleans, Louisiana, 2002

Sances, A. Jr., Kumaresan, S., Carlin, F., Friedman, K. & Meyer, S. Biomechanical Injury Evaluation of Laminated Side Door Windows and Sunroof During Rollover Accidents, Rocky Mountain Bioengineering Symposium Spring Conference, Biloxi, Mississippi, 2003

Sances, A. Jr., Kumaresan, S., Carlin, F., Friedman, K. & Meyer, S. Biomechanics of Occupant Ejection During Rollover Accidents, Southern Biomedical Engineering Conference, 2003

Sances, A. Jr., Kumaresan, S., Friedman, K., Carlin, F. & Daniels, D. Biomechanics of Thoracic Spine Injuries in Motor Vehicle Rollover Accidents, International Symposium of Biomechanical Engineering, Thailand, 2004

Friedman, K., Holloway, E. & Kenney, T. Impact Induced Fires: Statistical Analysis of FARS and State Data Files1978-2001, SAE World Congress, Paper 2005-01-1421, Troy, Michigan, 2005

Friedman, K., Hutchinson, J. & Mihora, D. Biomechanical Simulation for Evaluation of Alternative Rollover Occupant Protection Systems Designs, IASTED Biomedical Engineering 2005, Edited by K. P. Adlassnig and M. Bracale, Innsbruck, Austria, 2005

Friedman, K., Mihora, D. & Hutchinson, J. Effects of Buckling on Intrusion Velocity Behavior, Sixth European Conference on Structural Dynamics, Paris, France, 2005

Friedman, K., Mihora, D., Hutchinson, J., Sances, A. Jr. & Kumaresan, S. Biomechanical Effects of Buckling Induced increases in intrusion Velocity Behavior, ASME Summer Bioengineering Conference, 2005 (B0312380)

Friedman, K., Holloway, E. & Kenney, T. Impact Induced Fires: Pickup Design Feature Analysis, 2006 SAE World Congress, Paper 2006-01-0550, Detroit, Michigan, 2006

Friedman, K., Hutchinson, J., Mihora, D. & Senesac, S. Glass into Eye Penetration Modeling and Analysis, 7th International Symposium on Computer Methods in Biomechanics and Biomedical Engineering, Côte d'Azur, France, March 22-25, 2006

Okçuoğlu , M., Friedman, K., Mihora, D., Hutchinson, J., Fink, K., Reid, S., & Chan, S. The Effects of Strengthened Roof Structures on Vehicle CG Height and Vehicle Stability, XVI Canadian Multidisciplinary Road Safety Conference, Winnipeg, Manitoba, June 11-14, 2006

Friedman, K., Mihora, D., Hutchinson, J., Sances, A. Jr. & Kumaresan, S. Bicycle Helmet Roll-off Prevention Design and Testing, XVI Canadian Multidisciplinary Road Safety Conference, Winnipeg, Manitoba, June 11-14, 2006

Friedman, K., Senesac, D., Mihora, D. & Hutchinson, J. Effects of Laminated and Tempered Glass on Occupant Retention System Design, 2006 International Crashworthiness Conference ICrash, Athens, Greece, July 4-7, 2006

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117       TEL: 805.683.1300          FAX: 805.880.8889

PCR EXHIBIT 0082



**www.FriedmanResearch.com**

Friedman, K., Hutchinson, J. & Mihora, D. Restrained Occupant Protection Performance Under Rollover Conditions Using an Intelligent Rollover Protection Subsystem, 2006 International Crashworthiness Conference ICrash, Athens, Greece, July 4-7, 2006

Friedman, K., Hutchinson, J., Weerth, E. & Mihora, D. Implementation of Composite Roof Structures in Transit Buses to Increase Rollover Roof Strength and Reduce the Likelihood of Rollover, 2006 International Crashworthiness Conference ICrash, Athens, Greece, July 4-7, 2006

Okçuoğlu , M., Friedman, K., Mihora, D., Hutchinson, J., Wiedmann, J., Fink, K., Reid, S. & Chan, S. Consideration of Vehicle Handling and Stability with Improved Roof Strength, 2006 International Crashworthiness Conference ICrash, Athens, Greece, July 4-7, 2006

Mihora, D., Hutchinson, J., Friedman, K., Valente, J., Flanagan, T., Sances, A. Jr. & Kumaresan, S. Biomechanical Evaluation of Helmet Retention Systems, 2006 International Crashworthiness Conference ICrash, Athens, Greece, July 4-7, 2006

Friedman, K., Mihora, D. & Hutchinson, J. Vehicle Roof Structure Design Evaluation Under Rollover Impact Conditions, 6th IASTED International Conference on Modeling, Simulation, and Optimization (MSO 2006), Gaborone, Botswana, September 11-13, 2006

Kumaresan, S., Sances, A. Jr., Carlin, F., Frieder R., Friedman, K. & Renfroe, D. Biomechanics of Side Impact Injuries: Evaluation of Seat Belt Restraint System, Occupant Kinematics and Injury Potential, IEEE Engineering in Medicine and Biology Society (87-90), WEC, June 3, 2006

Friedman, K., Hutchinson, J. & Mihora, D. Restrained Occupant Protection Performance Under Rollover Conditions Using an Intelligent Rollover Protection Subsystem, International Journal of Crashworthiness, (12:2, 109-114), 2007

Friedman, K., Hutchinson, J., Mihora, D., Kumar, S., Frieder, R. & Sances, A. Effect of Roof Strength in Injury Mitigation During Pole Impact, Rocky Mountain Bioengineering Symposium & International ISA Biomedical Sciences Instrumentation Symposium, Denver, CO, April 13-15, 2007

Friedman, K., Hutchinson, J., Weerth, E. & Mihora, D. Transit Bus Design Effects Utilizing Improved Steel or Fiber Reinforced Composite Structures, 2007 SAE World Congress, Paper 2007-01-0457, Detroit, Michigan, 2007

Friedman, K., Hutchinson, J., Bui, K., Senesac, S. & Mihora, D. Glass System Design for Head Impact Protection with Automotive Bullet Proof Glass, Glass Processing Days 2007, Tampere, Finland, June 15-18, 2007

Friedman, K., Hutchinson, J. & Mihora, D. Finite Element Modeling of Rollover Crash Tests with Hybrid III Dummies, ASME 2007 Summer Bioengineering Conference, Keystone, CO, June 20-24, 2007

Friedman, K., Hutchinson, J. & Mihora, D. Biomechanical Evaluation of a Rollover Occupant Protection Subsystem, 21st International Society of Biomechanics, Taipei, Taiwan, July 1-5, 2007

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117          TEL: 805.683.1300          FAX: 805.880.8889

PCR EXHIBIT 0083

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

Okçuoğlu, M., Friedman, K., Mihora, D., Hutchinson, J., Wiedmann, J., Fink, K., Reid, S. & Chan, S. Consideration of Vehicle Handling and Stability with Improved Roof Strength, International Journal of Crashworthiness, (12:5, 541-547), 2007

Friedman, K., Hutchinson, J. & Mihora, D. Finite Element Modeling of Rollover Crash Tests with Hybrid III Dummies, 2008 SAE World Congress, Paper 2008-01-1123, Detroit, Michigan, 2008

Hutchinson, J. & Friedman, K. Comparison of the Jordan Rollover System with an Over the Ground Rollover, ASME International Mechanical Engineering Congress and Exposition, IMECE 2008-68876, Boston, Massachusetts, 2008

Friedman, K. & Hutchinson, J. Review of the Existing Repeatable Vehicle Rollover Dynamic Physical Testing Methods, ASME International Mechanical Engineering Congress and Exposition, IMECE 2008-68751, Boston, Massachusetts, 2008

Kumar, S., Friedman, K., Hutchinson, J., Mihora, D., & Harcourt, J. Biomechanical Analysis of Child Restraint System, Rocky Mountain Bioengineering Symposium & International ISA Biomedical Sciences Instrumentation Symposium, (436-441), April, 2009

Kumar, S., Friedman, K., Hutchinson, J., Mihora, D. & Senesac, S. Biomechanical Considerations in Automotive Rollover Accidents: Occupant Kinematics and Vehicular Restraint System, Annual Biomedical Engineering Society Conference, BMES 2009-001791, 2009

Friedman, Keith. Opportunities for Improved Occupant Protection under Rollover Conditions, SAE Government/Industry Conference, Washington, D.C., January 25, 2011

Friedman, Keith, Hutchinson, John & Mihora, Dennis. Heavy Truck Crashes and Sleeper Cab Occupant Protection in Rollovers, Presented to the Transportation Research Board of the National Academy of Science, Washington, D.C., January 27, 2011

Mihora, D., Friedman, K., Hutchinson, J. Effect of friction between head and airbag fabric on ejection mitigation performance of side curtain airbag systems, 2011 SAE World Congress, April 11-13, 2011, Detroit, Michigan, Paper 2011-01-0004

Hutchinson, J., Friedman, K., Mihora, D. Finite Element Modeling Comparisons of Rollover Test Devices, 2011 SAE World Congress, April 11-13, 2011, Detroit, Michigan, Paper 2011-01-0011

Strickland, D.J., Kumar, S., Friedman, K., Hutchinson, J., Mobrem, D. Biomechanics of Head-Neck Injuries In Heavy Truck Motor Vehicle Accidents, 2011 BMES Annual Meeting, October 12-15, 2011, Hartford, Connecticut

K. Friedman, J. Hutchinson, D. Mihora, Finite Element Modeling of Restrained Occupant Partial Ejection under Rollover Conditions, International Crashworthiness Conference, Icrash 2012-052, July 2012 , Milan, Italy,

K. Friedman, J. Hutchinson, D. Mihora, Rollover Protection for Occupants of Heavy Truck Sleeper Cabs, Icrash 2012-050, July 2012, Milan, Italy.

1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA 93117       TEL: 805.683.1300          FAX: 805.880.8889



**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

D. Mihora, K. Friedman, J. Hutchinson, <u>Friction Between Steel and Asphalt Without Gouging Under Representative Rollover Impact Pressures</u>, ASME International Mechanical Engineering Congress, IMECE2012-88983, November 2012, Houston, TX

K. Friedman, J. Hutchinson, D. Mihora, <u>Examination of the Ability of Conceptual Airbag Systems to Affect Restrained Occupant Kinematics and Associated Neck Loads During Rollover Impact Conditions</u>, ASME International Mechanical Engineering Congress, IMECE202-88979, November 2012, Houston, TX.

K. Friedman, J. Hutchinson, D. Mihora, <u>The Potential Effects of Radar Activated Heavy Truck Front End Airbags on Struck Vehicles in Front and Rear End Impacts</u>, SAE Commercial Vehicle Engineering Congress, Oral Only Presentation, October 2013, Chicago, IL

K. Friedman, J. Hutchinson, D. Mihora, M. Stephens, <u>Opportunities for Improved Heavy Truck Occupant Protection in Rollover and Overhead Loading Impacts</u>, International Crashworthiness Conference (ICRASH) , August 2014 *(in press)*, Sarawak, Malaysia.

K. Friedman, J. Hutchinson, D. Mihora, <u>Opportunities Heavy Truck Front End Compatibility with Passenger Vehicles</u>, International Crashworthiness Conference (ICRASH) , August 2014 *(in press)*, Sarawak, Malaysia.

P. Feraboli, K. Friedman, <u>Heavy Truck Cab Design Using Forged Composite Technology</u>, SAE Commercial Vehicle Engineering Congress, Oral Only Presentation, October 2014 *(expected)*, Chicago, IL

## EXAMPLES OF TECHNICAL REPORTS (Not limited to list):

<u>Motorcoach side glazing baseline and alternative design finite element modeling of ejection control effectiveness, FRC-1097</u>

<u>Motorcoach side glazing alternative design, fabrication and testing, FRC-1095</u>

<u>Motorcoach side glazing ejection control baseline testing and evaluation. FRC1090</u>

<u>Heavy Truck Aerodynamics and the implications of alternative cab designs on fuel consumption using CFD modeling, FRC-1085</u>

<u>Study of the Effects of Seat Performance Failure on Rear Seat Occupant Injuries in Rear Impacts</u>, August 31, 1999, Friedman Research Corporation, Technical Note FRC-1037

<u>On the Probability of Severe Injury as a Function of Occupant Proximity to Roof Crush in Rollover Impacts</u>, 1986, MCR Technology Inc., MCR-TR-216

<u>Investigation of the Relationship of Injury and Injury Measures</u>, 1984, MCR Technology Inc., MCR-TR-192

<u>Baseline Crash Test Recommendations</u>, 1981, MCR Technology Inc., KR-TR-092



1508-B Ferguson Lane, Austin, TX 78754          TEL: 512.247.2277          FAX: 512.727.5504
81 David Love Place #216, Goleta, CA  93117     TEL: 805.683.1300          FAX: 805.880.8889



**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

Evaluation of Controls Standardization, 1981, U.S. Department of Transportation, Minicars Inc., KR-TR-093

On Developing Restraint-Structure Performance Recommendations, 1981, MCR Technology Inc., KR-TR-096

An Overview of Heavy Truck Safety Problems, 1980, Minicars Inc., KR-TR-063

Anthropometric Characteristics of Front Seat Occupants, 1980, Minicars Inc., KR-TR-065

Baseline AIS to Delta-V Matrices, 1980, MCR Technology Inc., KR-TR-054

Contributions of Impact Mode to Accident Exposure Probabilities, 1979, Kinetic Research Inc., KRI-TR-030

Controlled Expansion Round and Round-Nose Bullet Impacts with Porcine Thighs, 1980, Los Angeles Police/Coroner's Office

Effects of Recent Motor Vehicle Design Changes on Safety Performance, 1979, U.S. Department of Transportation, Kinetic Research Inc., KRI-TR-032

An Electronic Control System for Use in a Hybrid Vehicle: Preliminary Design, 1979, Minicars Inc., KR-TR-043

Health Effects of Low Level Ionizing Radiation, 1979, Nuclear Regulatory Commission, Kinetic Research Inc., KRI-TR-041

New Concepts in Control Systems and Electronics, 1979, Toyota Motor Corporation, Minicars Inc., KR-TR-044

The Observed Fatality Rate by Impact Mode, 1979, Kinetic Research Inc., KRI-TR-031

Property Damage Assessment Methodology, 1979, Kinetic Research Inc., KRI-TR-033

Side Impact Data Analysis: An Overview, 1979, Minicars Inc., KR-TR-045

An Automobile Safety System Cost Algorithm, 1978, Kinetic Research Inc., KRI-TR-025

Generalized Contact Point Distributions, 1978, Kinetic Research Inc., KRI-TR-024

Kinetic Research Accident Environment Simulation and Projection Model, 1978, KRI-TR-027

The Kinetic Research Automobile Crash Test Data Bank, 1978, Kinetic Research Inc., KRI-TR-026

Observed Fatality Rates for Recent Automotive Model Years in 1977, 1978, Kinetic Research Inc., KRI-TR-028

1508-B Ferguson Lane, Austin, TX  78754        TEL: 512.247.2277        FAX: 512.727.5504
81 David Love Place #216, Goleta, CA  93117        TEL: 805.683.1300        FAX: 805.880.8889



PCR EXHIBIT 0086



**www.FriedmanResearch.com**

Statistical Analysis of Crash Conditions and Their Relationship to Injuries, 1978, U.S. Department of Transportation, Kinetic Research Inc., KRI-TR-038

Statistical Analysis of Motor Vehicle Design Parameters for 1974-1977 Model Year Automobiles, 1978, Kinetic Research Inc., KRI-TR-021

Analysis of Advanced and Conventional Air Bag Restraint System Benefits in the Current and 1985 Accident Environment, 1977, Kinetic Research Inc., KRI-TR-012

Benefit Analysis for the Implementation of Alternative Restraint Systems up to the 1990 Time Frame, 1977, Kinetic Research Inc., KRI-TR-013

Effects of Increased Rear Seat Occupancy on Societal Loss Distributions in the 1985 Time Frame for a 2000-Pound Vehicle: Analysis and Methodology, 1977, Kinetic Research Inc., KRI-TR-011

Optimal Restraint System Selection and the Effects of Organizational Priorities: A Demonstration with a Fixed Performance Constraint, 1977, Kinetic Research Inc., KRI-TR-017

RSV Accident Analysis User's Manual, 1977, Kinetic Research Inc., KRI-TR-010

Accident Analysis for Phase IV Test Plan, 1976, Minicars Inc.

A Study of the Distribution of Impact Angles and Velocities in Vehicle-to-Vehicle Side Impacts, July, 1976, Minicars Inc.

Study of the Relationship of Injury Measures to Societal Loss in Side Impacts, 1976, Minicars Inc., KRI-TR-002

A Three Dimensional Multi-Mass Model of the Head-Neck System Applied to Analysis of Rear Oblique Impacts: A Preliminary Report, 1976, Kinetic Research Inc., KRI-TR-001

A Methodology to Relate Dummy Injury Measures to Observed Mean Societal Loss, 1975, Minicars Inc.

Advanced Air Bag Restraints for Standard Size Car Drivers, 1974, U.S. Department of Transportation, NTIS Number DOT-HS-801 173

Operational and Societal Cost Considerations for Taxicabs and New Paratransit Vehicle Designs, 1974, Minicars Inc.

## SAMPLE REPORTS & SAFETY STUDIES FROM MCR's CONTRACTUAL HISTORY
(Mostly for the U.S. Department of Transportation)
### 1971
1. Improved Air Bag Restraints for Front Seat Compact Car Occupants, 1971, DOT-HS-113-1-163

### 1972
2. Advanced Air Bag Restraints for Standard Size Car Drivers, 1972, DOT-HS-113-2-441

 1508-B Ferguson Lane, Austin, TX 78754      TEL: 512.247.2277      FAX: 512.727.5504
81 David Love Place #216, Goleta, CA  93117      TEL: 805.683.1300      FAX: 805.880.8889

PCR EXHIBIT 0087

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

<u>1973</u>

3.  <u>Advanced Air Bag Restraints for Subcompact Car Drivers</u>, 1973, DOT-HS-113-3-742
4.  <u>Improving the Crashworthiness of Subcompact Cars</u>, 1973, DOT-HS-112-3-746

<u>1974</u>

5.  <u>Improved Inflation Techniques for Large Car Passenger Restraints</u>, 1974, DOT-HS-344-3-690 SUBRR
6.  <u>Improved Inflation Techniques for Large Car Passenger Restraints</u>, 1974, DOT-HS-344-3-690 SUBOLIN
7.  <u>Inflatable Belt Development for Subcompact Car Passengers</u>, 1974, DOT-HS-4-00917
8.  <u>Research Safety Vehicle (RSV), Phase 1</u>, 1974, DOT-HS-00844

<u>1975</u>

9.  <u>Benefit Cost Analysis of FMVSS 208, Passive Restraints</u>, 1975, Allstate PO Contract 1098
10. <u>Research Safety Vehicle (RSV), Phase 2</u>, 1975, DOT-HS-5-01215

<u>1976</u>

11. <u>Development of a Solid Propellant Passenger Restraint System</u>, 1976, DOT-HS-1384
12. <u>Vehicle Integration and Evaluation of Small Car Passive Restraint Systems</u>, 1976, DOT-HS-601397
13. <u>Small Car Driver Inflatable Restraint System Evaluation</u>, 1976, DOT-HS-01449
14. <u>Anticipation of Future Motor Vehicle Safety Problems</u>, 1976, DOT-HS-1420
15. <u>Subcompact Vehicle Energy Absorbing Column Evaluation and Improvement</u>, 1976, DOT-HS-6-01449
16. <u>Compliance Testing of Passenger Cars for Compliance with FMVSS 208 and 301</u>, Proposal to DOT, 1976

<u>1977</u>

17. <u>Research Safety Vehicle (RSV), Phase 3a</u>, 1977, DOT-HS-7-01552
18. <u>Door Lock and Door Retention Component Tests for Compliance with FMVSS 206</u>, 1977, DOT-HS-7-01611
19. <u>Crash Protection System for Handicapped School and Transit Bus Occupants</u>, 1977, DOT-HS-7-01774
20. <u>Statistical Analysis of Crash Conditions and Their Relationship to Injuries</u>, 1977, DOT-HS-701559
21. <u>Effects of Recent Design Changes on Vehicle Safety Performance</u>, 1977, DOT-HS-7-01759
22. <u>Analysis of Cost Lead Time and Production Capabilities for the Implementation of Passive Restraint Systems in Automobiles</u>, 1977
23. <u>Analysis of Advanced and Conventional Airbag Restraint System Benefits in Current and 1985 Accident Analysis</u>, 1977

<u>1978</u>

24. <u>Small Car Front Seat Passenger Inflatable Restraint System</u>, 1978, DOT-HS-8-01809
25. <u>Analysis of GM Gas Cushion Restraint Systems</u>, 1978
26. <u>Fatal Accident Reporting System Data Enhancement</u>, 1978, DOT-HS-8-02025
27. <u>Basic Ordering Agreement for Dynamic Crash Testing</u>, Static Crush Testing and Engineering Support, 1978, DOT-HS-8-01941
28. <u>Research Safety Vehicle (RSV), Phase 4</u>, 1978, DOT-HS-8-02096, Task and Order Nos. 2-7
29. <u>Proposal for the Development of Passive Restraint Systems</u>, Toyota, 1978

PCR EXHIBIT 0088

**FRIEDMAN RESEARCH CORPORATION**

www.FriedmanResearch.com

30. Analysis and Development of BMW ACRS, 1978
31. Analysis and Development of Volvo ACRS, 1978
32. Basic Ordering Agreement for Evaluation of Passive Restraint Systems, Proposal to DOT, 1978
33. Development of Passive Restraint Systems Volkswagen, 1978

**1979**
34. Passive Restraint Development of Light Trucks and Vans, 1979, DOT-HS-9-02076
35. Upgrading of Volvo-Airbag System, 1979, DOT-HS-9-02178
36. Paratransit Vehicle Prototype, 1979, DOT-UT-90046
37. Horizontal Impact Sled Tests of Foam Filled Structures, 1979, Ford Motor Company, Contract No. 47-R-678378
38. Task Orders for Systems Analysis and Systems Engineering Studies, 1979, DOT-HS-9-02096
39. Automotive Ratings from Accident Data, 1979, DOT-HS-9-02069

**1980**
40. Mall Shuttle Transportation, 1980, Municipal Transportation District in Denver Contract 80UK-0007
41. Projection of the Effects of New "Frontal" Restraint Systems on Side-Impact Injuries and Fatalities: Preliminary Assessment, 1980

**1981**
42. Impact Attenuators: A Current Engineering Evaluation, 1981, FHWA Contract ETHA22-80C-07530
43. Rust Impact Bags, 1981, Beech Aircraft Corp. (USAF), PO #00086929-020
44. BOA for Restraints System Research and Development and Testing to FMVSS 208, 1981 Technical Proposal to DOT

**1982**
45. Study of Occupant Impact with Vehicle Interior Surfaces, Technical Proposal to U.S. DOT, 1982
46. Design and Development of Modified Production Vehicle for Enhanced Crashworthiness and Fuel Economy, Phase 1, 1982, DTNH22-81-C-07085
47. Air Bag Impact Attenuation System for MX Drone, Beech Contract MQM-107AX, Beech, 1982
48. Sled Test for Evaluating Child Safety Seat Effectiveness, 1983, DTNH22-83-C-06010
49. Development of a Sled Test to Replicate the Driver Steering Assembly Interaction in a Baseline Frontal Car Crash, 1983, DTNH22-83-C-06010
**1983**
50. Unrestrained Driver Protection, Contract #DTNH 22-83-D-57019

**TECHNICAL PAPER PEER REVIEWER FOR:**

Society of Automotive Engineers
International Journal of Crashworthiness
International Journal of Impact Engineering
American Society of Mechanical Engineers

**PATENTS**

Six U.S. Patents Received

1508-B Ferguson Lane, Austin, TX 78754
81 David Love Place #216, Goleta, CA 93117

TEL: 512.247.2277
TEL: 805.683.1300

FAX: 512.727.5504
FAX: 805.880.8889 



TEST REPORT FOR:

# Montana Innocence Project



**EXHIBIT**

I

TESTED TO:

**Vehicle to Pedestrian Impact**

*1994 Chevrolet Blazer 5-Door MPV*

*Hybrid III ATD*

PREPARED FOR:

**Montana Innocence Project**

**PO Box 7607**

**Missoula, MT 59807**

TEST REPORT NUMBER:

*TR-P34165-01-B*

REPORT DATE:

*November 21, 2014*

TEST DATE:

*October 17, 2014*

**KARCO Engineering, LLC.**
AUTOMOTIVE AND SAFETY TESTING FACILITY
9270 Holly Road, Adelanto, CA 92301
Tel: (760) 246-1672 Fax: (760) 246-8112
www.karco.com

PCR EXHIBIT 0090

KARCO Engineering compiled this publication for information gathering only. The findings and conclusions expressed in this publication are those of the authors and not necessarily those of any other organization. KARCO Engineering provides test services only and is not involved in consulting, product design or the manufacturing of any automotive products. KARCO does not warrant, supervise or monitor compliance of products or services except as specifically agreed to in writing. By their very nature, testing, analysis and other KARCO services are limited in scope and subject to expected measurement variability. No activity by KARCO Engineering can release a manufacturer from product or any other liability. The results, findings and conclusions expressed in this publication relate only to the items tested for the specific situation simulated in the test.

Tested By: _____

Mr. Mark Kratzke
Test Engineer

Report By: _____

Mr. Balbino A. Beltran
Project Engineer

Reviewed By: _____

Mr. Christian S. Suarez
Quality Assurance Manager

Approved By: _____

Mr. Michael L. Dunlap
Director of Operations

Approval Date: _____November 21, 2014_____

TR-P34165-01-B

PCR EXHIBIT 0091

## REVISION CONTROL LOG

### TR-P34165-01-B

| Revision | Date | Description |
|---|---|---|
| -NC | 11/21/14 | Original Test Report |
| -A | 12/08/14 | Corrected test vehicle model year on cover page to read "1994" instead of "1999" |
| -B | 01/06/14 | Corrected "Left Front Passenger" to read "Right Front Passenger" in Test Summary on page 1 and General Test Vehicle Data on page 4. Removed the word "minor" in Test Summary on page 1. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PCR EXHIBIT 0092

**TABLE OF CONTENTS**

| Section | | Page No. |
|---|---|---|
| 1 | Test Summary | 1 |
| 2 | Data Sheets | 2 |

| Data Sheets | | Page No. |
|---|---|---|
| 1 | General Test and Vehicle Parameter Data | 3 |
| 2 | Post-Test Data | 5 |

| Appendix | | Page No. |
|---|---|---|
| A | Photographs | A |

TR-P34165-01-B

PCR EXHIBIT 0093

# SECTION 1
# TEST SUMMARY

A 35 mph per hour standing pedestrian impact test was conducted for Montana Innocence Project. A 1994 Chevrolet Blazer 5-Door MPV impacted a standing Hybrid III 50th percentile anthropomorphic testing device (ATD) at a velocity of 35.31 mph. The test was conducted in accordance with client specifications at the KARCO Engineering, LLC. facility in Adelanto, CA on October 17, 2014.

The test vehicle was received with a modified front bumper. It was ballasted with water dummies at the driver, right front passenger, and left rear passenger seating positions. The vehicle's tire pressures were adjusted to 30 psi from the required value of 35 psi and a ratchet strap was also used on the vehicle's suspension, both of these were done to attain an 18.5 in. front bumper height.

The 50th percentile male ATD was ballasted with 8.0 lbs in the chest area and 12.0 lbs in the abdomen region, for a total weight of 198.0 lbs. The dummy was not instrumented for this test. The ATD was oriented with its back towards the vehicle and was offset 13.5 in. to the passenger side of the car from the vehicle center line. The ATD stood at a height of 5' 11" with its feet spaced 10.5 in. apart on center and its left foot rearward of the right foot. A 1.0 in. sole was placed inside the dummy's shoe and a 3.0 in. lumbar extension was used to achieve the client specified height. The dummy was propped up with three (3) wooden rods.

The 1994 Chevrolet Blazer impacted the ATD at a velocity of 35.31 mph. Upon impact the vehicle engaged the lower half of the dummy's body. The dummy rotated backward until its back impacted the hood of the vehicle, forcing its legs up in the air until it flipped over and dismounted to the passenger side of the vehicle. The dummy's head contacted the hood and windshield. The upper and lower torso contacted the vehicle's hood. The test vehicle experienced damage to its front end and the windshield was broken on impact. Photographs of the test vehicle damage can be found in Appendix A of this report. The vehicle was stopped remotely after the impact.

The impact event was documented using three (3) high speed video cameras. Pre- and Post-test photographs can be found in Appendix A of this report.

PCR EXHIBIT 0094

## SECTION 2

### DATA SHEETS

Test Vehicle:     1994 Chevrolet Blazer 5-Door MPV        Project No.:   P34165-01

Test Program:     35 mph Standing Pedestrian Impact       Test Date:     10/17/14

### CONVERSION FACTORS

| Quantity | Typical Application | Std Units | Metric Unit | Multiply By |
|----------|--------------------|-----------|-------------|-------------|
| Mass | Vehicle Weight | lb | kg | 0.4536 |
| Linear Velocity | Impact Velocity | miles/hr | km/hr | 1.609344 |
| Length or Distance | Measurements | in | mm | 25.4 |
| Volume | Fuel Systems | gal | liter | 3.785 |
| Volume | Small Fluids | oz | mL | 29.574 |
| Pressure | Tire Pressures | $lbf/in^2$ | kPa | 6.895 |
| Temperature | General Use | $^{o}F$ | $^{o}C$ | =(Tf -32)/1.8 |
| Force | Dynamic Forces | lbf | N | 4.448 |
| Moment | Torque | lbf-ft | N•m | 1.355 |

PCR EXHIBIT 0095

## DATA SHEET NO. 1

### GENERAL TEST AND VEHICLE PARAMETER DATA

Test Vehicle:       1994 Chevrolet Blazer 5-Door MPV         Project No.:   P34165-01

Test Program:       35 mph Standing Pedestrian Impact        Test Date:     10/17/14

### TEST VEHICLE INFORMATION AND OPTIONS

| Project Number | P34165-01 | Power Steering | Yes |
|---|---|---|---|
| Model Year | 1994 | Sunroof / T-Top | No |
| Make | Chevrolet | Running Boards | No |
| Model | Blazer | Tilt Steering Wheel | Yes |
| Body Style | 5-Door MPV | Power Seats | Yes |
| VIN | 1GNDT13W4R2148532 | Anti-Lock Brakes (ABS) | Yes |
| Body Color | Green | Automatic Door Locks (ADLs) | Yes |
| Odometer Reading (km / mi) | | Transmission Speeds | 4 |
| Engine Displacement (L) | 4.3 | Overdrive | Yes |
| Type / No. of Cylinders | 6 | Final Drive | 4 x 4 |
| Engine Placement | Longitudinal | Roof Rack | Yes |
| Transmission Type | Automatic | Other | None |

| Does Owner's Manual provide instructions to turn off automatic door locks? | N/A |
|---|---|

TR-P34165-01-B

PCR EXHIBIT 0096

## DATA SHEET NO. 1 ... (CONTINUED)

### GENERAL TEST AND VEHICLE PARAMETER DATA

Test Vehicle:      1994 Chevrolet Blazer 5-Door MPV      Project No.:   P34165-01

Test Program:      35 mph Standing Pedestrian Impact      Test Date:      10/17/14

### TEST VEHICLE WEIGHTS

| | Units | As Delivered Weights (UVW) | | | As Tested Weights (ATW) | | |
|---|---|---|---|---|---|---|---|
| | | Front Axle | Rear Axle | Total | Front Axle | Rear Axle | Total |
| Left | lbs | 1089.0 | 947.0 | | 1240.0 | 1044.0 | |
| Right | lbs | 1074.0 | 804.0 | | 1150.0 | 922.0 | |
| Ratio | % | 55.3% | 44.7% | 100.0% | 54.9% | 45.1% | 100.0% |
| Total | lbs | 2163.0 | 1751.0 | 3914.0 | 2390.0 | 1966.0 | 4356.0 |

### TARGET TEST WEIGHT CALCULATION

| Measured Parameter | Units | Value |
|---|---|---|
| Total Delivered Weight (UVW) | lbs | 3914.0 |
| Target Vehicle Test Weight | lbs | 4356.0 [1] |

### TEST VEHICLE ATTITUDES

| Condition | Units | LF | RF | LR | RR |
|---|---|---|---|---|---|
| Delivered | in | 32.28 | 33.86 | 31.57 | 32.87 |
| As Tested | in | 31.18 | 32.48 | 31.22 | 32.32 |

### GENERAL TEST VEHICLE DATA

| Measurement Description | Units | Value |
|---|---|---|
| Vehicle Bumper Height | in | 18.5 |
| Vehicle Hood Leading Edge Height | in | 37.3 |
| Driver Seat Ballast Weight | lbs | 190.0 |
| Right Front Passenger Seat Ballast Weight | lbs | 145.0 |
| Left Rear Passenger Seat Ballast Weight | lbs | 180.0 |

[1]Target Vehicle Test Weight was specified by client.

TR-P34165-01-B

PCR EXHIBIT 0097

## DATA SHEET NO. 2
### POST TEST DATA

Test Vehicle:    1994 Chevrolet Blazer 5-Door MPV    Project No.:  P34165-01

Test Program:    35 mph Standing Pedestrian Impact    Test Date:    10/17/14

### POST-TEST VEHICLE AND ATD LOCATIONS

| Item | | X (ft) | Y (ft) |
|---|---|---|---|
| Vehicle | Left Front Tire | 127.8 | 0.0 |
| | Right Front Tire | 127.6 | 5.0 |
| | Left Rear Tire | 119.0 | 0.0 |
| | Right Rear Tire | 119.0 | 4.9 |
| | Center Front Bumper | 138.7 | 2.7 |
| ATD | ATD Body | 121.8 | 10.8 |
| | Head Skin | 134.3 | 9.8 |
| | Skull Cap | 67.8 | 103.0 |
| | Left Shoe | 102.0 | 22.6 |
| | Right Shoe | 46.3 | 5.8 |

Coordinates:     +X = forward of impact plane

+Y = right of monorail center

PCR EXHIBIT 0098

**APPENDIX A**

**PHOTOGRAPHS**

A

TR-P34165-01-B

PCR EXHIBIT 0099

## TABLE OF PHOTOGRAPHS

| Figure | | Page |
|---|---|---|
| 1 | As-Received, Right Front ¾ View of Test Vehicle | A-1 |
| 2 | As-Received. Left Rear ¾ View of Test Vehicle | A-1 |
| 3 | Test Vehicle Manufacturer's Label | A-2 |
| 4 | Pre-Test Left Side View of Test Dummy | A-2 |
| 5 | Pre-Test Left Front ¾ View of Test Dummy | A-3 |
| 6 | Pre-Test Front View of Test Dummy | A-3 |
| 7 | Pre-Test Right Front ¾ View of Test Dummy | A-4 |
| 8 | Pre-Test Right Side View of Test Dummy | A-4 |
| 9 | Test Setup | A-5 |
| 10 | Test Setup | A-5 |
| 11 | Test Setup | A-6 |
| 12 | Post-Test | A-6 |
| 13 | Post-Test | A-7 |
| 14 | Post-Test | A-7 |
| 15 | Pre-Test Left Side View of Test Vehicle | A-8 |
| 16 | Post-Test Left Side View of Test Vehicle | A-8 |
| 17 | Pre-Test Left Front ¾ View of Test Vehicle | A-9 |
| 18 | Post-Test Left Front ¾ View of Test Vehicle | A-9 |
| 19 | Pre-Test Front View of Test Vehicle | A-10 |
| 20 | Post-Test Front View of Test Vehicle | A-10 |
| 21 | Pre-Test Right Front ¾ View of Test Vehicle | A-11 |
| 22 | Post-Test Right Front ¾ View of Test Vehicle | A-11 |
| 23 | Pre-Test Right Side View of Test Vehicle | A-12 |
| 24 | Post-Test Right Side View of Test Vehicle | A-12 |
| 25 | Post-Test View of Test Vehicle Damage | A-13 |
| 26 | Post-Test View of Test Vehicle Damage | A-13 |
| 27 | Post-Test View of Test Vehicle Damage | A-14 |
| 28 | Post-Test View of Test Vehicle Damage | A-14 |

TR-P34165-01-B

PCR EXHIBIT 0100



FIGURE 1. As-Received, Right Front ¾ View of Test Vehicle



FIGURE 2. As-Received, Left Rear ¾ View of Test Vehicle

TR-P34165-01-B

PCR EXHIBIT 0101



FIGURE 3. Test Vehicle Manufacturer's Label



FIGURE 4. Pre-Test Left Side View of Test Dummy

A-2                                        TR-P34165-01-B

PCR EXHIBIT 0102



FIGURE 5. Pre-Test Left Front ¾ View of Test Dummy



FIGURE 6. Pre-Test Front View of Test Dummy

A-3                                    TR-P34165-01-B



FIGURE 7. Pre-Test Right Front ¾ View of Test Dummy



FIGURE 8. Pre-Test Right Side View of Test Dummy

A-4                                            TR-P34165-01-B

PCR EXHIBIT 0104



FIGURE 9. Test Setup



FIGURE 10. Test Setup

TR-P34165-01-B

PCR EXHIBIT 0105



FIGURE 11. Test Setup



FIGURE 12. Post-Test

A-6                                        TR-P34165-01-B

PCR EXHIBIT 0106

TR-P34165-01-B

A-7



FIGURE 14, Post-Test



FIGURE 13, Post-Test

PCR EXHIBIT 0107



FIGURE 15. Pre-Test Left Side View of Test Vehicle



FIGURE 16. Post-Test Left Side View of Test Vehicle

PCR EXHIBIT 0108



FIGURE 17. Pre-Test Left Front ¾ View of Test Vehicle



FIGURE 18. Post-Test Left Front ¾ View of Test Vehicle

A-9                                              TR-P34165-01-B

PCR EXHIBIT 0109



FIGURE 19. Pre-Test Front View of Test Vehicle



FIGURE 20. Post-Test Front View of Test Vehicle

TR-P34165-01-B

PCR EXHIBIT 0110



FIGURE 21. Pre-Test Right Front ¾ View of Test Vehicle



FIGURE 22. Post-Test Right Front ¾ View of Test Vehicle

TR-P34165-01-B

PCR EXHIBIT 0111



FIGURE 23. Pre-Test Right Side View of Test Vehicle



FIGURE 24. Post-Test Right Side View of Test Vehicle

A-12                                    TR-P34165-01-B



FIGURE 25. Post-Test View of Test Vehicle Damage



FIGURE 26. Post-Test View of Test Vehicle Damage

A-13                                    TR-P34165-01-B

PCR EXHIBIT 0113



FIGURE 27. Post-Test View of Test Vehicle Damage



FIGURE 28. Post-Test View of Test Vehicle Damage

TR-P34165-01-B

PCR EXHIBIT 0114



EXHIBIT
J

## Rocky Mountain Investigations
### P. O. Box 532
### Meridian, Idaho 83680
### Phone: 208 888-7885  Fax: 208 887-1622

CASE: Garding Case Review        INVESTIGATOR:  Warren Schiffer

TRAFFIC FATALITY REVIEW FOR MONTANA INNOCENCE PROJECT

Date: Feb 28, 2014              DATE OF FATALITY:  01/01/2008

### SYNOPSIS

I was contacted and asked to review a vehicle pedestrian accident for the Montana Innocence Project.  I was provided with photos, investigative reports, witness reports, sheriff's department reports, coroner reports, crime lab reports, court transcripts from Highway Patrol Trooper testimony, and video from patrol car cameras.

### NARRATIVE

I carefully examined all the documents provided in this case.  There were several issues noted in this examination.  The first and foremost issue in this case is the contamination of the crime scene on the morning of the accident.  The crime scene was not secured by the Highway Patrol officer assigned to the accident.  The sheriff's department recognized the issue and at a later point attempted to cordon off the area to preserve evidence.  The sheriff's officer at the scene also expressed his concern with the highway patrol not providing a supervisor at the scene.  The sheriff's department called their On-Scene Commander, Sgt. Rio and also Undersheriff Crego.  Sgt. Rio expressed his concern to Officer Novak and was advised that his supervisor had been called and was not coming. These issues were important enough that both officers commented about the issues in their after action reports.

At the point the deputy tried to secure the area, he had noted several vehicles had been allowed to drive over the area of the possible initial point of impact obscuring any physical evidence that may have been present that was of a temporary nature.  Detective Walrod walked the scene and noted "there were different locations in the southbound (west) lane that did have small amounts of broken glass but not in significant amounts." Detective Walrod also commented that there was one shoe in the northbound roadway (east lane).  The photo submitted by Officer Novak shows the shoe on the shoulder of the roadway.  There is a concern at this point by this investigator that the shoes had been moved by person or persons unknown prior to the photographs and annotation of this physical evidence.  The shoes also could have been hit by vehicles not involved in the accident as they maneuvered around the body away from the scene.  The ambulance appears to have been driven in that area to where it was parked by the body.  The diagram from the Highway Patrol shows one shoe on the fog line area of the northbound (east lane) and the second shoe in the lot on the north side of the roadway.  It is also noted the

glass that Detective Walrod saw in the southbound travel lane was never collected and never commented on by Officer Novak even though this glass would have been in an area that temporary evidence such as headlight debris could have been deposited.

The second problem area is that a supervisor did not respond to the scene even though it was reported the pedestrian was not expected to survive. This was further compounded by not sending a traffic accident reconstructionist or a more experienced patrol officer to the scene to take charge and ensure all evidence in this case was secured. The case was then partially assigned the next day to a senior officer and accident reconstructionist, but there was no clear delineation of duties between this officer and the investigating officer. This resulted in a disjointed communication between the officers and had the officers going different directions without sharing the information effectively. Witnesses were talked to and investigation was done without sharing this information. It is further noted there never was a reconstruction of the scene nor does it appear there ever was a detailed inspection of the accident scene to look for temporary evidence. The training, education and experience of Trooper Hader should have led them to a reconstruction and detailed examination. The Highway Patrol has every asset available to them such as light trucks, overhead bucket trucks and more importantly the manpower to do a thorough examination. By failing to take advantage of all its resources to locate and find evidence of the striking vehicle it took away the only definitive evidence from them and also took this evidence away from Ms. Garding in proving her vehicle was or was not the striking vehicle.

One of the most important problems in this case is Ms. Garding's vehicle which the patrol eventually felt had been involved in this case. This case was a hit and run but the Garding vehicle was stopped the next day by the Highway Patrol. The senior patrol officer and traffic reconstructionist had indicated that this vehicle was stopped due to it fitting the description of the striking vehicle. The patrol officer then spent 11 seconds of a 30 minute traffic stop viewing the vehicle. This resulted in the patrol officer stating that this was not the vehicle and the vehicle was released. No photographs, measurements, notes or any type of documentation was provided by the accident reconstructionist on this vehicle in this case.

Debris was found on Mr. Parson's clothing. The failure of documenting evidence from Ms. Garding's vehicle took any chance to definitively prove if this was the striking vehicle, and also took from Ms. Garding any chance she had of clearing this vehicle as the striking vehicle. The debris could have been analyzed to definitively prove if the striking vehicle was or was not the Garding vehicle. However, another suspect vehicle of interest to the Highway Patrol was not only documented, but was turned over to the crime lab for analysis. This vehicle had damage and had clothing imprints in the bumper. No photos were provided of this vehicle, but due to a cell phone call on a tower south of Missoula rather than East Missoula this vehicle was cleared by the Highway Patrol even though it had more physical findings than the Garding vehicle. I have not seen any documentation that the cell towers always are accurate as it would appear atmospheric conditions could affect which tower they utilize. I could not find any mention of an

2

expert in this type of communications which testified as to the accuracy of cell towers and the location of the cell phone striking that tower.

Since the glass was not noted or collected that Detective Walrod found, it also took away any chance of definitely proving the Garding vehicle was or was not the striking vehicle. One piece of evidence Officer Novak indicated that he felt was the result of the striking vehicle was a tire mark.  He photographed this mark and then stated that the crime lab could not analyze this mark without a casting of the tire mark.  An analysis to eliminate the Garding vehicle by the use of this tire mark as being the striking vehicle did not need a casting of the tire mark.  This tire mark shown in the photo has 4 central ribs and then the outside edges of the tire.  If any vehicle had any other tire pattern, or as in this case any vehicles such as the Garding vehicle that had 5 central ribs could have been eliminated as suspect.  It does not appear this was ever done even with having the Garding vehicle impounded, even though the photos of this vehicle taken by the Sheriff's Department clearly document the 5 ribs.

A year later the patrol seized this vehicle and used its condition at that time as evidence. This vehicle had changed hands and had not been in the possession of Ms. Garding for approximately that same time period.  The condition of the vehicle hours after the accident should have been the only condition taken into account in this case.  The best evidence is the evidence most closely aligned to the time of the accident and not after such a long period has elapsed.  Statements regarding duct tape on the turn indicator was noted after a year to substantiate a witness when clearly the photo taken only weeks after the accident show clear packing type tape.

The Garding vehicle in question is a 1994 Chevy Blazer.  This vehicle had measurements taken by the investigating officer and shows an extended bumper at a height of approximately 18-19 inches.  The top of the hood on the passenger side is at approximately 38 inches.  These measurements do not take into account any passenger loading by the 3 known passengers of the vehicle.  This vehicle now needs to be examined in light of how the accident occurred to determine what type of evidence would be needed to conclude this was or was not the vehicle involved in striking Mr. Parsons.

The best evidence of how the accident occurred is given by a pedestrian, Dan Barry.  Mr. Barry was walking beside the struck pedestrian, Bronson Parsons.  Mr. Barry was apparently drinking and was to some degree influenced by alcohol at this point.  The accident also occurred in an unlighted area of the roadway at night.  Mr. Barry's recollection must be examined with the physical evidence to determine its value in this case.  Mr. Barry indicated that he was walking on the right side of the struck pedestrian, Bronson Parsons.  The struck pedestrian would have been closest to the fog line and the lane of travel.  The accident account by Mr. Barry is that they heard something and the next thing he recalls is his friend was struck by a Durango like vehicle and was being carried on the hood and windshield of the vehicle.  The pedestrian comes off the vehicle as its swerving back on to the highway and is deposited on the roadway.  Mr. Barry describes seeing Mr. Parson's arms waving and coming off the side of the vehicle after being carried on the hood.  The vehicle was again described as a dark colored Durango or

PCR EXHIBIT 0117

CASE:  Garding, Montana Innocence Project

a black pickup.  The patrol officers indicate the beer cans as the best area for the point of impact.  This analysis and supposition by Officer Novak does not take into account the travel of the body or the shoes.  It also assumes the cans belong to and were held by Mr. Parsons and Mr. Barry.  Mr. Barry's statement indicates that both he and Mr. Parsons took one can of beer prior to walking down the road.  Mr. Barry indicates both were holding cans of beer.  There are three cans noted and photographed on the edge of the roadway.  Which can is the can that Mr. Parsons held is unknown.  No tests were done to determine which can was held by Mr. Parsons.  Mr. Barry indicates that he set his beer down after the accident.  There is one beer in the photo that appears to have been set down in the snow.  Two others are noted further toward the roadway.  Placement of the center of impact could shift depending on which can the Mr. Parsons was holding. Detective Walrod indicates a shoe was in the roadway and Officer Novak noted the same shoe off the roadway over the fog line.  The direction of the shoes appears to be in the same line of travel as the east bound roadway.  This being the case, an assumption can be made that Mr. Parsons was on the east bound roadway and not in the parking/shoulder area of the roadway.  This is also more likely since the photographs show a layer of snow/ice on the right hand side of the parking/shoulder area.  This would have caused slippery footing and possible wandering out toward the fog line and into the roadway.

The body was then found with the head approximately centered in the lane of travel, further down the road.  This gives additional credibility to the body coming up onto the car and being carried down the roadway and then coming off on the right side of the hood/windshield area of the car, as described by Mr. Barry.  The vehicle was described as accelerating away, which would cast doubt on the body being launched forward since it would then have been run over by the vehicle.  This information, as well as glass being found by Mr. Walrod, would indicate an impact by the right headlight and would have resulted in damage to the headlight, driving light or parking light.  This type of damage did not occur to the Garding vehicle.

Presented with these facts, the impact to the striking vehicle can be placed on the right side front of the vehicle.  Measuring including hands of a normal person's width is approximately 22-24 inches.  Mr. Barry would have been walking to the right of Mr. Parsons and was not struck.  Mr. Barry would have also been close enough to touch hands with Mr. Parsons.  Assuming a normal set of pedestrians walking together, it was believed they would have been walking approximately 12 inches apart.  This would put the contact area within 36 inches from the right front corner of the striking vehicle to the center of the vehicle.  This would be in the headlight area or close to that area.  Mr. Parsons was a male 72 inches tall.  Forensic evidence shows that he was impacted from the rear on the back of his calves.  It also appears that he was stepping on his left foot as it sustained the break in the lower leg at approximately 11 inches above the heel.  Mr. Parson's center of mass would be at approximately 39 ½ inches which should be located above his waist. Further assumptions in this case need to be made due to a lack of physical evidence collected or viewed.  One further assumption is that the impact was over 20 mph as data indicates a break in the leg usually results starting around 20 mph.  Data also indicates only 5% fatalities occur at this speed so the impact speed is possibly greater around the 30 mph speed where fatalities occur at a higher percentage such as 40% of the cases.

4

PCR EXHIBIT 0118

CASE: Garding, Montana Innocence Project

Death in this case resulted from blunt force trauma to the back of the head and severed carotid arteries. It is probable that the head struck the windshield or possibly the A pillar on the car's windshield as the car's momentum carried it through the body. The only portion of the body that was focused on by the Highway Patrol was the impact to the calf area of Mr. Parsons. The forensic evidence in this case would indicate that a vehicle with a bumper in the area of 11-18 inches could have caused this trauma to the calves. This would encompass virtually every factory built vehicle that has not been modified in a small to mid-size range. Some large vehicles also fit this criterion. The lack of lumbar injury to this victim does not support a flat fronted vehicle such as the Garding vehicle.

Environmental conditions the morning of the accident were normal winter like conditions in Montana. Snow and ice can be seen along the roadway and onto the shoulder. It was stated it had snowed previously, but the road had blown clear of the snow. There was also gravel and other debris along the roadway. Vehicles traveling in Montana on these roads can expect to incur road grime from the snow, water and chemicals/sand placed on the road to improve traction. The striking vehicle in this case could be expected to have this same grime over all areas of the vehicle. Striking a pedestrian and carrying it up onto the hood and windshield would remove this grime over the areas the pedestrian was struck and moved over its surface. It would also deposit this debris onto the victims clothing. There was debris in the victim's clothing, but it was not compared to the Garding vehicle.

The Garding vehicle in this case was stopped on the same day as the accident in an unrelated traffic stop. Officer Hader, a seasoned reconstructionist, happened to be in the patrol vehicle as a passenger and suspected that this vehicle was possibly involved in the morning's accident. Officer Hader is viewed on the patrol car's camera walking to the front passenger side of the vehicle and looking at the vehicle. This examination was conducted for 11 seconds of the 30 minute traffic stop. No photos, documentation, or other evidence is collected and Officer Hader makes a judgment that this is not the vehicle involved. Video evidence does not show that the vehicle had been recently washed. Officer Haders' training, education and experience should have had him conduct a thorough investigation of this vehicle for these very types of contact damage. However, the Highway Patrol officers in this case do not photograph or in any way document this vehicle for approximately one year. Fortunately, the sheriff deputies working a separate case felt the need to document this car with photos and we are able to view this car approximately two weeks after the accident. These photos show heavy road grime and old damage to the vehicle on the right headlight and turn signal. The headlight is taped with packing type tape and there is an after-market turn signal held on by the same type of tape. There is a radio antennae on the passenger side just prior to the windshield. It is not bent or distorted. The windshield is intact. There is no blood visible on the vehicle and it does not have any rub type marks in the grime. There are no impact damage points on the hood. The license plate is intact and actually bent lengthwise out away from the vehicle. The turn indicator light is not bent backwards. There is no indication of pedestrian contact on the right passenger side of this vehicle. This information regarding this vehicle was present and available to Officer Hader and

PCR EXHIBIT 0119

Officer Novak. Officer Hader had total discretion to take this vehicle and document all damage to the vehicle and forever document its condition with photographs. This vehicle also could have had evidence collected to compare to the clothing debris to definitively show if this was or was not the striking vehicle. The Highway Patrol officers were then presented another chance to document the condition of this vehicle, just days later, when a person called the vehicle in as a tip.

The probability that the Garding vehicle was involved in this accident and sustained no damage is not probable. Mr. Parsons would have been first impacted by the bumper to the back of his legs. Mr. Parson's center of mass is just above the hood of the Blazer. The legs would have been impacting the bumper as the buttocks would have been impacting the grill and hood area. An impact of at least 20 mph by the buttocks of Mr. Parsons would have damaged a plastic grill and dented the hood of this vehicle. The barely attached turn indicator light would have been bent severely back, if not detached totally. Mr. Parsons would have continued to rotate up riding onto the hood and sliding across the hood onto the windshield with his head being snapped back in a whiplash type condition. This would have been the force applied to sever the carotid arteries. The resultant striking of the vehicle with the back of the head would have been the force to crush the skull and also damage the vehicle. The body was then described as coming off the hood/windshield passenger side onto the road. This would have severely bent or broken off the antennae of the Garding vehicle. The photo proof in this case shows none of this occurred and should have eliminated this vehicle from being the striking vehicle in this case. The blunt front end of the Blazer also causes issues with the body ramping up over the hood. It would be more likely that a smaller lower car with an angled hood was involved. This would be vehicle similar to a small S10 pickup, small vans, small SUV's and all with sloping fronts. Failure to document vehicle evidence in a timely manner creates issues with Officer Novak's assumption that duct tape was placed on the headlight on the day of the accident, as stated by one of the informants. The condition of the vehicle a year after the time of the accident was used to corroborate a witness's statement, when in fact the sheriff's department's photo refuted the witness. This failure to document deprived the Garding's from the information needed to clear the vehicle as the striking vehicle.

Quoting "Pedestrian Involved Traffic Collision Reconstruction Methodology" by Jerry J. Eubanks and W.R. Rusty Haight, 921591, "If a vehicle strikes a pedestrian and continues in its original direction at a constant velocity without slowing, the body will move in one of three ways. The body will (1) remain on the hood of the car near or at the windshield, (2) be ramped to the windshield and slide from the windshield to the ground off the side of the car or, (3) if the velocity is great enough, be projected up the windshield and over the roof behind the car." Mr. Barry's witness statement is clearly fitting the pedestrian being ramped to the windshield and sliding off the car's side.

The Garding vehicle has a very blunt front. It is more probable with the blunt front of the Blazer for the pedestrian to have been projected forward after his body had bent into an approximate 90 degree angle with the legs and lower body perpendicular to the front of the vehicle and bent just above the waist backward with the head striking the vehicle

PCR EXHIBIT 0120

CASE:  Garding, Montana Innocence Project

approximately 34 inches back from the front of the hood.  The facts in this case do not
support the body being projected forward, since it would have been run over by the
vehicle.  The witness stated the vehicle did not slow but in fact accelerated.  The only
way for the body to get onto the road without being run over is by flipping all the way
over the roof of the car and sliding off the rear or to have fallen off the side of the hood as
indicated by Mr. Barry.  There are several publicly viewable YouTube crash tests with
SUV's and cars.  One specific test shows a Honda midsize SUV with a slightly sloped
front end striking a dummy at 20 mph.  The crash shows the hood rising off the frame of
the car and then reverting back into place during the collision.  The pedestrian's head
contacted at the lower portion of the windshield before being projected off the front of
the car due to braking by the vehicle.  The hood clearly shows damage from the impact.
If the Garding vehicle had struck this pedestrian with the front of the 94 Blazer, this
damage should have been at least this visible, if not more.  This type of SUV (Honda)
with the sloped hood is a much more likely striking vehicle than the blunt nosed Blazer.

My review of the case now shifts to the witnesses and alleged driver of the Blazer, Ms.
Garding.  Mr. Parsons, when struck, would not only have stood out by creating a very
noisy impact, but would also have been very visible and unforgettable when his body
ramped onto the hood and against the windshield.  This would not have been a bump
where a person would not realize something significant had happened.  The right front
passenger indicated that he was talking to the person in the backseat, but the backseat
passenger would have been looking forward talking to the front passenger.  At least two
out of three persons in the car were looking forward and saw nothing.  The rear seat
passenger also did not hear anything.  As most persons traveling in a vehicle know, a
rock striking a windshield is very loud.  How much more so would a vehicle striking a
pedestrian with the front end of the vehicle and then the windshield?  To carry the body
for 100 feet would also have presented the front passenger sufficient time, as he stated, to
turn and see the victim still on the hood.  The driver, front passenger, and rear passenger
all stated they never saw the victim.

The driver of the car is irrefutably proven to be talking on the phone when this accident
had to have been occurring.  It is improbable to think that a person talking on the phone
would not have been startled and given out an exclamation when striking a pedestrian and
seeing the body come onto the car, into the windshield, and then off onto the roadway
while just continuing to talk.  The person on the other end of the conversation should also
have heard the impact, let alone the exclamation from the driver

Reviewing Dr. Dale's forensic pathology report and the report by the coroner regarding
body injuries, it is noted there are contusions to the calf region of both legs extending
from 11 inches to 19 inches above the heels.  Between 14 and 17 inches above the heels
are lacerations of the gastrocnemii and soleus muscles.  The slightly displaced fracture is
at 11 inches above the heel of the left fibula.  There is no mention of this same type of
contusion or laceration of muscles in the area of 38 inches in the lower back of the
victim.  Viewing the front of the Blazer and its blunt flat front, the hood would have
inflicted similar damage to this area of the victim.  With no damage being noted, it would
be more apparent that the striking vehicle had a sloped front allowing the body to bend

7

CASE:  Garding, Montana Innocence Project

from the knees backward spreading the striking force more uniformly over the body.
While the body was assuming the forward momentum of the striking vehicle, his body
would be depressed into the front grill area with at least 112,590 foot pounds of energy.
It would not be probable to think that, with this type of force exerted on the hood and
plastic grill, damage would not occur.

In direct examination of Officer Novak he indicates that when he first talked with Dr.
Dale that Dr. Dale "thought it was probably a small car".  Officer Novak indicated he
shared the fact that the vehicle was turning back toward the road and it was in the middle
of a slight turn.  Officer Novak states he described the type of collision as "more of a
clip".  Officer Novak states Dr. Dale then felt the scenario presented by Officer Novak
was consistent with the injuries he observed.  Officer Novak does not give any factual
data as how he reached this scenario and has no background or expertise in pedestrian
accidents to form such an opinion.  Evidence from the victim's right and left calf
indicates they were struck from the rear which does not indicate a "clip".  Dr. Dale
would be more qualified with his examination of the injuries to determine what parts of
the body were hit and if this was a "clip".  This information was passed to Dr. Dale as
fact when even the Highway Patrol reconstructionist on this case felt that the body may
have made a flip.  Further, the physical evidence of the body travel in this case is contrary
to a clip, and more accurately in compliance with Newton's first law as it was carried or
thrown in the direction imparted by the vehicle's travel.  The body traveled 100 to 150
feet south in the vehicle's travel direction prior to being deposited on the road.  A clip
with the car driving on the shoulder and the pedestrian on the shoulder would have
deposited the body within a few feet of impact and it would have been found on the
shoulder of the roadway by the fog line.  Using the actual area where the body was
deposited on the roadway, the car would have been driving somewhere in the area of the
roadway centerline and the victim would have been walking in the middle of the
eastbound lane of travel.  A clip does not fit the physical facts in this case and should
never have been told to a forensic specialist as fact.

A further review of the evidence that was allegedly found in this case is the scale diagram
and the objects resting positions.  Officer Novak circled a tire mark that he felt was the
hit and run vehicle.  This mark was within an area that contained glass fragments.  Visual
analyses of the photographs shows that the tire mark in the snow has four ridges and the
two outside edges.  The Garding vehicle had BF Goodrich Radial T/A tires with 5 ridges
and the outside edges.  This is documented in photos of the vehicle taken by Missoula
County deputies and the Highway Patrol photographs.  The glass photographed with this
tire mark appears to be old incidental debris along the road.  It is also outside the area
where an impact would have deposited the glass.

A vehicle pedestrian collision expects to have various degrees of temporary evidence that
must be found and documented immediately.  The first expected debris is debris that falls
from the car.  In this case it could be debris from winter driving such as snow, sand and
dirt.  Secondly, debris such as glass, plastic or even fluids can be deposited.  Also, there
should be steering input in this case as the driver was stated to have swerved to deposit
the victim after riding on the hood.  Shoes can be expected to leave a scuff on the

8

roadway at the point of impact. The body then leaves marks as it is projected down the roadway in the form of blue jeans fibers and dye embedded in the road, blood spots where it impacts the road and clothing or personal items deposited in the path of momentum. In this case there is a beer can on the shoulder allegedly in the area of impact. If one of these cans was in the hands of the victim, it would have had to have been the right hand and the can would have had to have dropped without much input from the vehicle. The can is slightly damaged and only moved a short distance where the witness indicated he set his can down. The only other noted evidence in this case were the shoes which could have been tampered with since they do not appear to be consistent in where they had been deposited.

## SUMMARY

It is my expert preliminary opinion in this case that the Garding S10 Blazer was not involved in the traffic fatality of Bronson Parsons. My opinion is that the vehicle that struck the pedestrian was a newer, smaller or midsize vehicle with a sloped front end. Facts that support this opinion are as follows:

*Blazer*
- Blunt front end with no recent front end damage to grill or hood
- Antennae undamaged when directly in line with expected victim path
- No debris removal from hood or bumper
- Old vehicle not expected to be "quiet"
- Tires have 5 ribs
- No contact windshield damage except from rock chip
- Bumper mounted light not removed or bent
- License plate not bent by contact with victim
- The contact area would have been with the turn signal light or the license plate if the pedestrian was struck with the right front by this vehicle.
- Lots of road grime debris should have been deposited on roadway. None noted.
- Forensic pathologist stated in his court testimony that no other injuries on the victim were consistent with striking the Blazer. There would have been injury to the torso with the flat front on the vehicle. The only injury stated that was possible was from the bumper which also included thousands of vehicles in the Missoula area.
- Law enforcement only connects that the Blazer was involved due to its having a bumper of similar height as the calf injury. They did not have any evidence of any other connection to the victim which is not probable as other damage was expected.

*Striking vehicle*
- Expected damage to front end hood, grill, and windshield area
- Should have sloped front end as victim had no injuries consistent with vehicle contact on torso
- May have bent antennae, or antennae encased in windshield that was not struck

9

CASE: Garding, Montana Innocence Project

- Should have debris removal on vehicle
- Newer vehicle would be quiet
- Highway Patrol photo has 4 rib tire mark they felt was contact vehicle
- Possible breakage of front marker lights/turn lights if so equipped
- Due to pattern injury to calf may have angled protrusion on bumper/grill

It is my expert preliminary opinion that Ms. Garding was not the driver of the vehicle that struck this victim. Facts that support this opinion:

- Ms. Garding was on the phone and gave no involuntary exclamation at a sudden unexpected event while on the phone.
- Ms. Garding's time line is not consistent with being in the area where the victim was struck.
- The witnesses to this event all were consistent in first interview that Ms. Garding was not the driver of the striking vehicle and the victim. Only subsequent changes to testimony by witnesses indicated Ms. Garding driving.
- Law enforcement provided inaccurate information to the forensic expert in this case and also to the county attorney prior to charging.
- Ms. Garding consistent with statement she was not the driver that struck victim

In conclusion, it is my opinion that the selective information that was used by non-credible witnesses and never supported with factual data to provide the basis for charges filed in this case, should never have been used. There is no forensic evidence taken from the Garding vehicle that supports it being the vehicle in this case. Evidence that the Blazer had a bumper should only have been used to state that it had a bumper similar in height. There is nothing to connect this bumper to the victim.

The body injuries to the victim are not consistent with an impact from a vehicle such as the Blazer. The forensic pathologist testified there was no damage to the victim's body consistent with striking this vehicle except the bumper area. There is no body damage to the Blazer that is consistent with an impact with a pedestrian. The tire mark allegedly left by the striking vehicle has 4 ribs and the Garding vehicle tires have 5 ribs. Ms. Garding was on the phone when the accident occurred and there was no accident recorded during this conversation. Officers neglected to safeguard the scene and allowed valuable evidence to be destroyed by other vehicles. Officers had the vehicle in custody at a traffic stop and could have proven this vehicle was or was not involved the day of the accident. The officer did not see any indication of striking the victim and released the vehicle. This inspection of the vehicle the day of the accident should have provided evidence that cast doubt on any further investigation into this person or vehicle as being involved in this case.

Rocky Mountain Investigations will do nothing further with this case unless new information is received.

10

PCR EXHIBIT 0124

CASE:  Garding, Montana Innocence Project

Respectfully,

Warren Schiffer
Rocky Mountain Investigations

11

PCR EXHIBIT 0125



EXHIBIT

$K$

## Rocky Mountain Investigations
## P. O. Box 532
## Meridian, Idaho 83680
## Phone: 208 888-7885  Fax: 208 887-1622

CASE: Garding Case Follow-up report          INVESTIGATOR:  Warren Schiffer

TRAFFIC FATALITY REVIEW FOR MONTANA INNOCENCE PROJECT

Date: March 1, 2015                          DATE OF FATALITY:  01/01/2008

### SYNOPSIS

This is a follow up report regarding a traffic fatality for the Montana Innocence Project.  I received information from the Montana Innocence Project from a crash test conducted by KARCO Engineering, LLC on October 17, 2014, a report by Harry Townes, PhD, and a report by Keith Friedman.

### NARRATIVE

Feb. 25, 2015, I met with Jeff Patterson who provided a DVD with videos, photographs and reports.  This information had been compiled in the past year since my original review of this case had been conducted.  I reviewed this information and used it to determine if the information was consistent with the results I had obtained from this investigation.

March 1, 2015
I again reviewed all the supplementary data that was received from the Innocence Project.  The findings of the crash test, the review of the case by Harry Townes PhD, and Keith Freidman was not only consistent with my findings but actually totally affirmed the findings that the 1994 S10 Blazer was not involved in an accident with Mr. Parsons.

Mr. Freidman is an expert in the field of traffic accident reconstruction and I have relied on his expertise over the years by his reports and testing in my investigations.  I am not familiar with Dr. Townes, but his curriculum vitae speaks of his qualifications in this field.  I have been involved with the crash testing process and the processes used by KARCO Engineering appear to meet very detailed and very complete.  These experts and the crash test all indicate the irrefutable fact that the 1994 Blazer (Garding vehicle), could not have been involved in the collision with pedestrian Mr. Parsons.  The experts also point to the issues of the erroneous findings of the Highway Patrol officers in this case.

My report of February 2014 is the result of my education and experience of 22 years on the Highway Patrol as an officer, supervisor and a traffic accident reconstructionist.  Even after retirement I continued in this field for the next 19 years.  I also applied my experience of Highway Patrol policies and procedures as I had been stationed in Missoula working as a traffic patrol officer and also as a supervisor.

Case:  Garding, Montana Innocence Project                    PCR EXHIBIT 0126

I was a reconstructionist for the 10 final years in Missoula. With this experience as having worked this exact area as a reconstructionist and supervisor this issue needs to be addressed.

During my time as a supervisor I was always called and always responded to a fatality or complicated traffic accident. If there was a time I could not respond the officer needing assistance would always be provided with an experienced officer to assist with the investigation until I could review the case and if needed do a reconstruction. Failures in policies and procedure in this case are:

1. Failing to have a supervisor respond
2. Failing to send a more experienced officer/reconstructionist
3. Failing to follow basic scene protection
4. Failing to conduct a reconstruction
5. Failing to conduct a coordinated investigation
6. Maintaining an officer in charge of the investigation
7. Failure to utilize the deputies who obviously were more experienced in scene protection
8. Failure to collect evidence at this scene
9. Failure to acknowledge more experienced experts such as Dr. Dale
10. Failure to document evidence such as the Garding vehicle by Trooper Hader
11. Failure to use witness evidence provided by Mr. Barry that the vehicle had round tail lights and was a Durango or pickup
12. Failing to maintain custody of the Garding vehicle and accepting as evidence the condition of the vehicle one year after the accident
13. Failing to utilize photos taken by deputies of the Garding vehicle weeks after the accident to refute evidence they claimed as fact on the front signal light tape
14. Providing information as fact that was supposition to support their position to the medical examiner and the county attorney

Mr. Freidman and Dr. Townes not only concurred that the investigation by the Highway Patrol officers was flawed, but their theories violated the laws of physics and impact mechanics. My report of February 2014 details issues regarding this case and the investigation by the patrol officers in this case. I will defer to that report for the detailed description of errors in their methodology of investigation in this accident. There are three main errors by the Highway Patrol officers and supervisors in this case.

1. No supervisor responded to the accident scene even after being contacted regarding the accident and having county officers suggest a supervisor should be called. There never was a mention of a supervisor being involved and coordinating the investigation.
2. Leaving an unseasoned officer in charge of a fatal pedestrian accident that needed an officer with expertise in temporary evidence present in these accidents and inherent issues these accident present.
3. Having a traffic accident reconstruction certified officer assist with the case that fails to use even the basic premises of traffic accident reconstruction in his investigation. Trooper Hader also fails to take control of the investigation and lead a coordinated effort in this case leaving both officers to take different courses in their investigation leaving two different accident scenarios at trial.

Case: Garding, Montana Innocence Project

## SUMMARY

The 1994 Chevy Blazer (Garding vehicle) was not the striking vehicle in this case. A review of this case by leading experts in the field and an impartial crash test show the flaws of the investigation and subsequent wrongful conclusion the Garding vehicle was involved. Any impartial traffic accident reconstructionist using the laws of physics and engineering dynamics involved in a pedestrian collision would come up with the same conclusion. Two different unsupported scenarios by officers at the trial, testimony by a witness who changed stories several times, and a vehicle with no supporting physical evidence do not prove beyond a reasonable doubt that the Garding vehicle was the striking vehicle or had anything to do with this accident.

Respectfully,

Warren L. Schiffer
Rocky Mountain Investigations

Case:  Garding, Montana Innocence Project



STATE OF MONTANA
DISTRICT COURT, MISSOULA COUNTY

- - - - - - - - - - - - - - - - - - - - - - - x
               :
STATE OF MONTANA,           :  NO.
               :
vs.               :  **AFFIDAVIT OF**
               :  **JEFFREY NEUSCHATZ, Ph.D.**
KATIE IRENE GARDING.     :
               :
- - - - - - - - - - - - - - - - - - - - - - - x

       I, Jeffrey Neuschatz, am of majority and swear under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am presently a professor of Psychology and Chair of the Psychology Department at the University of Alabama in Huntsville. I received a Bachelor of Arts degree from Roger Williams University in 1992, graduating *summa cum laude* in Psychology. I received a Master of Arts degree in Experimental Psychology from the State University of New York at Cortland in 1994, and a Ph.D. in Cognitive Psychology from Binghamton University in 1999. I have been studying issues related to the confluence between the field of psychology and the legal system for twenty years. Over the preceding five years I have designed and executed numerous studies focusing my academic inquiry into issues pertaining to accomplice witness testimony, jailhouse informant testimony, confessions and secondary confessions and how this evidence influences jurors. I have published dozens of articles on these topics in peer-reviewed journals, written peer-invited chapters, and presented my research findings at regional and national conferences. I have been qualified as an expert in approximately 60 criminal cases in six states and military courts. A copy of my *curriculum vitae* is attached as Exhibit A.

*False Testimony's Role in Wrongful Convictions*

2. False accomplice witness testimony is a leading cause of wrongful convictions in the United States. A 1990 report by a Los Angeles County Grand Jury titled "Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles

1

County" exposed a culture of utilizing and rewarding inmates who provided incriminating and often fabricated information about other inmates' purported confessions. For this comprehensive report, the grand jury interviewed 120 witnesses and reviewed thousands of documents including court transcripts, internal memos, and district attorney files. It concluded that the typical jailhouse informant was someone who was incarcerated and facing a lengthy prison term, was highly motivated to gain favor with the authorities, does not have a commitment to the truth, was interested in serving his/her own interests, had previously testified for the prosecution, and wanted something in exchange for his/her testimony or help.

3. In cases where the wrongfully convicted were subsequently exonerated, research has shown that false statements from incentivized informants essentially clinched the original guilty verdict and conviction. The Northwestern University School of Law Center on Wrongful Convictions reviewed the cases of 111 persons released from death row between 1973 and 2004 after being exonerated and found false testimony from informants in more than 45% of those cases. Northwestern University School of Law Center on Wrongful Convictions, *The Snitch System* (2005). This makes false informant testimony the leading cause of wrongful convictions in capital cases in the United States. *Id.* According to The Innocence Project, informant testimony has contributed to more than 15% of wrongful convictions later overturned through DNA testing. http://www.innocenceproject.org/understand/Snitches-Informants.php (last visited 3/22/2013).

4. Due to the fact that there is no way to know exactly how many people have been wrongfully convicted statistics likely underestimate the prevalence of false informant testimony.

*The Limited Ability to of Jurors to Detect Lies and the Value of Expert Assistance*

5. Without expert assistance, jurors' abilities to assess the veracity of a witness's testimony are extremely limited. It has been demonstrated that jurors tend to make no meaningful distinction between true and false confessions. In a notable 2004 experiment, researchers found that individuals were no better at judging the truthfulness of confessions than

2

PCR EXHIBIT 0130

someone flipping a coin (i.e., the participants' accuracy was no greater than chance). *See* Lassiter, Clark, Daniels and Soinski, *Can We Recognize False Confessions and Does Presentation Format Make a Difference?*, presented at the annual meeting of the American Psychology-Law Society, Scottsdale, AZ (2004); *see also* Kassin, Meissner, & Norwick, *"I'd know a false confession if I saw one": A Comparative Study of College Students and Police Investigators*, L. & HUM. BEHAV. (2005) (finding college students slightly more accurate than police officers in rating confessions for truthfulness, but that both the students and police officers exhibited accuracy rates no greater than chance).

*Incentives Create Risk of False Testimony*

6.  An informant who testifies for the prosecution regarding a defendant's alleged confession is often provided with a reward that creates an incentive for the informant to provide such testimony. These incentives usually come in the form of a reduced prison sentence or dropped charges, *see* BRANDON L. GARRETT, CONVICTING THE INNOCENT 127-30 (2011), and can lead an informant to fabricate information, Swanner, Beike & Cole, *Snitching, Lies and Computer Crashes: An Experimental Investigation of Secondary Confessions*, L. & HUM. BEHAV. (2009). A prominent 1996 study examined the effect of incentives on a person's willingness to lie. The results suggest that people will lie for even a minimal incentive. Bruggeman and Hart, *Cheating, Lying, and Moral Reasoning by Religious and Secular High School Students*, J. OF EDUC. RES. (1996).

7.  The information about confessions is beyond the kin of the jury. It has been well documented that laypeople accept confession evidence automatically, as they believe the codefendant in a case will have intimate knowledge of the events in question, which they accept to be true. However, an expert can inform the jury that there are a variety of contextual factors that may influence a codefendant's decision to give confession evidence. Given the people who are informants, as well as the nature of the informant business, it is likely that they do not become informants out of a sense of moral responsibility and justice, but rather for their own self-interest (See Sharon, 1998; L. A. Grand Jury Report, 1998). The L. A. Grand Jury Report states informants received extra visits, phone calls, access to television, movies, moved to more desirable cells and some

3

even were given small amounts of money so they could buy more treats at the prison store. An expert witness can educate a jury about some of these contextual factors such as incentives (i.e., getting a reduced prison sentence or extra privileges in prison) can influence his decision to testify. This will allow the jury to make a more educated and informed decision regarding the confession evidence.

*Confession Evidence and the Fundamental Attribution Error*

8. In order to counter the risk of wrongful conviction we must understand why Jurors attribute such weight to incentivized "secondary confession" evidence and educate jurors so that they may better evaluate the veracity of the evidence before them. Jurors place undue weight on confessions—including secondary confessions—even when they do not think they are doing so.  The tendency of jurors to believe confession evidence stems from the fact that people tend to engage in a fundamental attribution error where they unconsciously and automatically accept what is presented to them.  Kassin, *Why Confessions Trump Innocence*, AM. PSYCHOL. (2012).

9. Research shows that confession evidence has an extremely high level of persuasiveness and impact on jurors, regardless of how the confession was obtained. Juror's give the same evidentiary weight to confessions whether they are obtained from a witness voluntarily or involuntarily, ie., gratuitously given as opposed to coerced or incentivized. *See* Kassin & Gudjonsson, *The Psychology of Confession Evidence: A Review of the Literature and Issues*, PSYCHOL. SCI. IN THE PUB. INT. (2004). *See* Kassin & Sukel, *Coerced Confessions and the Jury: An Experimental Test of the "Harmless Error" Rule*, L. & HUM. BEHAV. (1997).

10. Similar to "primary confession" evidence discussed above "secondary confessions" or confessions whose only proof of existence is the hearsay testimony of a jail house informant, is enormously persuasive evidence to jurors and this evidence has a high level of impact on juror decision making and impacts verdicts to a similar degree whether or not is was voluntarily given or incentivized. In a study that United States Circuit Judge Richard Posner has referred to as a "rigorous empirical stud[y] of jury behavior," *Stephenson v. Wilson*, 619 F.3d 664, 673 (7th Cir. 2010), my colleagues and I extended

4

PCR EXHIBIT 0132

the findings of Kassin et al to secondary confession testimony from jailhouse informants. *See* Neuschatz, Lawson, Swanner, Meissner & Neuschatz, *The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making*, L. & HUM. BEHAV. (2007). A copy of this study is annexed as Exhibit B. Wetmore, Neuschatz & Gronlund, *On the Power of Secondary Confession Evidence*, PSYCHOL., CRIME & L. (in press). Wetmore et al.; *see also* Kassin & Neumann, *On the Power of Confession Evidence: An Experimental Test of the "Fundamental Difference" Hypothesis*, L. & HUM. BEHAV. (1997). A copy of the Wetmore et al. study is attached as Exhibit C.

11. Further, it has been found that mock jurors' conviction rates were unaffected by whether the cooperating witness received an incentive in exchange for his testimony, even though participants reported perceiving the witnesses who had received incentives as being less interested in serving justice and more interested in serving their self-interests. These results demonstrate that jurors place great weight on informant testimony about secondary confessions in making verdict decisions. *See* Neuschatz, Lawson, Swanner, Meissner & Neuschatz, *The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making*, L. & HUM. BEHAV. (2007).

12. Informant testimony is typically persuasive due to what is known in psychology as the fundamental attribution error. Ross, *The Intuitive Psychologist and His Shortcomings: Distortions in the Attribution Process*, ADVANCES IN EXPERIMENTAL SOC. PSYCHOL. (1977). Fundamental attribution error occurs when people do not taken into account the situation a person was placed in while making their decision and instead think the reason for the decision is attributed to the person's disposition. A fundamental attribution error occurs when a juror underestimates the importance of situational factors (such as the informant receiving an incentive or having been an informant multiple times in the past) and overvalues dispositional factors (such as the informant's honesty or guilty conscience). Trope, *Identification and Inferential Processes in Dispositional Attribution*, PSYCHOL. REV. (1986).

13. The fundamental attribution error may sometimes result from a lack of information about the situational constraints that a person is under. Gilbert & Malone, *The Correspondence*

PCR EXHIBIT 0133

*Bias*, PSYCHOL. BULL. (1995). Although jurors who are unaware that an informant is testifying in exchange for an incentive cannot take the incentive into account when assessing the informant's credibility, my research has suggested that fundamental attribution error is so strong that jurors often do not discount informant testimony even when they know that the informant is receiving an incentive in exchange for testifying. *See* Neuschatz et al. (2007).

Considering that laypeople do not understand or are not aware of the fundamental attribution error, it is easy for them to fall prey to it. One way to avoid this error is to gain more information about the situation surrounding the confession, in this case. An expert could educate jurors about the fundamental attribution error so that they could correct this bias if it in fact exists.

### Corroboration Error and the Effect of Confession Evidence on Other Evidence

14. Confession evidence, including "secondary confession" evidence is so persuasive that it has been shown to infect other forms of evidence.  In a 2012 article, Saul Kassin discussed the corruptive power of confession evidence through a phenomenon known as corroboration inflation, which is the tendency for confessions to produce an illusion of support from other evidence. Kassin, *Why Confessions Trump Innocence*. As Kassin explains, this illusion of support typically comes either from the details of the confession itself, which can be understood as providing proof of the confessor's guilty knowledge, or from extrinsic evidence offered by witnesses whose judgments have been tainted by knowledge of the confession. The taint of corroboration error can be so extreme, as demonstrated by a 2009 study by Hasel and Kassin, that evidence of a confession can actually alter an eyewitness's identification. *See* Hasel & Kassin, *On the Presumption of Evidentiary Independence: Can Confessions Corrupt Eyewitness Identifications?*, PSYCHOL. SCI. (2009).

15. The corruptive effect of confession evidence has also been shown to influence polygraph examiners, Elaad, Ginton & Ben-Shakhar, *The Effects of Prior Expectations and Outcome Knowledge on Polygraph Examiners' Decisions*, J. OF BEHAV. DECISION MAKING (1994) and latent fingerprint examiners, Dror, Charlton & Peron, *Contextual*

PCR EXHIBIT 0134

*Information Renders Experts Vulnerable to Making Erroneous Identifications*, FORENSIC
SCI. INT'L (2006).

**Opinions Regarding Bordeaux's Testimony**

16. In preparing my opinion regarding the evidence presented by James Bordeaux (herein
after referred to as Bordeaux) at the trial of Katie Garding (herein after referred to as
Garding) for the offense of vehicular homicide while under the influence I reviewed the
following materials: Bordeaux's trial testimony, Portions of the full trial transcript in
*State of Montana v. Garding*, DC-10-160, transcripts of interviews with law enforcement,
the dates of which follow: Jan. 15, 2008, Mar. 16, 2009, May 27, 2009, and Mar. 22,
2011, a transcript of an interview of Bordeaux conducted by defense investigators on
Dec. 19, 2010, and a transcript of testimony given by Bordeaux at a probable cause
hearing on Mar. 2, 2011.

17. Bordeaux was the prototypical informant: He was a career criminal, was incarcerated,
was highly motivated to gain favor with the authorities due to his legal problems and fear
of a lengthy prison sentence, and received a "sweetheart" deal from authorities in
exchange for his testimony.
Pg 1017
1
(By Ms. Clark)
Does that appear to be the plea

2 agreement that you entered?

3 A. Yes, ma'am.

4 Q. All right.
In that agreement there is a -- a

5 clause that says that you will testify truthfully in any

6 hearing or trial in regards to Ms. Garding.
Do you remember

7 that?

7

8 A. Yes, ma'am.
Uh-huh.
9 Q. Was that something negotiated in exchange for a

10
plea agreement?

11
A.
That was a rule, one of the stipulations, but I

12 mean I don't think that's the reason.
The whole reason I got
13 my plea agreement, I just did 16 months in prison.
So I mean
14 I felt like that was a big part of my agreement.
I just --
15 it's not like I got locked up yesterday by the time I got

16 here so.

Pg 1018
6 Q.
(By Ms. Clark)
Is that the judgment for the

7 sentence you received after you pled guilty on the burglary

8 charge?

9 A. Yes, ma'am.

10 Q. I want to refer you to -- I'll do it for you.
On
11 page 2 of the plea agreement (sic), does that accurately

12 reflect the sentence that you received on the burglary?

13 A. Yes, ma'am.

14 Q. And what does it say?

15 A. It says burglary, felony, guilty, five year --

8

16
five-year sentence, five years suspended.

18. It is extremely difficult for lay jurors, unfamiliar with ; concepts of fundamental attribution error, corroborative effect, the research on informant testimony and confession evidence, to appreciate the factors that can affect the reliability of informant testimony. According to current psychological research, several factors present in Bordeaux's confession testimony may have impacted its reliability and would likely have contributed to the jurors' inability to properly assess its veracity.

19. The State of Montana provided Bordeaux with a favorable agreement (reduced prison sentence) in exchange for his testimony about Garding. As mentioned above, even minimal incentives motivate people to give false testimony. Based on how concerned Bordeaux was with the increasing number of criminal charges and subsequent years in prison, the "sweetheart" deal provided to him in exchange for his testimony against Garding could have provided more than adequate incentive for him to fabricate testimony to gain favor with authorities.

20. The jurors at Garding's trial were not aware of all the factors that could have impacted the reliability of Bordeaux's testimony. But, even had the jurors been aware of these incentives, it is likely that, absent expert testimony, fundamental attribution error would have prevented the jurors from appreciating how such incentives could have impacted the reliability of Mr. Bordeaux's testimony. Further, people tend to reflexively accept what is presented to them, it is difficult for individuals, such as the jurors at Garding's trial, to appreciate the factors that would make someone like Mr. Bordeaux testify. As a result, jurors tend to find informant testimony like Bordeaux's unjustifiably persuasive and possibly influenced their decision.

21. Given the persuasive nature of confession evidence, it is in fact one of the most influential and persuasive forms of evidence. Considering that Bordeaux has a history of lying, has changed his story several times, and received a "sweetheart deal" in exchange for his testimony, jurors should scrutinize his testimony with extreme caution. An expert on secondary confessions can make the jury aware of these issues so they can evaluate

9

PCR EXHIBIT 0137

his testimony in a more informed manner. It is extremely important to have an expert testify about this issue given the number of convictions which relied on secondary confessions and then later those confessions are proved false, resulting in overturned convictions. As mentioned earlier, false secondary confessions are a leading cause of wrongful convictions in capitol cases since the death penalty has been reinstated. Given the dire circumstances of wrongful convictions, it is imperative that jurors be educated on secondary confessions, the causes as well as the consequences.

22. Lastly, Bordeaux provided confession testimony in Garding's trial, which is more persuasive than any other type of evidence. Once Bordeaux's secondary confession testimony was accepted by the jurors, it had the potential to taint the juror's perception of all other non-confession evidence. Testimony by an expert on the corroboration error effect could be of substantial value in assisting the jury in its evaluation of the evidence presented in Garding's trial.

### Conclusion

23. How to interpret and accurately assign value to evidence provided by jailhouse informants is beyond the common knowledge of jurors as they are unaware of the effects of incentivized testimony, fundamental attribution error and the potentially adverse affects of false confession evidence on other evidence, like corroboration error. Thus, given that lay individuals have a difficult time understanding the dynamics articulated above, having an expert explain these issues will help the jurors make more objective and informed opinions in accessing the veracity of Bordeaux's testimony.

24. The opinions contained in this report are stated to a reasonable degree of psychological certainty and are based upon the information I have been provided to date. I reserve the right to modify my opinions should I receive new or additional information.

25. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this ___ day of November, 2014 in Huntsville, Alabama.

10

Jeffery Neuschatz Ph.D

University Of Alabama- Huntsville

(256) 824-2321

neuschaj@uah.edu

On this __ day of November, 2014 before me a Notary Public for the State of Alabama,

personally appeared Jeffery Neuschatz known to me to be the person whose name is

subscribed to the foregoing Affidavit and acknowledged to that he has read the foregoing

Affidavit and knows the contents thereof to be true and correct to the best of his belief.

SUBSCRIBED AND SWORN to before me this 1 day of December, 2014

NOTARY PUBLIC, State of Alabama

Residing at _Huntsville, AL_

My Commission expires _7/12/16_

11

Curriculum Vitae
**Jeffrey Scott Neuschatz**

## Personal Information

Office Address:      Department of Psychology
Morton Hall 321
University of Alabama in Huntsville
Huntsville, AL 35899
Phone: (256) 824-2321
Email: neuschaj@email.uah.edu

## Academic Positions

August 2012      Professor
University of Alabama in Huntsville

August 2007 - 2012      Associate Professor
University of Alabama in Huntsville

August 2000 -2006      Assistant Professor
University of Alabama in Huntsville

August 1999      Visiting Assistant Professor
St. Mary's College of Maryland

## Education

June 1999      Ph.D. in Cognitive Psychology
Binghamton University

May 1994      M.S. in Experimental Psychology
State University of New York College at Cortland

May 1992      B.S. in Psychology
Roger Williams University

## Honors and Awards

UAH Foundation Award for Research and Creative Achievement (2003)
Outstanding Faculty Advisor, University of Alabama in Huntsville (2000-2001)
Dissertation Year Fellowship, Binghamton University (1997-1998)

PCR EXHIBIT 0140

**Grants**

National Science Foundation LSS-1060921 (2011-2014)
    Title:    Showups vs. Lineups: A Comparison of Two Identification Techniques
    PIs:    Jeffrey S. Neuschatz , Scott Gronlund, Charlie A. Goodsell
    Amount:    $302,000

National Science Foundation  SES-1060921 (2011-2014)
    Title:    Showups vs. Lineups: A Comparison of Two Identification Techniques
    PI:    Jeffrey S. Neuschatz
    Amount:    $10,000

University of Alabama in Huntsville Research Mini-Grant. (2003).
    Title : The effect of post identification feedback on the elderly: Implications and recommendation for lineup administrators.
    PI:    Jeffrey S. Neuschatz
    Amount:    $10,000

University of Alabama in Huntsville Research Mini-Grant. (2001).
    Title:    I am sorry I forgot your name: Testing an expanding rehearsal account of name learning with the elderly.
    PI:    Jeffrey S. Neuschatz
    Amount:    $10,000

**Books**

    Lampinen, J. M., **Neuschatz, J. S.**, Cling, A. D. (2012). Psychology of Eyewitness Memory.  Psychological Press: New York.

**Articles in Refereed Journals**

    Goodsell, C. A. **Neuschatz, J. S.,** & Gronlund, S. D. (accepted pending minor revisions). *Psychology,* Investigating mugshot commitment. *Crime and Law*

    Gronlund, S. D.,  &Neuschatz, J. S.,  (in press). Eyewitness identification discriminability: ROC analysis versus Logistic regression*Journal of Applied Research in Memory and Cognition. 4,* 221-228.

  Wetmore, S. A., **Neuschatz, J. S.**, & Gronlund, S. D. (2014).  On the power of secondary confessions. *Psychology, Crime and Law.20 (4), 3339- 357,*

    Gronlund, S. D., Carlson, C. A., **Neuschatz, J. S.**, Goodsell, C. A., Wetmore, S. A., Wooten, A., & Graham , M. C., (2012). Showups versus Lineups: An evaluation using ROC Analysis. *Journal of Applied Research in Memory and Cognition. 4,* 221-228.

**Neuschatz, J. S.,** Wilkinson, M. L., Goodsell, C. A., Wetmore, S. A., Quinlivan, D. S., & Jones, N. J. (2012). Secondary Confessions, Expert Testimony, and Unreliable Testimony. *Journal of Police and Criminal Psychology. 27,* 179-192.

Quinlivan, D. S., **Neuschatz, J.S.,** Wells, G. L., Douglass, A. B., & Wetmore, S. A. (2012). The Effect of Post-Identification Feedback, Delay, and Suspicion on Accurate Eyewitnesses. *Law and Human Behavior. 36,* 206-214.

Quinlivan, D. S., **Neuschatz, J.S.,** Wells, G. L., Cutler, B. L., McClung, J. E., & Harker, D. (2012). Do pre-admonition suggestions moderate the effect of the unbiased-lineup instructions? *Legal and Criminological Psychology,17,* 165-176.

Douglass, A. B., **Neuschatz, J. S.,** Imrich, J., & Wilkinson, M. (2010) Does Post-identification Feedback Affect Evaluations of Eyewitness Testimony and Identification Procedures?" *Law and Human Behavior. 34, 282-294.*

Quinlivan, D. S., Wells, G. L. & **Neuschatz, J. S.** (2010) Is Manipulative Intent Necessary to Mitigate the Eyewitness Post-Identification Feedback Effect? *Law and Human Behavior. 34,* 186-197.

Goodsell, C. A. **Neuschatz, J. S.,** & Gronlund, S. D. (2009). Effects of Mugshot Commitment and Choosing on Lineup Performance in Young and Older Adults. *Applied Cognitive Psychology, 23,* 788-803.

Quinlivan, D. S., **Neuschatz, J. S.,** Jimenez, A., Cling, A. D., Douglass, A. B., & Goodsell, C. A. (2009). Do Prophylactics Prevent Inflation?: Post-Identification Feedback and the Effectiveness of Procedures to Protect Against Confidence-Inflation in Earwitnesses. *Law and Human Behavior,33,* 111-121.

**Neuschatz, J. S.,** Lawson, D. S., Swanner, J. S., Meissner, C. A., & Neuschatz, J. S. (2008). The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making. *Law and Human Behavior 32(2),* 137-149.

**Neuschatz, J. S.,** Neuschatz, J. S., Lawson, D. S., Powers, R. A., Fairless, A. H., Goodsell, C. A., Toglia, M. P. (2007).The mitigating effects of suspicion on post-identification feedback and on retrospective eyewitness memory. *Law and Human Behavior, 31(3),* 231-247

**Neuschatz, J. S.,** Neuschatz, J. S., Seemann, E. A., & Noble, A. P., (2006). Lineup identification: combating the effects of post identification feedback. *Journal of Forensic Psychology Practice,* 6, 63-73.

**Neuschatz, J. S.,** Preston, E. L., Burkett, A. D., Toglia, M. P., Lampinen, J. M., & Neuschatz, J. S., Farless, A. H., Lawson, D. S., Powers, R. A., & Goodsell, C., (2005).

PCR EXHIBIT 0142

The effects of post-identification feedback and age on retrospective eyewitness memory. *Applied Cognitive Psychology, 19,* 435-453.

**Neuschatz, J. S.,** Preston, E. L., Toglia, M. P., & Neuschatz, J. S. (2005). A Comparison of the Efficacy of Two Name Learning Techniques: Expanding Rehearsal vs. Name-Face Imagery. *American Journal of Psychology, 118,* 79-101.

Lampinen, J. M., Odegard, T., & **Neuschatz, J. S.** (2004). Robust recollection rejection in the memory conjunction paradigm. *Journal of Experimental Psychology: Learning, Memory, and Cognition,30,* 332-342

**Neuschatz, J. S.,** Lynn, S. J., Benoit, G. E. & Fite, R. (2003). Hypnosis and memory illusions: An investigation using the Deese/Roediger and McDermott paradigm. *Imagination, Cognition, and Personality, 22,* 3-12.

Soraci, S., Carlin, M. T., Toglia, M. P., Chechile, R., & **Neuschatz, J. S.** (2003). Generative processing and false memories: When there is no cost. *Journal of Experimental Psychology: Learning, Memory and Cognition, 29,* 511-523.

**Neuschatz, J. S.,** Benoit, G. E., & Payne, D.G. (2003). Effective warnings in the Deese/Roediger and McDermott false memory paradigm: The role of identifiablity. *Journal of Experimental Psychology: Learning, Memory and Cognition, 29,* 35-41.

**Neuschatz, J. S.,** Lampinen, J. M., Preston, E. L., Hawkins, E. R., & Toglia, M. P. (2002). The effect of memory schemata on memory and the phenomenological experience of naturalistic situations *Applied Cognitive Psychology, 16,* 687-708.

Lampinen, J. M., Copeland, S. M. & **Neuschatz, J. S.** (2001). Recollections of things schematic: Room schemas revisited. *Journal of Experimental Psychology: Learning, Memory and Cognition, 27,* 1211-1222.

**Neuschatz, J. S.,** Payne, D.G., Lampinen, J. M., & Toglia, M. P. (2001). Assessing the Effectiveness of Warnings and the Phenomenological Characteristics of False Memories. *Memory, 9,* 53-71.

Lynn, S. J., **Neuschatz, J. S.,** Fite, R., & Kirsch, I. (2001). Hypnosis in forensic settings. *Journal of Forensic Psychology Practice, 1,* 113-122.

Lampinen, J. M., Faries, J. M., **Neuschatz, J. S.,** & Toglia, M. P. (2000). Recollections of things schematic: The influence of scripts of recollective experience. *Applied Cognitive Psychology, 14,* 453-554.

Lampinen, J. M., **Neuschatz, J. S.,** & Payne, D. G. (1999). Source attributions and false memories: A test of the demand characteristic account. *Psychonomic Bulletin and Review,* 130-135.

Toglia, M. P., **Neuschatz, J. S.**, & Goodwin, K. A. (1999). Recall accuracy and illusory memories: When more is less. *Memory, 7,* 233-256.

Lampinen, J. M., **Neuschatz, J. S.**, & Payne, D. G. (1998). Memory illusions and consciousness: Examining the phenomenology of true and false memories. *Current Psychology, 16,* 181-224.

Payne, D. G., **Neuschatz, J. S.,** Lampinen, J. M., & Lynn, S. J. (1997). Compelling memory illusions: The phenomenological qualities of false memories. *Current Directions in Psychological Science, 6,* 56-60.

Payne, D. G., Elie, C. J., Blackwell, J. M., & **Neuschatz, J. S.** (1996). Memory illusions: Recalling, recognizing, and recollecting events that never occurred. *Journal of Memory and Language, 35,* 261-285.

## Book Chapters

**Neuschatz, J. S.**, Wetmore, S, A., & Grondlund, S. D. (in Press). Memory gaps and memory errors. in Emerging Trends in the Social and Behavioral Sciences (eds.) Robert Scott and Stephen Kosslyn, Hoboken, NJ: John Wiley and Sons

Price, J., Mueller, N., Wetmore, S. A., & **Neuschatz, J.S.** (2014). Eyewitness Memory and Metamemory in Older Adults . In M. P. Toglia, D. F. Ross, J. A.& Pozzulo, & E. Pica (Eds.), *The elderly witness in court.* London: Francis & Taylor.

Goodsell, C., Wetmore, S. A., **Neuschatz, J. S.**, & Gronlund, S. D., Showups. (2013). Lineup Reform. In B. L. Cutler (Ed.), pp. 213-238. Conviction of the innocent: Lessons from legal research. Washington, D.C, American Psychological Association.

**Neuschatz, J. S.**, Jones, N., McClung, J., & Wetmore, S. A., (2012). Unreliable Informant Testiomy. In B. L. Cutler (Ed.), pp. 213-238. Conviction of the innocent: Lessons from legal research. Washington, D.C, American Psychological Association.

**Neuschatz, J. S.** & Cutler, B. L. (2008). Eyewitness Identification. In H.L. Roediger, III (Ed.), Cognitive Psychology of Memory. Vol. 2 of Learning and Memory: A Comprehensive Reference, 4 vols. (J.Byrne Editor). pp. 845-865 Oxford: Elsevier.

**Neuschatz, J.S.**, Lampinen, J.M, Toglia, M.P., Payne, D.G., & Preston, E. L. (2007). False Memories: History, Theory, and Implications. In D. Ross, J. Read, D. Ross, & R. Lindsay. (Eds.), *Handbook of Eyewitness Psychology.* (pp. 239 – 260). New York: Erlbaum Associates, Inc.

Lynn, S. J., **Neuschatz, J. S.,** Rhue, J., & Fite, R. (2001). Hypnosis and memory in forensic contexts. In D. Eisen, G. Goodman, & J. Quas. (Eds.), *Memory and suggestibility in the forensic interview,* New York: Wiley.

Payne, D. G., Klin, C., Lampinen, J. M., **Neuschatz, J. S.,** & Lindsay, D. S. (1999). Memory applied. In F. T. Durso, R. Nickerson, R. W. Schanveldt, S. T. Dumais, & M. T. H. Chi (Eds.), *Handbook of applied cognition.* (pp. 83 – 113). New York: Wiley.

Toglia, M. P., **Neuschatz, J. S.**, Hembrooke, H., & Ceci, S. J. (1996). Children's memory following misleading postevent information: A contextual approach. In D. Herrmann, C. McEvoy, C. Hertzog, P. Hertel, & M. K. Johnson. (Eds.), *Basic and applied memory research: Practical applications.* (pp. 67 - 76). New York: Erlbaum Associates, Inc.

## Other Publications

**Neuschatz, J. S.**, & Lawson, D. S. (2008). Eyewitness Memory. In B. L. Cutler (Ed.), *Encyclopedia of Psychology & Law.* Thousand Oaks, CA: Sage.

Toglia, M. P., Goodwin, K. A., & **Neuschatz, J. S.** (2009). Adult suggestibility. In A Jamieson & A. Moenssens (Eds.), Wiley Encyclopedia of Forensic Science (pp. 1065-1072). Chichister, UK: John Wiley & Sons.

Lampinen, J. M., & **Neuschatz, J. S.** (2008). Reconstructive Memory. In B. L. Cutler (Ed.), *Encyclopedia of Psychology & Law.* Thousand Oaks, CA: Sage.

## Invited Lectures

Neuschatz, J. S. (2008). Bartered Testimony. University of Oklahoma.

Neuschatz, J. S. (2007). Eyewitness Identification. Alabama Criminal Defense Lawyers Association.

Neuschatz, J. S. (2007). Accomplice Witnesses and Jailhouse informants: Are we dancing with the devil? John Jay College of Criminal Justice.

Neuschatz, J. S. (2007). Post Identification Can't Go on with Suspicious minds. University of Arkansas.

Neuschatz, J. S. (2006). Post Identification Can't Go on with Suspicious minds. University of California, Irvine.

Neuschatz, J. S. (2006). The Effect of Suspicion on Post Identification Feedback. Florida International University.

Neuschatz, J. S. (2004). Eyewitness Identification and Post Identification Feedback. University of Alabama.

Neuschatz, J. S. (2004). Recollections of Things Schematic: The influence of Scripts on Recollective Experience. University of Alabama.

## Presentations at Professional Conventions

Wetmore, S. A., Gronlund, S. D., & Neuschatz, J. S. (April, 2014). Eyewitness Identifications: A New Perspective. Paper presented at Oklahoma/Kansas Judgment and Decision Making Annual Workshop.

Goodsell, C. A., Gronlund, S. D., Neuschatz, J. S., &  Wetmore, S. A. (2012). *Are Showups Ever Better than Lineups?*. Poster to be presented at the 63rd Psychonomic Society Conference (Toronto, CA, November)

Wetmore, S. A., Neuschatz, J. S., Gronlund, S. D. (March 2013). The influential jailhouse informant.  Poster presented at the annual American Psychology and Law Society Conference, Portland, OR.

Gronlund, S. D., Carlson, C. A., Neuschatz, J. S., Goodsell, C. A., Wetmore, S. A., Wooten, A., & Graham, M. (March 2013).  Showups versus lineups: An evaluation using ROC analysis. Paper presented at the annual American Psychology and Law Society Conference, Portland, OR.

Wooten, A., Neuschatz, J. S., Carlson, C. A., Gronlund, S. D., Wetmore, S. A., Goodsell, C. A. (March 2013). Showups vs. lineups: Can showups be reliable?  Paper presented at the annual American Psychology and Law Society Conference, Portland, OR.

Goodsell, C. A., Gronlund, S. D., Neuschatz, J. S., Wetmore, S. A., & McAdoo, R. (2012). *Contributions of Commitment and Familiarity to Lineup Identifications Following Mugshot Exposure.* Poster to be presented at the 62nd Psychonomic Society Conference (Minneapolis, MN, November)

Carslon, C., Goodsell, C. A., Wetmore, S. A., Gronlund, S. D., & Neuschatz, J. S., (2012). *Showups Versus Lineups: An Evaluation Using ROC Analysis*. Poster to be presented at the 62nd Psychonomic Society Conference (Minneapolis, MN, November)

Wright, B. J., Clement, L., Atkins, D., Park, M., Bond, K., Price, J., & Neuschatz, J. (2012). *Feedback's impact on younger and older adults' number estimation performance.* Poster to be presented at the 62nd Psychonomic Society Conference (Minneapolis, MN, November)

Wetmore, S. A., Neuschatz, J. S., Goodsell, C. A., & Gronlund, S. D. (March, 2012). Primary or secondary confessions: What do jurors believe? Poster presented at the annual American Psychology and Law Society Conference, San Juan, PR.

PCR EXHIBIT 0146

Wetmore, S. A., Graham, M., Wooten, A., Neuschatz, J. S., & Goodsell, C. A. (March, 2012).  Clothing bias: Does it need to be distinctive? Poster presented at the annual American Psychology and Law Society Conference, San Juan, PR.

Erickson, W. B., Lampinen, J. M., Neuschatz, J. S., Wetmore, S. A., Peters, C. S., & Sweeney, L. N. (March, 2012). Are snitches taken seriously? An investigation of post-identification feedback from a secondary source.  Poster presented at the annual American Psychology and Law Society Conference, San Juan, PR.

Clement, L., Atkins, D., Mann, E., Bond, K., Price, J., & Neuschatz, J. (2011). Manipulations That Enhance Integration Do Not Reduce Retrieval-Induced Forgetting. Paper presented at the fifty-second annual meeting of the Psychonomic Society, Seattle, Washington.

Wetmore, S. A., Neuschatz, J., Graham, M., Davidson, R., & Exley, W. (March, 2011). On the Power of Secondary Confessions. Presentation at the annual American Psychology and Law Society conference, Miami, Florida.

Goodsell, C. A., Gronlund, S., Neuschatz, J., & Dobos, R. (March, 2011). Contributions of memory and decision processes to lineup identifications following mugshot exposure. Presentation at the annual American Psychology and Law Society conference, Miami, Florida.

Goodsell, C. A., Gronlund, S.,  & Neuschatz, J., (March, 2011). Contributions of memory and decision processes to lineup identifications following mugshot exposure. Paper presented at the fifty-first annual meeting of the Psychonomic Society, St Louis, MO.

Knight, M.A., Smalarz, L.A., Turosak, A.K., Hunter, J.H., Benal, J.L., Butcher, B.D., Arndorfer A.L., Quinlivan, D.S. Neuschatz, J. S. Wells, G.L.  (2010, May). Perceptions on Race and Socioeconomic Status in Ambiguous Situations.  Poster presentation at the Association for Psychological Science Conference, Boston, MA.

Quinlivan, D.S., McClung, J., Harker, D., Neuschatz, J.S., Wells, G.L., Cutler, B., Wilford, M. M. (2009, March). "Surely, You Can Pick Him Out!" The Effects of Pre-Identification Feedback on Choosing Rates and Certainty. Paper presented at the annual American Psychology and Law Society conference, San Antonio, TX.

Neuschatz, J.S. & Wilkinson, M. L. (March, 2009). Jailhouse informant testimony: How much is too much? Plenary Panel presentation at the annual American Psychology and Law Society conference, San Antonio, TX.

Quinlivan, D.S., Lovik, C. J., Peterson, M., Wells, G. W., Neuschatz, J.S. (November, 2008) Surely you can pick him out! Poster presented at the annual Psychonomic Society conference, Chicago, IL.

PCR EXHIBIT 0147

Jimenez, A., Quinlivan, D.S., Neuschatz, J.S. (2008, May). Exploring the confidence prophylactic as a method for abating the post identification feedback effect in earwitness testimony. Poster presented at the American Psychological Society, Chicago, IL.

Quinlivan, D.S., Wells, G. L., Neuschatz, J.S. (2008, May). The necessity of manipulative intent on the feedback nullification effect. Poster presented at the American Psychological Society, Chicago, IL.

McClung, J., Quinlivan, D. S., Neuschatz, J. S., Cling, A. (2008, May). The effects of Pre identification suggestion on likelihood beliefs, confidence and choosing. Poster presented at the American Psychological

Goodsell, C. A., Neuschatz, J. S., & Gronlund, S. D.  (2007). Mugshot exposure prior to lineup identification: Age, familiarity, and commitment effects.  Paper presented at the 7th Biannual Meeting of the Society for Applied Research in Memory and Cognition, Lewiston, ME

Jimenez, A. M., Quinlivan, D. S., Neuschatz, J. S., Cling, A., Douglass, A. B., Goodsell, C. A. (2008, March). Exploring the confidence prophylactic as a method for abating the post-identification feedback effect in earwitness eestimony. Presented at the annual American Psychology and Law Society conference, Jacksonville, FL.

Wilkinson, M., Quinlivan, D. S., Howard, J., Swanner, J. S., Neuschatz, J. S., Cling, A. (2008, March). The effect of modified judicial instructions and expert testimony on jury perception of secondary confessions. Poster presented at the annual American Psychology and Law Society conference, Jacksonville, FL.

McClung, J., Quinlivan, D. S., Neuschatz, J. S., Wells, G. L., Wilford, M. M. (2008, March). The effects of pre-identification feedback on eyewitness' retrospective confidence reports. Poster presented at the annual American Psychology and Law Society conference, Jacksonville, FL.

Lawson, D. S., Swanner, J. K., Pitts, W. N., Myers, C. A. (2007). The effects of suspicion on post Identification feedback using a target present lineup. Poster for the American Psychological Society.

Lawson, D. S., Neuschatz, J. S., Swanner, J. K., & Meissner, C. A. (2007). The effects of accomplice witnesses and jailhouse snitches on judicial decision making. Paper Presentation at ASTC Conference, Long Beach, CA.

Wilkinson, M., Pitts, W. N., Lawson, D. S., Neuschatz, C. A., Cling, A., Meissner, C. A. (2007). The effects of incentive and source on jury decision making. Poster for the American Psychological Society.

PCR EXHIBIT 0148

Swanner, J. K., Wilkinson, M., Lawson, D.S., Neuschatz, J. S. (2007). Explicit incentive instruction on jury decision making. . Poster for the American Psychological Society.

Lawson, D.S., Swanner, J. K., Neuschatz, J. S., Cling, A., Lawson, M. (2007). The Effects of Source and Motivation of a Secondary Confession on Jury Verdicts. Paper presented at the Munsterberg Conference.

Lawson, D. S., Swanner, J. K., Neuschatz, J. S., Myers, C. M., Davis, M. R. (2007). The Mitigating Effects of Suspicion on Post Identification Feedback Using a Target Present Photo Lineup. Poster for the Munsterberg Conference.

Swanner. J.k, Lawson, D.S., Kisper, C. Neuschatz, J.S. & Lampinen, J. (2007). Motivation Reduces Bias Due to Coerced Confessions in Judicial Decision-Making. Poster for the Munsterberg Conference.

Lawson, D. S., Swanner, J. K., Neuschatz, J. S. (2006). *The Effects of Information Source and Witness Motivation on Judicial Decision Making.* Poster for the American Psychological Society.

Swanner, J. K., Lawson, D. S., Neuschatz, J. S. (2006). *The Effects of Suspicion on Coerced Confessions and Jury Decision Making.* Poster for the American Psychological Society.

Swanner, J., Lawson, D., Neuschatz, J., & Goodsell, C. (2006). *The Use of Suspicion of Coerced Confessions and Judicial Decision Making.* Poster Presentation at the Annual Psychology and Law conference, Tampa, FL.

Neuschatz, J., Lawson, D., Goodsell, C, Swanner, J (2006, March). A Symposium on Eyewitness Identification Research at the annual Psychology and Law conference, Tampa, FL.

Neuschatz, J. S., Toglia, M. P., Goodsell, C. A., Lawson, D. S., Swanner, J. K., & Neuschatz, J. S. (2005). Suspicious Minds Reduce the Post-Identification Feedback Effect. Paper presented at the forty-sixth annual meeting of the Psychonomic Society, Toronto, ON, Canada.

Goodsell, C. A., Neuschatz, J. S., Neuschatz, J. S., Fairless, A. H., **Lawson, D. S.,** Powers, R. A. (2005). *Eliminating the effects of post-identification feedback through the use of suspicion.* Poster to be presented at the annual conference of the Southeastern Psychological Association, Nashville, TN.

Jimenez, A., Adhami, M., Lawson, D., Neuschatz, J. (2005). *The mitigating effects of suspicion on post-identification feedback.* Poster presented at the annual Southeastern Undergraduate Psychology Research Conference, Huntsville, AL.

Toglia, M. P., Neuschatz, J.S., Neuschatz, J.S., Preston, E., & Noble, A.P. (2005). Expanding Rehearsal vs. Name/Face Imagery: A Comparison of Two Name Learning

Techniques. Paper presented at the fifth biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), New Zealand.

Fairless, A. H., Wise, R. A., Lawson, D.S., Neuschatz, J. S., Toglia, M.P. (2004)Post-Identification feedback effects as a function of delay and age. Paper presented at the 16th Annual Convention of the American Psychological Society, Chicago, IL

Neuschatz, J. S., Toglia, M. P., Preston, E. L., Lampinen, J. M., Neuschatz, J. S., Goodsell, C., Lawson, D. S., Powers, R. A., & Fairless, A (2004) Confidence inflation and event recognition with younger and older adult eyewitnesses. Paper presented at the forty-fifth annual meeting of the Psychonomic Society, Minneapolis, MN.

Powers, R., Fairless, A., Lawson, D., Neuschatz, J., (2004). The Effects of PostIdentification Feedback on the Witnessing Experience Over a 3 Week Delay. Paper presented at the annual Southeastern Undergraduate Psychology Research Conference, Birmingham, AL.

Powers, R., Fairless, A., Cornwell, M., Rosenbloom, C., Lawson, D., Neuschatz, J. (2004). The Effects of Feedback Over a Three Week Interval. Poster presented at Committee for Equality of Professional Opportunity at the annual conference of the Southeastern Psychological Association, Atlanta, GA .

Neuschatz, J. S., Toglia, M. P.,Burkett, A., Preston, E. L., Lampinen, J. M., & Neuschatz, J. S., (2004). The postidentification feedback effect with young and elderly adults. Paper presented at the forty-fifth annual meeting of the Psychonomic Society, Vancouver, Canada.

Neuschatz, J. S., Toglia, M. P, Preston, E. L., Neuschatz, J. S., & Fairless, A. (2003). Sorry, I forgot your name:Comparing naming. Paper presented at the forty-forth annual meeting of the Psychonomic Society, Vancouver, Canada.

Toglia, M. P., Preston, E., Neuschatz, J., & Neuschatz, J. (2003, July). Warnings and the social contagion of false memories. Paper presented at the fifth biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), Aberdeen, Scotland.

Preston, E. L., Neuschatz, J. S., Toglia, M. P., & Neuschatz, J. S. (2003, May). Social contagion of false memories in naturalistic environments. Paper presented at the 15th Annual Convention of the American Psychological Society, Atlanta, GA.

Toglia, M. P., Preston, E. L., Neuschatz, J. S., & Neuschatz, J. S. (2002). Social contagion of false memories in naturalistic situations. Paper presented at the forty-third annual meeting of the Psychonomic Society, Kansas City, Missouri.

Neuschatz, J. S., Abbott, K. E., Goldstein, J. E., Neuschatz, J. S., Preston, E. L., & Scherzo, G. (2002). Priming effect of violence proclivity on recall of aggressive words.

Paper presented at the fourteenth annual convention of the American Psychological Society, New Orleans, Louisiana.

Neuschatz, J. S., Neuschatz, J. S., Goldstein, J. E., Abbott, K. E., Scherzo, G., Preston, E. L., & Trimbach, C. M. (2002). Relationship between violence proclivity, culture of honor, and social dominance. Paper presented at the fourteenth annual convention of the American Psychological Society, New Orleans, Louisiana.

Preston, E. L., Neuschatz, J. S., Pettibone, J. C., Neuschatz, J. S., Griffith, A., & Zeitlin, D. (2002). Sorry I forgot your name: Comparing name learning techniques. Paper presented at the forty-eighth annual meeting of the Southeastern Psychological Association, Orlando, Florida.

Neuschatz, J. S., Toglia, M. P., Lampinen, J. M., & Preston, E. L. (2001). Schemas and retention intervals influence false memories in the classroom. Paper presented at the forty-second annual meeting of the Psychonomic Society, Orlando, Florida.

Soraci, S. A., Chechile, R. A., Toglia, M. P., Neuschatz, J. S., Carlin, M. T., Ho, C. (2001). Does "more or less" hold for generative processing? Paper presented at the forty-second annual meeting of the Psychonomic Society, Orlando, Florida.

Lampinen, J. M. & Neuschatz, J. S. (2001). Recollections of things schematic: The influence of scripts on recollective experience. Paper presented at the 2001 annual meeting of the Midwestern Psychological Association, Chicago, Illinois.

Neuschatz, J. S., Benoit, G. E., & Payne, D.G. (2001). The truth about warnings and false memories. Paper presented at the forty-seventh annual meeting of the Southeastern Psychological Association, Atlanta, GA.

Preston, E. L., Hawkins, E. R., Goodloe, A., Lahiere, C., & Neuschatz, J. S., (2001). The effect of memory schemata on memory for naturalistic settings. Paper presented at the forty-seventh annual meeting of the Southeastern Psychological Association, Atlanta, GA.

Neuschatz, J. S, Toglia, M. P. & Lampinen, J. M. (2000). False memories for cartoon characters: "I tawt I taw a puddy tat'. Paper presented at the forty-first annual meeting of the Psychonomic Society, New Orleans, Louisiana.

Platt, R., Harsch, B., & Neuschatz, J. S (2000). The relationship among personality factors, metamemory, and two memory illusions. Paper presented at the forty-first annual meeting of the Psychonomic Society, New Orleans, Louisiana.

Lampinen, J. M., & Neuschatz, J. S. (2000). Memory Illusions and Consciousness. Towards a Science of Consciousness Conference, Tucson, AZ

Benoit, G. E., Payne, D.G., & Neuschatz, J. S. (2000). Identifiablity and the effect of warnings on false recognition. Paper presented at the seventy-first annual meeting of the Eastern Psychological Association, Baltimore, MD.

Platt, R. D., Walker, G. W., Neuschatz, J. S., & Smith, R. L. (2000). Individual differences in memory performance in the DRM false memory task. Paper presented at the seventy-first annual meeting of the Eastern Psychological Association, Baltimore, MD.

Juhasz, B., Jugens, H., Levine, W., Payne, D. G., & Neuschatz, J. S. (2000). Applications of the Expanding Rehearsal Mnemonic. Paper presented at the seventy-first annual meeting of the Eastern Psychological Association, Baltimore, MD.

Toglia, M. P., Neuschatz, J. S., Payne, D. G., Lampinen, J. M., & Grasso, J. M. (1999). Warning! Warnings may not be hazardous to your false memories. Paper presented at the fortieth annual meeting of the Psychonomic Society, Los Angeles, CA.

Neuschatz, J. S., Lynn, S. J., Fite, R., & Benoit, G. E. (1999). Hypnosis, ideomotor signaling and false memories. Paper presented at the 107th annual convention of the American Psychological Association, Boston, MA.

Benoit, G. E., Payne, D. G., & Neuschatz, J. S. (1999). Reality monitoring and the effect of warnings on false recognition. Paper presented at the seventieth annual meeting of the Eastern Psychological Association, Providence, RI.

Neuschatz, J. S., Lampinen, J. M., & Payne D. G. (1999). False memories: Does subjectively compelling mean perceptually similar? Paper presented at the seventieth annual meeting of the Eastern Psychological Association, Boston, MA.

Neuschatz, J. S., Lampinen, J. M., Batsedis, V. A., & Payne D. G. (1999). Improving name and face memory with expanded test type rehearsal. Paper presented at the third biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), Denver, CO.

Toglia, M. P., & Neuschatz, J. S (1998). The "More is Less" pattern of true and false memories. Paper presented at the thirty-ninth annual meeting of the Psychonomic Society, Dallas, Texas.

Neuschatz, J. S., Lampinen, J. M., & Payne, D. G. (1998). Effect of warnings on false memories. Paper presented at the 24th International Congress of Applied Psychology, San Francisco, CA.

Neuschatz, J. S., Lampinen, J. M., & Payne, D. G. (1998). The phenomenology of false memories. Paper presented at the tenth annual convention of the American Psychological Society, Washington, DC.

PCR EXHIBIT 0152

Neuschatz, J. S., Lampinen, J. M., & Payne, D. G. (1998). An investigation of the phenomenology of false memories. Paper presented sixty-ninth annual meeting of the Eastern Psychological Association, Boston, MA.

Lampinen, J. M., Neuschatz, J. S., & Payne, D. G. (1998). Reducing the false memory effect: When warnings work. Paper presented at the sixty-ninth annual meeting of the Eastern Psychological Association, Boston, MA.

Neuschatz, J. S., & Payne, D. G. (1997). Production loss in a collaborative recall task: A comparison of two mechanism. Paper presented at the sixty-eighth annual meeting of the Eastern Psychological Association, Washington, DC.

Toglia, M. P., Neuschatz, J. S., & Pyscynski, T. A. (1997). Pictorial vs. verbal representations and the creation of false memories. Paper presented at the sixty-eighth annual meeting of the Eastern Psychological Association, Washington, DC.

Toglia, M. P., & Neuschatz, J. S (1997). The impact of warnings on accurate and false recollections of a story. Paper presented at the ninth annual convention of the American Psychological Society, Washington, DC.

Toglia, M. P., & Neuschatz, J. S. (1997). Are all memories created equal? . Paper presented second biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), Toronto, CA.

Toglia, M. P., & Neuschatz, J. S. (1997). False memories: Are pictures really worth a thousand words? Paper presented at the thirty-eighth annual meeting of the Psychonomic Society, Philadelphia, PA.

Neuschatz, J. S., & Payne, D. G. (1996). The influence of warnings and encoding instructions on the magnitude on the false memory effect. Paper presented at the sixty-seventh annual meeting of the Eastern Psychological Association, Philadelphia, PA.

Neuschatz, J. S., & Payne, D. G. (1996). The effect of rehearsal difficulty on long-term recall. Paper presented at the eighth annual convention of American Psychological Society, San Francisco, CA.

Toglia, M. P., & Neuschatz, J. S. (1996). The influence of word concreteness on false memories. Paper presented at the eighth annual convention of the American Psychological Society, San Francisco, CA.

Toglia, M. P., Neuschatz, J. S., Goodwin, K. A. (1996). Gist representations and the production of false memories. Paper presented at the second International Conference in Memory, Padua, Italy.

PCR EXHIBIT 0153

Toglia, M. P., & Neuschatz, J. S. (1996). False memories: Where does encoding opportunity fit into the equation. Paper presented at the thirty-seventh annual meeting of the Psychonomic Society, Chicago, IL.

Neuschatz, J. S., Toglia, M. P., & Neuschatz, J. S. (1995). The child witness: Resistance to suggestibility over time. Paper presented at the sixty-sixth annual meeting of the Eastern Psychological Association, Boston, MA.

Neuschatz, J. S., & Payne, D. G. (1995). The influence of rehearsal schedule on long-term memory. Paper presented at the sixty-sixth annual meeting of the Eastern Psychological Association, Boston, MA.

Payne, D. G., Blackwell, J. M., & Neuschatz, J. S., (1995). Creating false memories: Remembering items and sources of information for non-existent events. Paper presented at the sixty-sixth annual meeting of the Eastern Psychological Association, Boston, MA.

Payne, D. G., Neuschatz, J. S., & Wenger, M. J., (1995). Cued recall hypermnesia: Intralist vs. extralist cues and rhyme vs. semantic cues. Paper presented at the annual meeting of the Midwestern Psychological Association, Chicago, IL.

Payne, D. G., & Neuschatz, J. S., (1995). Cued recall hypermnesia for categorically related words. Paper presented at the seventh annual convention of the American Psychological Society, New York, NY.

Toglia, M. P., Goodwin, K. A., Lyon, M. L., & Neuschatz, J. S. (1995). False memory in list recall: The role of depth of processing. Paper presented at the seventh annual convention of the American Psychological Society, New York, NY.

Payne, D. G., Neuschatz, J. S., Elie, C. J., & Blackwell, J. M. (1995). False memory: Empirical demonstrations and practical implications. Paper presented at the first biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), Vancouver, Canada.

Toglia, M. P., Neuschatz, J. S., Goodwin, K. A., & Lyon, M. L., (1995). Thematic abstraction and the creation of false memories. Paper presented at the first biennial meeting of the Society for Applied Research in Memory and Cognition (SARMAC), Vancouver, Canada.

Payne, D. G., Blackwell, J. M., Elie, C. J., & Neuschatz, J. S. (1995). False memory effect in recall and recognition. Paper presented at the thirty-sixth annual meeting of the Psychonomic Society, Los Angeles, CA.

Toglia, M. P., Neuschatz, J. S., Goodwin, K. A., & Lyon, M. L. (1995). The influence of delayed recall on false memories. Paper presented at the thirty-sixth annual meeting of the Psychonomic Society, Los Angeles, CA.

PCR EXHIBIT 0154

Toglia, M. P., Neuschatz, J. S., Lyon, M. L., Gilbert, J. L., & Von Bergen, H. A. (1995). The influence or organization and delayed recall on illusory memories. Paper presented at the sixty-sixth annual meeting of the Eastern Psychological Association, Philadelphia, PA.

Neuschatz, J. S., & Starzec, J. (1994). The effects of selective attention on a modified version of the Stroop color-word task. Paper presented at the sixty-fifth annual meeting of the Eastern Psychological Association, Providence, RI.

Toglia, M. P., Neuschatz, J. S., Hembrooke, H., & Ceci, S. J. (1994). The influence of misleading postevent information on children's memory: Is it more widespread than we thought? Paper presented at the Third Practical Aspects of Memory Conference, Arlington, VA.

Toglia, M. P., Payne, D. G., Anastasi, J. S., & Neuschatz, J. S., (1994). Recognition accuracy and memory impairment: A meta-analysis. Paper presented at the American Psychology-Law Society conference, Santa Fe, NM.

Neuschatz, J. S., & Neuschatz, J. S. (1993). The effects of sports motivations on individual and team performance. Paper presented at the sixty-fourth annual meeting of the Eastern Psychological Association, Arlington VA.

**Dissertation**

Neuschatz, J. S. (1999). The phenomenological characteristics of false memories.

**Master's Thesis**

Neuschatz, J. S. (1992). The influence of misleading postevent information on children's memory: Is it more widespread than we thought?

**Research Interests**

Memory for complex events
Phenomenology of memory
Eyewitness memory
False memories
Applied cognitive psychology
Psychology and the law
Collaborative recall
Mnemonic devices

**Teaching Experience**

*Courses Taught*

Graduate
> Cognitive Psychology
> Statistics for Experimental Methods
> Psychology and Law

Undergraduate
> Psychology and Law
> Cognitive Psychology
> Laboratory in Cognitive Psychology
> Sensation and Perception
> Laboratory in Sensation and Perception
> Introductory Psychology
> Statistical Analysis and Design
> Research Methods in Psychology
> Learning

## Professional Affiliations

American Psychological Association
American Psychology-Law Society (APA Division 41)
Psychonomics (Associate Member)
Southeastern Psychological Association
American Psychological Society
Society for Applied Research in Memory and Cognition (SARMAC)

## Professional Service

Editorial Board, *Law and Human Behavior*, as of 2008
Ad Hoc Reviewer
> *Memory*
> *Memory & Cognition*
> *Applied Cognitive Psychology*
> *Psychonomic Bulletin and Review*
> *Acta Psychologia*
> *Journal of Experimental Psychology: Learning, Memory, and Cognition*
> *Canadian Journal of Experimental Psychology*

2008 American Psychology-Law Society Conference Program Co-Chair
Expert Testimony on the Psychology of Eyewitness Memory in criminal and military trials

PCR EXHIBIT 0156

REFERENCES

Dr. Andrew Cling
Chair, Department of Philosophy
University of Alabama in Huntsville
Huntsville AL  35899
clinga@uah.edu
(256) 824-2334

Dr. Michael P. Toglia
Department of Psychology
SUNY College at Cortland
Cortland NY  13045
mtoglia@snycorva.cortland.edu
(607) 753-4222

Brian L. Cutler, Ph.D.
Professor and Chair, Department of Psychology
University of North Carolina Charlotte
9201 University City Boulevard
Charlotte, NC  28223-0001
blcutler@uncc.edu
(704) 687-4775

Dr. Steven J. Lynn
Department of Psychology
Binghamton University
Binghamton, NY.13902
slynn@binghamton.edu
(607)-777-4946

PCR EXHIBIT 0157

EXHIBIT

M

1  Jeffrey T. Patterson, Private Investigator

2  Patterson Investigations

3  13400 Turah Rd

4  Clinton, MT  59825

5  (406)240-8598

6

7

8                              AFFIDAVIT

9  Jeffrey T. Patterson deposes and says:

10    1.  I am over 18 years of age.

11    2.  I am of sound mind and make the following declarations at my own free will

12        without coercion or influence.

13    3.  I have been a professional private investigator in Montana since January 1981 and

14        in private practice since March of 1983.

15    4.  Over the course of my investigative career I have investigated, documented,

16        reviewed, consulted or assisted with hundreds of automobile collisions.

17    5.  I have investigated, reviewed, consulted or assisted with numerous motor vehicle

18        versus pedestrian and/or animal collisions.

19    6.  After Katie Garding's conviction, and before her sentencing, I was hired by Rob

20        and Lori Garding to review Katie's conviction for vehicular homicide of Bronson

21        Parsons which occurred January 1, 2008 along Highway 200 in East Missoula,

22        MT at approximately 1:40 a.m.

23    7.  After review of Katie Garding's conviction, my interviews with jurors,

24        examination of proceedings and the investigation conducted by the State's

25        prosecutors and defense, it is clear that critical and necessary evidence and

Affidavit of Jeffrey T. Patterson
Page 1 of 3

1    investigation common, expected and available in this kind of collision was

2    ignored and/or neglected.

3    8.  I found no evidence in my review that there had been any attempt by Katie's

4    defense, or the State of Montana to engage an expert accident reconstruction,

5    which was paramount and necessary in validating or dispelling the investigating

6    officers' suspicions or conclusions that were reached with outstanding questions

7    of fact and valid suspicions of inaccuracy.

8    9.  The best evidence available in my review of Katie Garding's trial was Katie

9    Garding's vehicle.

10   10. Relying on my years of experience investigating motor vehicle collisions,

11   specifically motor vehicle v. pedestrian collisions, I expected to find significant

12   damage to Katie Garding's vehicle as I would any similar vehicle that collides

13   with an adult human walking along the roadway at the speed estimated in this

14   case.

15   11. The lack of obvious damage to Katie Garding's vehicle made it critically

16   necessary to reconstruct the collision using all the elements of the collision

17   available, including a vehicle identical or close to identical to the suspect vehicle.

18   12. Lacking a scientific reconstruction of the collision in question that explained a

19   phenomenon allowing Katie Garding's vehicle to collide with Bronson Parsons at

20   an estimated speed of 40 miles per hour without causing damage to Katie

21   Garding's vehicle, it is highly improbable and unreasonable that any professional

22   investigator could conclude with any degree of reasonableness, let alone beyond

23   reasonable doubt, that Katie Garding's vehicle did in fact hit Bronson Parsons.

24   Further affiant sayeth not.

25        /

Affidavit of Jeffrey T. Patterson
Page 2 of 3

1
2    DATED this _16_ day of _July._____, 2015.
3
4                                    _Jeffry T. Patt_____
5
6
7    State of Montana
8    County of Missoula
9
10   This instrument was signed before me on this _16th_ day of _July____, 2015
11
12   by   _Jeffrey T. Patterson_____
13       *Print name of signer*
14
15                          _Darcy L. Larson_____
16   ⟨NOTARIAL   DARCY L LARSON          *Notary Signature*
         SEAL⟩    NOTARY PUBLIC for the
17                State of Montana
                  Residing at Missoula, Montana  _Darcy L. Larson_____
18                My Commission Expires
                  May 14, 2017
19      S   E   A   L        *Printed Name*

20                          Notary Public for the state of Montana.  Residing
21                          at_ Missoula_____ My
22                          Commission expires: _May 14_, 20_15_

23

24

25

26

27

Affidavit of Jeffrey T. Patterson
Page 3 of 3

PCR EXHIBIT 0160

EXHIBIT

_N_

1
2
3
4

MONTANA FOURTH JUDICIAL DISTRICT COURT,
MISSOULA COUNTY

**KATIE IRENE GARDING,**

             **Petitioner,**

        -v-

**STATE OF MONTANA,**

             **Respondent.**

Dept. No.
Cause No.

**AFFIDAVIT OF
JENNIFER STREANO (II)**

5

6   STATE OF MONTANA )
7                                  : ss
8   County of Missoula      )
9

10        Before the undersigned, a notary public for the State of Montana,

11   personally appeared Jennifer Streano, who, having been duly sworn, on her oath

12   deposes and says that this affidavit is made on her personal knowledge, and that

13   if she were to appear as a witness in the above-captioned matter, she would

14   competently testify as follows:

15        1.    My name is Jennifer Streano and I reside in Missoula, Montana.

16        2.    I have a B.A. in Political Science from the University of

1

1  Washington (2001); and a J.D. from the University of Montana School of Law

2  (2005).

3       3.    I have been licensed to practice law in Montana since 2005.

4       4.    I have been employed with the Office of the Public Defender, State

5  of Montana since 2006.

6       5.    The exclusive nature of my law practice is criminal defense.

7       6.    In my capacity as a Public Defender I represented Katie Garding,

8  who was charged with Vehicular Homicide; Leaving the Scene of a Fatal Crash;

9  Tampering with Evidence; and Driving a Motor Vehicle without a Valid

10  License. The case went to trial in October 2011, and she was convicted of all but

11  Tampering with Evidence. See *State of Montana v, Katie Garding*, No. DC 10-

12  160.

13       7.    I have been asked to give an opinion as to my performance in

14  representing Katie Garding in that matter. Specifically, was Ms. Garding

15  afforded effective assistance of counsel in accordance with the standards set

16  forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Whitlow v. State*,

17  2008 MT 140, 343 Mont. 90, 193 P.3d 861?

18       8.    I conclude that I was ineffective as a matter of law in my

19  representation of Ms. Garding, for the reasons set forth more fully below.

PCR EXHIBIT 0162

9.     I was inadequately prepared to represent Ms. Garding. This was only my second homicide trial, and I had no co-counsel to assist me. Thus, I was overwhelmed with the complexities of the case.

10.     I was inadequately prepared for trial in this matter in that I failed to take necessary steps to consult with accident reconstruction experts and secure appropriate testing. I failed to request funding to secure testing. I failed to request more time to secure testing. My failure to take these steps had nothing to do with strategy. Rather, these failures were illogical, unreasonable, and terrible oversights which fell below objective standards of representation set forth in *Strickland* and *Whitlow*.

11.     I failed to appreciate the fact that an accident reconstruction was critical to the case and to my representation of Ms. Garding. This is particularly true because the State of Montana conducted no accident reconstruction at trial. Rather, the State relied on the testimony of Highway Patrolmen Richard Hader and Robert Strauch, who offered opinions at trial as to the vehicle's speed, point of impact, final resting place of the victim's body, damage to the vehicle, and injuries to the victim. A professional accident reconstruction would have certainly and effectively countered the State's testimony.

12.     I am aware that defense counsel often has the duty to hire expert witnesses on behalf of their clients in appropriate circumstances. Further an

3

1    attorney has the duty to make reasonable investigations, or make reasonable

2    decisions that makes particular investigations unnecessary. I am also aware that

3    cursory investigations do not automatically justify tactical decisions. These

4    propositions were and are set forth in such cases as *Smith v. Jenkins,* U.S. Court

5    of Appeals for the Sixth circuit, No. 13-4269 (6th Cir. Apr 23, 2015), *Richey v.*

6    *Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007), *Strickland v. Washington*, 466

7    U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); and *Gersten v.*

8    *Senkowski,* 426 R.3d 588 (2d Cir. 2005). The holdings in these cases, and others,

9    reinforce my position that I could have, and should have, procured accident

10   reconstruction experts on behalf of my client Katie Garding, and that failure to

11   do so constituted ineffective assistance of counsel.

12          13.    I have reviewed the accident reconstruction reports and conclusions

13   of experts Harry W. Townes and Keith Friedman. I have also reviewed the

14   report. of retired Highway Patrol officer Warren Schiffer. The video evidence,

15   the expert opinions, and the supporting documentation overwhelmingly establish

16   that evidence of this kind should have been prepared prior to trial. This evidence

17   is and would have been powerful, compelling scientific, and expert evidence of

18   Ms. Garding's innocence.

19          14.    My failures as defense counsel were so severe that they deprived

20   Ms. Garding of a fair trial. Because I failed in my duties as counsel, critical

4

1  expert and scientific evidence was not presented to the jury. Had this evidence

2  been presented, it is my opinion that the result in this trial would surely have

3  been different. Since it was not, Ms. Garding's conviction was all but assured.

4      15.    For all these reasons it is my opinion that, in the matter of *State of*

5  *Montana* v. *Katie Irene Garding*, DC 10-160, the defendant was denied effective

6  assistance of counsel in accordance with the standards set forth in *Strickland* and

7  *Whitlow*.

8                        FURTHER AFFIANT SAYETH NOT.

9

10

11                  Jennifer Streano

12

13  SUBSCRIBED AND SWORN TO BEFORE ME this __13ᵗʰ__ day of

14  __August__, 2015

15

16      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my

17  official seal the day and year hereinabove first written.

18

19

20

21                  Notary Public, State of Montana

22                  Residing at __Missoula__, Montana

23                  My Commission expires: __12-17-2017__

24

25

26

CRAIG A. MCKILLOP
NOTARIAL SEAL
NOTARY PUBLIC for the
State of Montana
Residing at Missoula, MT
My Commission Expires
December 17 2017

PCR EXHIBIT 0165



STATE OF MONTANA )
                      ss.
County of Cascade   )

## AFFIDAVIT OF DAVID F. NESS

David F. Ness, having been first duly sworn, deposes and states:

1.     I am an Assistant Federal Defender employed by the Federal Defenders

of Montana in Great Falls, Montana. I have held this position since November of

2000. I am admitted to practice before the United States Supreme Court, the Montana

Supreme Court, the United States Courts of Appeals for the Sixth and Ninth Circuits,

and the United States District Courts of Eastern Tennessee and Montana.

2.     Prior to my employment with the Federal Defenders of Montana, I

was an Assistant Federal Defender with the Federal Defender Services of Eastern

Tennessee in Chattanooga, Tennessee. I held that position from June of 1998 until

November of 2000.

3.     I was in private practice from August of 1991 until June of 1998. As a

private practitioner, I concentrated on criminal defense and civil rights litigation with

an emphasis on litigation brought under 42 U.S.C. § 1983. In 1998, I was honored,

together with Palmer Hoovestal, to be recognized as Trial Lawyer of the Year by the

Montana Trial Lawyers Association.

1

4.     From August of 1989 to August of 1991, I was a law clerk to the Honorable Russell C. McDonough at the Montana Supreme Court.  I took this position following graduation from the University of Montana School of Law in June of 1989.

5.     At this point in time, my practice is primarily focused on federal habeas and post-conviction litigation under 28 U.S.C. §§ 2254 and 2255.  My case load (both trial level petitions and appeals) derives from assignments by the District Court's Magistrate Judges and referrals by the Ninth Circuit Appellate Commissioner.

6.     I have appeared for oral argument on numerous occasions before the Sixth and Ninth Circuits.  On two occasions, once in the Sixth Circuit and once in the Ninth Circuit, I appeared before the court sitting *en banc* for oral argument.

7.     Most of my career as an Assistant Federal Defender has been spent as a trial lawyer.  I am not sure how many trials I have had but the cases I have tried include a broad range of offenses -- murder, manslaughter, sex offenses (including forcible rape and child sexual abuse), assault, burglary, drug distribution, firearms, bank robbery, and immigration.  Some of the manslaughter and assault trials arose out of drunk driving accidents.

8.     In the District of Montana, vehicular homicide is most often charged under the involuntary manslaughter statute, 18 U.S.C. § 1112.  In cases where there

2

is not a death but someone is seriously injured, the United States Attorney often

charges the defendant with assault resulting in serious bodily injury under 18 U.S.C.

§ 113(6). In many, but not all of these cases, my office hires an expert witness to

testify for the defense.

8.    Prior to preparing this affidavit, I reviewed the following materials:

- Trial Transcript, *State of Montana v. Katie Irene Garding*

- Karco Pedestrian Impact Videos

- Friedman Research Corporation Preliminary Report, "Analysis of Claimed Garding Pedestrian Impact", December 19, 2014

- Report of Harry W. Townes, Professional Mechnical Engineer, January 26, 2015

- Report of Rocky Mountain Investigations, Garding Case Report, March 1, 2015

- Police Accident Scene Photographs

- Garding Vehicle Photographs

- Diagrams of Scene prepared by MHP

- MCSO Inclusive Case Report, Case # S080101-004

- MCSO, County Coroner Report for Entry # 3176, Decedent Name: Bronson David Parsons

-
- MHP Fatal Crash Report - "East Missoula Fatal Hit

3

and Run"

- Report of Postmortem Examination, Decedent Name: Bronson David Parsons

- MHP Total Station Report

- Alice Ammen correspondence of February 23, 2014

- Montana Supreme Court Opinion, *State v. Garding*, 315 P.3d 912 (Mont. 2014)

9.     From my review of these materials, I am aware that Katie Garding was convicted of vehicular homicide while under the influence, failure to stop at the scene of an accident involving an injured person, and driving without a valid license. Her convictions arose out an allegation that she killed Bronson David Parsons in a hit-and-run accident in the early morning of January 1, 2008.

10.     Garding spent the preceding evening in the company of her then boyfriend, James Bordeaux, and a man named Paul McFarling. Garding and Bordeaux met McFarling for the first time that evening at a bar in downtown Missoula. It was New Years Eve and Garding was under the influence of alcohol and marijuana.

11.     Bronson Parsons was struck by what was described as a dark colored SUV at about 1:40 a.m. on January 1, 2008. When the accident occurred, Parsons was walking along the shoulder of Highway 200 in East Missoula with his friend,

4

Daniel Barry. Parsons was walking to Barry's left about three feet from the fog line. Barry, who was one of only two people who claimed to have actually seen the accident, testified that he felt a "rush of wind." He looked up and saw Parsons "stuck on the front of a car" with his head "kind of back over the hood." He watched as Parsons was carried away by the vehicle. Parsons eventually slid off the hood onto the roadway and the SUV accelerated and left the scene.

12.    Based on Barry's report, law enforcement initially believed that the vehicle involved in the accident would have sustained "heavy front-end damage." Later that day, at about 1:00 p.m., one of the investigating officers, MHP Officer Richard Hader, stopped Garding for an equipment violation, a crack in her windshield. Garding drove a black 1994 Chevrolet Blazer. Because her car matched Barry's general description of the vehicle that hit Parsons, Hader examined its front end. Finding no damage to the hood or windshield, he determined that Garding's Blazer was not the vehicle involved in the hit-and-run. Garding was given a ticket and allowed to leave but her boyfriend, James Bordeuax, was arrested on an out-of-state warrant.

13.    Law enforcement spent the next year or more investigating the hit-and-run accident. During this period of time, they developed several leads but they did not make an arrest. In late December, Officer Hader received a telephone call

5

from a confidential informant who claimed that Garding's Blazer was the vehicle that struck Parsons. The informant went on to state that a fog lamp mounted on the right side of its bumper had been knocked loose during the accident and had been duct-taped back into position. The confidential informant was later identified as Teuray Cornell, who was incarcerated at the Missoula County Jail with James Bordeuax.

14.    Cornell initially told the police that Bordeaux was driving Garding's Blazer. Later, when he was housed in the same pod as Bordeaux, he changed his story and stated that Garding was driving.

15.    Garding's Blazer had an aftermarket square tube bumper welded on its front end. Two fog lights had been affixed to the top of the bumper, below the headlights. After speaking with Cornell, investigating officers inspected her Blazer and found that the passenger side fog light was secured to the bumper with duct tape.

16.    Bordeaux was extradited from Missouri, where he was serving time, to face a burglary charge. In March of 2009, Officer Hader tried to speak with him about the hit-and-run accident. Bordeaux invoked his Fifth Amendment rights and refused to be interviewed. Two months later, however, he agreed to speak with Hader. His statement, although inconsistent in important respects from the known evidence, implicated Garding in Parsons's death. Bordeaux gave several more statements in the months leading up to Garding's trial. Although he continued to

6

PCR EXHIBIT 0171

implicate Garding, his statements conflicted with one another and the known evidence.

17.     Bordeaux agreed to testify against Garding in return for a recommendation that he receive a five year suspended sentence on the burglary charge.  According to documents filed at his omnibus hearing, Bordeaux faced a potential sentence of over one hundred years under Montana's Persistent Felony Offender statute.

18.     At trial, Bordeaux testified that when the accident occurred, he was riding in the front passenger seat of Garding's Blazer arguing with Paul McFarling, who was in the backseat.  McFarling was angry because Bordeaux had stolen some of his money.  The argument escalated and McFarling pulled out a gun.  Bordeaux testified that as they were arguing, he heard a loud thump.  He turned around just in time to see a person flying through the air and hear Garding say, "I just hit somebody."

19.     Paul McFarling testified for the prosecution.  Although he confirmed much of what occurred during the evening he spent with Garding and Bordeaux, he adamantly denied that Garding was involved in a hit-and-run accident or that they were even in East Missoula when the accident occurred.

20.     Bordeaux's sister, Heather Harmon, was called as a prosecution witness.

7

She testified that she saw Garding on New Years Day and noticed that her fog light had been attached to the bumper with duct tape. Harmon testified that she did not recall seeing the broken light the night before and asked Garding about it. Garding told her that she "thought she had hit something." Garding did not, however, specify when the light was broken. It could have, according to Harmon, happened at any time "in the past."

21.    Everette Newhouse, Garding's former boyfriend, testified that the fog light was torn off when they took her Blazer "mudding."[1] He stated that they replaced the light by affixing it to the bumper with duct tape.

22.    Dr. Gary Dale, the medical examiner who conducted Parsons's autopsy, testified that the size and location of Garding's bumper was consistent with muscle tearing injuries to Parsons's calves.

23.    The State called two Highway Patrol Officers to testify about the facts and circumstances of the accident. Officer Richard Hader opined that Parsons was hit only on the left calf. Officer Andrew Novak testified that Parsons was hit from behind on both legs. According to Novak's estimation, after he was hit, Parsons flew forward 90 feet before landing in the roadway.

---

[1] Newhouse and Garding had gotten back together. He was her boyfriend when he testified at trial.

8

24.     After Garding's conviction became final, the Montana Innocence Project consulted with Dr. Harry Townes and Keith Friedman, who agreed that computer modeling of the accident was necessary. These models establish that the striking vehicle would have sustained significant damage upon impact, eliminating Katie Garding's vehicle. With Mr. Friedman overseeing, KARCO Engineering conducted a physical crash test and documented the results. It was determined within a reasonable degree of engineering certainty that Katie Garding's car was not the vehicle that hit Bronson Parsons. This conclusion was based on the following:

- Both computer modeling and the physical crash reconstruction test established that the striking vehicle would have sustained significant damage to its hood and windshield. Other than a broken fog light (and it is unknown when the fog light was broken), the Garding vehicle was not damaged.

- The results of the computer modeling and crash reconstruction test are consistent with the description of the accident provided by Daniel Barry.

- The claim that Parsons's leg injuries were consistent with being struck by Garding's vehicle did not support a theory that Garding was responsible for the accident. The height of the bumper on her vehicle was consistent with virtually every other vehicle bumper in the United States. The injuries to Parsons's calves, in other words, could have been caused by almost any vehicle.

25.     It is my understanding that Garding's trial counsel, Jennifer Streano, has submitted an affidavit conceding that she provided ineffective assistance of

9

counsel. Ms. Streano has stated that she was overwhelmed by the complexities of the case and that she failed to consult with or employ an accident reconstruction expert. Although I recognize that "the craft of trying cases is far from an exact science" and that scrutiny of an attorney's performance is highly deferential, *Bolender v. Singletary*, 16 F.3d 1547, 1557 (11th Cir. 1994), I nevertheless agree with Ms. Streano's self-assessment.

26.    In coming to this conclusion, I have relied on the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and adopted by Montana in *Whitlow v. State*, 183 P.3d 861 (Mont. 2008). To demonstrate ineffective assistance of counsel under *Strickland*, a petitioner must show: (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of the circumstances of the particular case; and (2) that it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-94.

27.    I recognize that expert witness testimony is not necessary in every vehicular homicide case. However, after having reviewed Ms. Garding's case, it is my opinion that presentation of expert testimony was vital to her defense. I base this opinion on the following factors:

  •    It was critically important to effectively challenge the State's

10

witnesses. Expert testimony could have done that. It would have shown that the accident could not have occurred as Bordeaux testified and would have supported the testimony of Garding and McFarling.

- The damage to the physical test vehicle and the computer model vehicles is extensive. Garding's Blazer was essentially undamaged. Experts could have explained the process of physical testing and computer modeling and provided their opinions that it was impossible for Garding's vehicle to have struck Bronson Parsons.

- Expert witnesses could have established that the testimony presented by the State was flawed and incorrect. As Dr. Townes's report shows, a defense expert using fairly simple mathematics could have disproved the theory advanced by Officers Hader and Novak that the Garding vehicle escaped damage because it was turning at the time of impact. Expert testimony that Parsons's leg injuries were consistent with being struck by virtually any other vehicle in the United States would have undermined or neutralized Dr. Gary Dale's testimony.

- Accident reconstruction requires an understanding of physics and kinematics that the average juror does not possess.

- Jurors do not normally have knowledge or an understanding of computer modeling, injury patterns of pedestrian impact, or the professional research and literature regarding automotive pedestrian collision.

28.    A criminal defense lawyer has an obligation under *Strickland* to present expert testimony when the facts and circumstances of a case call for it. *See, Wiggins v. Smith,* 539 U.S. 510, 527 (2003); *Richey v. Bradshaw,* 498 F.3d 344, 363 (6th Cir. 2007). At trial, Ms. Garding denied that she had anything to do with Bronson Parsons's death. The evidence outlined in the reports prepared by Dr. Townes and Mr. Schiffer supports, and is fully consistent with, this defense. The findings and conclusions in those reports undermine the testimony of the Highway Patrol Officers,

11

Dr. Dale, and James Bordeaux. They are consistent with the eye-witness testimony of Daniel Barry. Accident reconstruction testimony would have provided support for, and was essential to, Garding's defense.

29.    As Ms. Streano has forthrightly acknowledged, there was no tactical or strategic justification for failing to employ an accident reconstruction expert. Expert testimony was essential to Katie Garding's defense because it would have provided solid proof of her innocence. Ms. Streano is no doubt a conscientious, well meaning attorney. But her failure to consult with or call an accident reconstruction expert in Ms. Garding's case was a serious omission that "amounted to incompetence under 'prevailing professional norms.'" *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 788 (2011).

DATED this 21st day of July, 2015.

_____
DAVID F. NESS

SUBSCRIBED AND SWORN TO before me this 21st day of July, 2015.

_____
Notary Public For the State of Montana
Residing at Great Falls, Montana
My Commission Expires: 05-01-2016

ADINA K. POITRA
NOTARY PUBLIC for the
State of Montana
SEAL
Residing at Great Falls, Montana
My Commission Expires
May 1, 2016

12



EXHIBIT

P

WENDY HOLTON
Attorney at Law
211 5th Avenue
Helena, MT 59601

(406) 442-9349
(406) 443-4829 (fax, call first)

## MONTANA FOURTH JUDICIAL DISTRICT COURT,
## MISSOULA COUNTY

| | |
|---|---|
| **KATIE IRENE GARDING,** | **Dept. No.** |
| **Petitioner,** | **Cause No.** |
| -vs- | |
| **STATE OF MONTANA,** | **DECLARATION OF WENDY HOLTON** |
| **Respondent.** | |

State of Montana            )
                            )
County of Lewis and Clark   )

I, Wendy Holton, being duly sworn on oath, depose and state as follows:

1. I am an attorney and have been licensed to practice law in the State of Montana since 1984.  I am also admitted to practice in the Federal District Court for the State of Montana, the Ninth Circuit Court of Appeals, and the United States Supreme Court.

2. I received my J.D. from the University of Montana School of Law in 1984.

3. I received my L.L.M. in Advocacy from the Georgetown University Law Center in 1988.

Page 1 of 5

4. From 1984 - 1986, I was an Advocacy Fellow in the Prettyman Legal Internship Program, Georgetown University Law Center, Washington, D.C.

5. From 1986 - 1988, I was employed as a law clerk for the Hon. Gordon R. Bennett, First Judicial District, Lewis and Clark County, Helena, Montana.

6. Since 1989, I have been self-employed as an attorney. My practice focuses on criminal jury trials, appeals, and post-conviction proceedings in both the federal and state courts. I have tried more than 50 jury trials as sole or lead counsel in federal and state courts throughout Montana, including major felonies. I have litigated numerous appeals in the Montana Supreme Court and the Ninth Circuit Court of Appeals, including more than 30 oral arguments. My curriculum vitae is attached to this declaration.

7. I have been asked to give an opinion regarding trial counsel, Jennifer Streano's performance in representing Katie Garding in this matter. Specifically, was Ms. Garding afforded effective assistance of counsel in accordance with the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Whitlow v. State*, 2008 MT 140, 343 Mont. 90, 193 P.3d 861?

8. The right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063 (1984). The Montana Supreme Court has held that "the right to counsel afforded by Article II, Section 24 of the Montana Constitution is broader than the rights afforded by the United States Constitution." *State v. Garcia*, 2003 MT 211, ¶37,

Page 2 of 5

317 Mont. 73, ¶37, 75 P.3d 313, ¶37.

9.   A criminal defendant is denied effective assistance of counsel if: (1) his counsel's conduct falls short of the range reasonably demanded in light of the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution; and (2) counsel's failure is prejudicial.   *State v. Jefferson*, 2003 MT 90, ¶43, 315 Mont. 146, ¶43, 69 P.3d 641, ¶43 *citing Strickland, supra.*

10.   The question of deficient performance is not merely whether counsel's conduct flowed from strategic decision and trial tactics but, rather, whether it was based on "reasonable" or "sound" professional judgment.   *Whitlow v. State*, 343 Mont. 90, 183 P.3d 861, ¶ 19 (2008) *citing Massaro v. United States,* 538 U.S. 500, 505, 123 S.Ct. 1690 (2003).

11.   An attorney has the duty to make reasonable investigations, or make reasonable decisions that makes particular investigations unnecessary.   *Richey v. Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007), *Strickland v. Washington*, 466 U.S. at 690-91; *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); and *Gersten v. Senkowski*, 426 R.3d 588 (2d Cir. 2005).   The adversarial testing process generally does not function properly unless defense counsel investigates the prosecution's case and various defense strategies. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).  This  duty extends to investigating and presenting impeachment evidence that serves to undermine the credibility of the prosecution's witnesses or the probative value of its evidence.   *Driscoll v. Delo*, 71 F.3d

Page 3 of  5

701 (8th Cir. 1995); *Moffett v. Kolb*, 930 F.2d 1156 (7th Cir. 1991).

12.   In a case such as this where the client maintains her innocence and scientific evidence is critical, it is difficult to envision a scenario where defense counsel would not a duty to consult with experts in the area of accident reconstruction.

13.   To establish prejudice the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

14.   The reasonable probability standard requires a lesser proof than the preponderance of the evidence standard:   "The only question is whether there is a reasonable probability that counsel's failure to investigate, and to locate and produce witnesses, affected the outcome of the proceeding. . . . [The defendant] *does not have to show* by a preponderance of the evidence that the result in his case would have been different but for counsel's errors." *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.1998); *See also, Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

15.   I have reviewed the trial transcript of trial in this case, the accident reconstruction reports and conclusions of experts Harry W. Townes and Keith Friedman, and the report of retired Highway Patrol officer Warren Schiffer.

16.   A review of the reports of the accident reconstruction experts confirms that the assistance of an accident reconstruction expert was critical for proper preparation in

Page 4 of 5

PCR EXHIBIT 0181

this case. As set forth in the Towns, Friedman, and Schiffer reports, professional accident reconstruction would have effectively countered the State's case against Ms. Garding and likely would have led to an acquittal.

17.   Ms. Streano, in her affidavit, acknowledges that she should have but failed to consult with accident reconstruction experts and secure appropriate testing. She additionally acknowledges that her failure to do so was not a strategic decision and was not based on reasonable and sound professional judgment. Rather, the failure was an oversight, caused by her relative lack of experience and the fact that she was overwhelmed – given that she was assigned by the Officer of Public Defender to be the sole counsel on a homicide case.

18.   The failure of the defense to obtain the services of accident reconstruction experts in this case caused the jury to be deprived of critical information.   Had the testimony of Harry W. Townes, Keith Friedman, and Warren Schiffer (or other similarly qualified experts) been presented to the jury, the outcome of the trial likely would have been different.

19.   For the above reasons, it is my opinion that Ms. Garding was denied effective assistance of counsel in accordance with the standards set forth in *Strickland* and *Whitlow*.

Further Affiant Sayeth Not.

Dated:  8-9-15

Wendy Holton

Page 5 of 5

**WENDY HOLTON**
Attorney at Law
211 5th Avenue,  Helena, MT 59601

Telephone: (406) 442-9349
Direct line: (406) 443-4829

Facsimile:   (406) 992-3944
E-mail: wholton@mt.net

## EDUCATION

Georgetown University Law Center, E. Barrett Prettyman Fellow – LLM, (Advocacy), 1988

University of Montana – JD, with Honors, 1984

Montana State University – BS (Accounting), with Highest Honors, 1979

Helena High School – Graduate 1975, 3.93 GPA

## LEGAL AND TEACHING EXPERIENCE

**Private Law Practice** – 1989 to present.

Practice focuses on criminal jury trials, appeals, and post-conviction proceedings in both the federal and state courts, and professional licensing issues before state administrative tribunals.

AV rated by Martindale-Hubbel.

More than 50 jury trials as sole or lead counsel in federal and state courts throughout Montana, including major felonies.

Numerous appeals to the Montana Supreme Court and the Ninth Circuit Court of Appeals including more than 30 oral arguments.

Criminal Justice Act and Montana Public Defender conflict panels.

**Law Clerk** – Hon. Gordon R. Bennett, First Judicial District, Lewis and Clark County, Helena, Montana, November 1986 – December 1988.

Researched and wrote numerous proposed opinions covering a wide variety of civil and criminal legal matters.

Wendy Holton, Page 2

**Advocacy Fellow** – Prettyman Legal Internship Program, Georgetown University Law Center, Washington, D.C., August 1984 – July 1986.

> One of five fellows chosen nationally to serve in Georgetown's Criminal Justice Clinic. The first year consisted of intensive training in criminal law, procedure, evidence, and trial practice as well as practical experience as both a prosecutor and defense attorney representing indigent defendants. The second year I supervised ten third-year law students including teaching a two-week orientation and subsequent weekly classes covering Maryland criminal law and procedure, directing moot court sessions, coordinating placement of students in three State Attorney's offices for fall semester, and supervising students defending indigent defendants during spring semester. I also handled my own caseload, co-authored a district court trial manual, and completed required course work.

**Legal Intern** – Missoula County Attorney's Office, Missoula, Montana, February 1983 - May 1984.

> Prosecuted misdemeanors (several jury trials), researched and wrote legal briefs/memoranda, and handled consumer, landlord/tenant, and wage/hour disputes.

**Research Assistant** – Montana Criminal Law Information Research Center, University of Montana Law School, Missoula, Montana, October 1982 – May 1984.

> Researched and wrote legal memoranda for publicly paid members of Montana's criminal justice system.

**Instructor of Accounting** – Eastern Montana College, Billings, Montana, September 1981 – July 1982.

> Taught accounting and business law during a one year sabbatical from law school. Proposed, received funding for, developed the curriculum for, and taught a new senior level class, *Business Law for Accountants*, that subsequently became a requirement in the accounting curriculum. Taught 48 credit hours in four quarters.

PCR EXHIBIT 0184

Wendy Holton, Page 3

## SUBSTITUTE JUDGE APPOINTMENTS

Substitute Municipal Court Judge, City of Helena, Montana, 2001 – present
Substitute Justice of the Peace, Jefferson County, Montana, 2002 – present

## PROFESSIONAL LICENSES

State Bar of Montana (1984)
United States District Court for the District of Montana (1987)
Ninth Circuit Court of Appeals (1990)
United States Supreme Court (1990)
Certified Public Accountant – Montana (inactive status)

## PROFESSIONAL ORGANIZATIONS

State Bar of Montana
Federal Bar Association – President Montana Chapter, 2004 – 2005
Montana Association of Criminal Defense Lawyers – President, 2010 – 2011
Criminal Defense Section (State Bar of Montana)
National Association of Criminal Defense Lawyers
National College for DUI Defense
National Trial Lawyers

## PROFESSIONAL ACTIVITIES

Ninth Circuit Attorney Admission Fund Advisory Committee, 2015 – present,
    appointed by Chief Ninth Circuit Judge Sidney Thomas
CJA Panel Selection Committee for the District of Montana, 2014 – present, appointed
    by Chief U.S. District Court Judge Dana Christensen
Ninth Circuit Judicial Conference – Conference Executive Committee, 2006 – 2009
Montana Public Defender Commission, 2005 – 2008, appointed by Governor Brian
    Schweitzer
Advisory Committee on Rules of Practice and Internal Operating Procedures for the
    Ninth Circuit Court of Appeals, 2004 – 2007
Lawyer Representative to the Ninth Circuit Judicial Conference, 2003 – 2006,
    appointed by Chief U.S. District Court Judge Donald Molloy
Montana Criminal Jury Instruction Commission, 1988 – 2012, appointed by the
    Montana Supreme Court
Montana Commission on Evidence, 2001 – 2012, appointed by the Montana Supreme
    Court

PCR EXHIBIT 0185

Wendy Holton, Page 4

## HONORS AND AWARDS

Montana Justice Foundation – Champion of Justice (2014)
Montana Innocence Project – Defender of Justice Award (2013)
Martindale– Hubbell – AV Rating
Mountain States Super Lawyers (2013, 2014, 2015)
National Trial Lawyers Top 100, Montana Lawyers

## PROFESSIONAL SPEAKING ENGAGEMENTS

Montana Association of Criminal Defense Lawyers and Federal Defenders of Montana, Annual Conference, March 2015 – *DUIFSFSTHGN: Alphabet Soup – Defending the Drinking Driver*

State Bar of Montana, June 2014 – *New Lawyer Workshop*

Montana State Public Defenders, October 2014 – *Cross-Examination of the Expert in a DUI Case*; *Cross-Examination of the Cop in a DUI Case*

U.S. Attorney's Office/Montana Attorney General's Office, 2014 Tribal Court Trial Advocacy Program,  May 2014 – *Evidence and Evidentiary Foundations*

Montana State Public Defenders, October 2013 – *Jury Instructions*

Montana State Public Defenders, August 2012,  *Defending DUI Cases in Montana – Voir Dire*

Montana Bar Association, May 2012, *DUI Cases: From Stop to Appeal – The Defense Perspective*

Montana Bar Association, October 2009 – *Rookie Camp*

Montana Judicial Institute, February 2008 – *Anatomy of a Criminal Case*

Montana State Public Defenders, July 2007 – *The Art and Science of DUI Defense in Montana*

Montana Association of Criminal Defense Lawyers, March 2007  –  *How to Keep Your State Court Client Out of Federal Court*

Montana State Public Defenders, February 2007 – *What State Defenders Need to Know About Federal Criminal Law*

Montana Bar Association, September 2005 – *Rookie Camp*

Minnesota Society for Criminal Justice Twentieth Annual Seminar, February 2005 – *Ethics*

Montana Bar Association Annual Meeting, September  2004 – Moderator, *Federal Sentencing Guidelines Panel*

Montana County Attorney's Association Summer Training Conference, July 2004 – Panel Discussion – *Admissibility of the Preliminary Breath Test*

PCR EXHIBIT 0186

Wendy Holton, Page 5

## PROFESSIONAL SPEAKING ENGAGEMENTS (continued)

Minnesota Society for Criminal Justice Nineteenth Annual Seminar, February 2004 – *Ethics 101 for the DUI Practitioner*

United States District Court, Montana Chapter Federal Bar Association, and the Federal Practice Section of the Montana State Bar, Federal Practice Program, September 2003 – Criminal Panel, *Preparing and Conducting Criminal Litigation in Federal Court*

State Bar of Montana CLE Institute, June 2002 – *Capital Crimes Defense CLE, Appellate Practice, The Montana Perspective*

State Bar of Montana CLE Institute, March 1997 – *Criminal Defense CLE, Finding the Truth Through the Use of Pretrial Motions and Jury Instructions*

Montana Law Enforcement Academy – Presentations on courtroom demeanor and moot court exercises for law enforcement officer trainees.

Law Day – Presentations at area high schools in recognition of Law Day

PCR EXHIBIT 0187

Petitioner's Exhibit Q

Computer Modeling Disk

PCR EXHIBIT 0188

Petitioner's Exhibit Q

Computer Modeling Disk

Petitioner's Exhibit R

KARCO Reconstruction Test Disk

PCR EXHIBIT 0190

## Petitioner's Exhibit S

S-1 (Garding vehicle next to the pre-test accident reconstruction test vehicle)

S-2 (test vehicle after test, close-up, angle)

S-3 (test vehicle after test, close-up straight on)

S-4 (test vehicle after test, wide view of front end)



EXHIBIT

51

Exhibit





EXHIBIT

S-3



EXHIBIT

S-4

tabbies

PCR EXHIBIT 0195