IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KATIE IRENE GARDING, | Cause No. CV 20-105-M-DLC |
| Petitioner, | |
| vs. | ORDER |
| MONTANA DEPARTMENT OF CORRECTIONS, | |
| Respondent. | |

Petitioner Katie Irene Garding (Garding) has been released on parole during the pendency of these proceedings and is now under the supervision of the Montana Department of Corrections.  Accordingly, Garding's unopposed Motion for Substitution of Party (Doc. 22) will be granted.  The caption is amended to reflect Garding's proper custodian as the Montana Department of Corrections.  *See Jones v. Cunningham*, 371 U.S. 236, 242-43 (1963).

Pending before this Court is Garding's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254(d).  Garding challenges her convictions for: Vehicular Homicide while Under the Influence, Failure to Stop Immediately at the

1

Scene of an Accident Involving Injury, and Driving Without a Valid Driver's

license, handed down in Montana's Fourth Judicial District, Missoula County.

Having considered the parties' submissions, the record in the case, and the

applicable law, the Court GRANTS the petition, in part.

## I.      Background

The following facts, presumed to be correct under 28 U.S.C. §2254(e)(1),

are taken from the Montana Supreme Court's decision affirming the denial of

Garding's postconviction petition.  Additional facts will be supplied herein where

necessary.

> Garding's conviction of vehicular homicide arises out of a tragic incident
> leading to the death of Bronson Parsons (Parsons) from injuries he sustained
> after being hit by a vehicle while walking along Highway 200 in East
> Missoula, in the early morning hours of January 1, 2008. Parsons had been
> walking with a friend, Daniel Barry (Barry), who testified Parsons was hit
> by a bigger, dark-colored SUV or truck, possibly with a deer guard or other
> front-end attachment. Another eyewitness, Deborah Baylor (Baylor), also
> reported that a dark-colored vehicle had hit Parsons with its passenger side.
> After the impact, the vehicle drove off. After a lengthy period of
> investigation, the State charged Garding with vehicular homicide, leaving
> the scene of a fatal crash, tampering with evidence, and driving a motor
> vehicle without a valid license.
>
> The case proceeded to a jury trial in 2011. In addition to the testimony of
> Barry and Baylor, the State provided testimony from the two Montana
> Highway Patrol officers who had conducted the investigation. The State did
> not retain an expert to conduct an accident reconstruction, and the officers
> did not conduct one. However, the State did provide the expert testimony of
> Dr. Gary Dale, the medical examiner who had examined Parsons. Dr. Dale
> testified the location and size of Garding's bumper was consistent with the
> injuries sustained in Parsons' calves.

In response to cross examination by Garding's counsel, Dr. Dale acknowledged that any vehicle with a bumper of the same height could have caused Parsons' injuries. Further, Garding's counsel presented the testimony of an expert forensic pathologist, Dr. Thomas Bennett (Dr. Bennett), that the irregular bruising on Parsons' calves could not have been caused by a bumper like the one on Garding's vehicle.

The jury heard testimony from Gabrielle Weiss (Wiess), who law enforcement initially suspected of hitting Parsons. Weiss had made an unusual 911 call around the time of the accident, during which she identified herself as being in East Missoula. However, Weiss later explained she was reacting to an emergency when she called 911, and that she was actually in the Blue Mountain area at the time. Law enforcement agreed with Weiss after reviewing her cell phone records, and believed she was not driving the vehicle involved in the accident. Garding's counsel questioned Weiss, the investigating officers, and a Verizon representative who testified about Weiss' cell phone records, about Weiss' story. Garding's counsel emphasized that Weiss' vehicle contained a fabric impression from a pair of jeans, and that Verizon was unable to analyze several of Weiss' phone records. Garding's counsel pointed out inconsistencies in Weiss' story regarding her location, and secured an admission from Weiss on cross examination that she could not remember much about the night because she had been drinking heavily.

Highway Patrol Trooper Richard Hader (Trooper Hader) testified that the case went cold after police ruled out Weiss as a suspect, until he received a lead from Teuray Cornell (Cornell) almost one year after the accident. Cornell, at the time detained at the Missoula County Detention Center, contacted Trooper Hader to report that he had information about the accident. Cornell related to Trooper Hader that Garding had driven to his house later in the day on January 1, 2008, told him that she had hit a deer, and asked him to fix a broken light on the front of her vehicle, which Cornell did by affixing it with tape. On cross examination at trial, Garding's counsel got Cornell to acknowledge that he could not say with certainty whether Garding actually told him she hit a deer on the day he fixed her light. Garding's counsel also highlighted several different versions of the story Cornell had provided to police, and also elicited testimony from Cornell and Trooper Hader that Cornell was seeking to get out of jail when he contacted

police regarding the accident. Garding's counsel also elicited testimony from Cornell's cellmate at the time that Cornell had told the cellmate he was going to lie to police about the accident.

Other primary witnesses in the case were James Bordeaux (Bordeaux) and Paul McFarling (McFarling), both of whom were passengers in Garding's vehicle on the night in question. Bordeaux, Garding's boyfriend at the time, testified that he and Garding had started drinking around 11:00 a.m. on December 31st, and met up with McFarling that afternoon. He reported the three of them continued to drink throughout the afternoon and evening, including at Red's Bar in Missoula and the Reno Bar in East Missoula. After midnight, they went to a friend's house to purchase cocaine and, after they were unsuccessful, returned to Red's Bar. Garding hit the curb as she parked, and an officer observing this instructed her not to drive for the rest of the night. About 1:30 a.m., they left Red's Bar, with Garding driving, to again attempt to purchase cocaine in East Missoula. During this drive, Bordeaux testified that McFarling, who was sitting in the back seat, pulled out a gun and attempted to show it to Bordeaux. Bordeaux, who was sitting in the front passenger's seat while Garding was driving, turned around and started arguing with McFarling about the gun, causing a commotion in the vehicle. Bordeaux testified that, upon an impact, he spun around in his seat just in time to see a person flying through the air, and that Garding had stated, "I hit somebody." Bordeaux testified they were "in a panic about what to do," Garding did not stop the vehicle, and instead, she drove back to Red's Bar, where she attempted to park close to the same spot where they had been parked when the officer told Garding not to drive that evening. Then, the three got into McFarling's vehicle and drove to Missoula, where the three stayed the night at McFarling's house.

In exchange for his testimony, Bordeaux obtained a plea deal regarding a burglary charge arising out of the theft of McFarling's gun, which occurred the morning following the accident. Garding's counsel attacked Bordeaux's credibility at trial by focusing on his plea deal and highlighting inconsistencies in the stories Bordeaux had given to police. Garding's counsel also emphasized the testimony of McFarling, who consistently stated he did not remember Garding hitting anything with the vehicle that night. Further, Garding's counsel had McFarling explain that he had no reason to lie to protect Garding, as he believed Garding aided Bordeaux in stealing his gun.

(*Garding v. State*, 2020 MT 163, ¶¶ 2-8, 400 Mont. 296,  466 P.3d 501 (Mont. 2020)(internal citations omitted).

As set forth above, Garding was convicted of Vehicular Homicide while Under the Influence, Failure to Stop, and Driving without a Valid License.  She was acquitted of one count of Tampering with Physical Evidence.  On October 11, 2011, the district court sentenced Garding to a 30-year prison term for Vehicular Homicide, a consecutive 10-year sentence for Failure to Stop, and a concurrent 6-month sentence for Driving without a License.[1]

> Garding appealed, challenging evidentiary rulings made by the District Court regarding witnesses, cross examination, and Garding's expert witness. [The Montana Supreme Court] affirmed, and the United States Supreme Court subsequently denied Garding's petition for writ of certiorari. *Garding v. Montana,* 574 U.S. 863, 135 S. Ct. 162, 190 L.Ed.2d 118 (2014).

> On September 15, 2015, Garding, represented by the Montana Innocence Project, filed a petition for postconviction relief (Petition), raising three claims: ineffective assistance of counsel (IAC), discovery violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and newly discovered evidence of her innocence. Specifically, Garding claimed her trial counsel had been ineffective for failing to hire an accident reconstructionist; that the State had failed to produce x-rays of Parson's legs and photographs of an unrelated 2005 vehicle-pedestrian accident, both of which she claimed were exculpatory; and that post-trial accident reconstructions produced by new experts constituted new evidence that proved Garding's innocence.

> The State filed motions for summary judgment on Garding's newly discovered evidence claims and her *Brady* claim regarding Parsons' x-rays, which the District Court granted after a hearing. The District Court then

---

[1] (*See* Sent. Trans.)(Doc. 1-25 at 712-13.)

> conducted a hearing on the remainder of Garding's claims, after which it
> denied the Petition in March of 2019.

*Garding*, 2020 MT 163, ¶¶ 10-11.

On appeal, the Montana Supreme Court found that the district court did not

err in denying Garding's ineffective assistance of counsel claim.  Specifically, the

Court found trial counsel, Jennifer Streano (Streano), did not perform deficiently

by failing to retain an expert in accident reconstruction.  *Id*. at ¶¶ 17-23.  The Court

also held the district court properly concluded the State did not fail to disclose

exculpatory evidence in violation of *Brady*.  *Id*. at ¶¶ 29-36.[2]

## II.    Legal Standards

A federal court may entertain a habeas petition from a state prisoner "only

on the ground that [she] is in custody in violation of the Constitution or laws or

treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and

Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas

relief unless the state court's adjudication of the claim "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2)

---

[2] In a strongly worded dissent, two justices of the Montana Supreme Court would have reversed
the lower court, granted Garding relief on all of her claims, and ordered a new trial.  *Garding*,
2020 MT 163, ¶¶ 44-61. (Gustafson dissenting, joined by McKinnon).

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *Id*. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Additionally, a federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The U.S. Supreme Court further instructs that § 2254(d)(1) consists of two separate clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached [by the U.S. Supreme Court] on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. A federal court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  The question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

7

Thus, AEDPA sets forth a highly deferential standard for evaluating state court decisions.  A state prisoner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Bearing these principles in mind and the limited scope of review outlined by AEDPA, the Court turns to Garding's claims.

### III.   Discussion

Garding raises the following claims for relief:

1.  The State violated *Brady v. Maryland*[3] by failing to produce the x-rays of Parsons' leg taken by Dr. Dale, despite a court order;

2.  The State violated *Brady v. Maryland* by failing to produce the 2005 accident photographs; and,

3.  Trial counsel provided ineffective assistance by failing to consult with and call an accident reconstruction expert.

The Court will address Garding's ineffective assistance of counsel claim first, followed by the *Brady* claims.

//

---

[3] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Court held that "suppression by the prosecution of evidence favorable to an accused…violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution."

**1.  Ineffective Assistance of Counsel: Accident Reconstruction Expert**

Garding contends she was deprived of her Sixth Amendment right to effective assistance of counsel at trial because her counsel failed to consult with and present testimony from an accident reconstruction expert that would have testified that the State's theory of the case violated the laws of physics.

**i.      Clearly Established Federal Law**

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

To obtain relief on a claim of ineffective assistance of counsel, a defendant must show both that her attorney provided deficient performance, and that prejudice ensued as a result.  *Strickland*, 466 U.S. at 687-96.  To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id*. at 689.  Thus, in evaluating allegations of deficient performance the reviewing

9

court's scrutiny of counsel's actions or omissions is highly deferential. *Id*. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. The defendant's burden is to show that counsel made errors so serious that she was not functioning as counsel guaranteed by the Sixth Amendment. *Id*. at 687.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In addition, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard…A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Accordingly, the federal court must engage in "a 'doubly deferential' standard of review that gives both the state court and the

defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

### ii.    Garding's IAC claim on postconviction

In support of her IAC claim, Garding presented the opinion report of mechanical engineer Dr. Harry W. Townes, an expert in accident reconstruction, as well as the opinion of Keith Friedman, an accident reconstructionist with over 35 years of experience.  (*See* Townes Report, Ex. G)(Doc. 1-2 at 31-45); *see also* (Friedman Report, Ex. H)(Doc. 1-2 at 46-89.)   Mr. Friedman conducted virtual testing via computer simulations to replicate the hit-and-run accident.  (*Id*. at 58-63.)

On October 17, 2014, KARCO Engineering, LLC, an automotive and safety testing facility conducted a physical crash reconstruction using a 1994 Chevrolet Blazer with a modified bumper, like Garding's.   (*See* KARCO Test Report, Ex. I) (Doc. 1-2 at 90-114).  A 198-pound dummy was positioned on the test track and the test vehicle was outfitted with weighted dummies, consistent with the individuals present in Garding's vehicle.  The crash was reconstructed at a speed of 35.31 miles per hour.  The crash test report summarized: "[u]pon impact the vehicle engaged the lower half of the dummy's body.  The dummy rotated backward until its back impacted the hood of the vehicle, forcing its legs up in the air until it flipped over and dismounted to the passenger side of the vehicle.  The dummy's head contacted the hood and windshield.  The upper and lower torso

contacted the vehicle's hood. The test vehicle experienced damage to its front end and the windshield was broken on impact." (*Id*. 94.)  The crash reconstruction was documented via photos contained within the report. (*Id*. at 101-14.)  The test vehicle was significantly damaged. (*Id*. at 193-95) (Ex. S, Photos of test vehicle following crash reconstruction.)

Based, in part, upon the KARCO testing data, both Dr. Townes and Mr. Friedman provided opinions that Garding's vehicle did not strike Mr. Parsons. Central to both opinions was the fact that Garding's vehicle sustained no damage. (*Id*. at 39, 40-42)(Townes Report); (*Id*. at 64-66, 72)(Friedman Report).  Mr. Friedman concluded, within a reasonable degree of engineering certainty that Garding's vehicle was not the vehicle that struck Parsons. (*Id*. at 72.)  Further, Mr. Friedman opined that the trial testimony offered by Trooper Hader and Trooper Novak, regarding the pedestrian kinematics that they believed to have occurred during impact, was incorrect and "violate[d] the laws of physics given the front-end design of [Garding's] vehicle and Mr. Parsons' body characteristics." (*Id*.) Specifically, Trooper Novak's trial testimony regarding Parsons being hit from behind in both legs by the bumper but never contacting the body of the vehicle and then flying forward 90 feet, allowing the vehicle to swerve around the body and not run it over, was a "physical impossibility," violating both the laws of physics and impact mechanics." (*Id*. at 67.)

Similarly, Trooper Hader's theory that Parsons was struck only in the left leg and projected forward approximately 90 feet also presented an impossibility. (*Id.*) Under this scenario "the leg, if not separated from the rest of [the] body, would move out of the way and rotate about Mr. Parsons' center of mass, leaving Mr. Parsons in a location very close to the point of impact." *Id.* Mr. Friedman noted that eyewitness Daniel Barry's description of the impact, in which Parsons was carried along by the vehicle with his head and upper shoulders on the hood/windshield and his body sliding off the side of the vehicle and landing on the ground, was "consistent with the results of the crash test and virtual testing" in which the dummy ended up approximately 120 feet from the point of impact. (*Id.* at 67-8.)

Dr. Townes opined "it is beyond a reasonable doubt" that Garding's vehicle did not strike Parsons. (*Id.* at 31.) He also explained the flawed reasoning, testified to by both Trooper Hader and Trooper Novak, that the lack of front-end damage to the Garding vehicle was due to turning or swerving. Dr. Townes noted that neither trooper presented any quantitative information to support their turning theory and further explained how the geometrics involved in the turning theory would not be sufficient to eliminate vehicle damage. (*Id.* at 36-38, 45.)[4]

---

[4] Garding also provided additional expert support, including a report from Peter J. Stephen, M.D. and report from Rocky Mountain Investigations, which offered similar findings: Garding's vehicle was not involved in the hit-and-run. *See* (Stephens Report, Ex. F)(Doc. 1-2 at 21-

Streano also provided an affidavit acknowledging she failed to consult with accident reconstruction experts and secure appropriate testing. (Aff. Streano II, Ex. N) (Doc. 1-2 at 163, ℙ 10.) Streano explicitly stated this decision was not strategic, but rather was illogical and a "terrible oversight" on her part. (*Id.*) She explained that she failed to appreciate that accident reconstruction was critical to Garding's case and that without such expert testimony, the opinions offered at trial by Troopers Hader and Novak were left unchallenged. *Id.* at ℙ 11. Defense investigator Mori Woods confirmed that she and Streano never discussed the possibility of procuring or consulting with an accident reconstructionist during the investigation leading up to Garding's trial. (*See* Hrg. Trans.)(Doc. 1-16 at 153:1-16.)[5]

In response to Garding's claim, the State provided a report prepared by Trooper Smart. In this document Trooper Smart posited that the collision occurred at a speed range between 12-18 miles per hour and that the collision was of the "wrap and carry" variety. Under this scenario, Mr. Parsons would be "wrapped" onto the hood of the striking vehicle and carried for some distance before falling

---

30)(Parsons' injuries consistent with a steep sloping hooded vehicle such as a sports car or sedan, not Garding's Blazer); *see also* (Rocky Mountain Investigations Report, Ex. J)(Doc. 1-2 at 115-128(no indication of pedestrian contact on Garding's vehicle; improbable that it was involved in the accident and sustained no damage).

[5] (*See also* Doc. 1-4 at 60) (Ex. E, 6/22/16 "To Whom it may concern" letter written by Woods.)

14

off.  (Smart Report, Ex. 8)(Doc. 1-3 at 112-122.)  Trooper Smart, drawing from Dr. Dale's report, stated that "lacerations to the left, right, top front and back of head…and the stellate laceration on the right occipital bone was caused by contact with the ground and was the cause of death." (*Id*. at 115.)  Trooper Smart went on to observe that "no broken bones were noted on Parson's head, although other experts referred to a broken anterior fossa."  (*Id*.) Trooper Smart then went on to focus on the minimal injury to Parsons' legs and lack of damage to Garding's vehicle.  (*Id*. at 115, 118)  Trooper Smart concluded that a low-speed collision explains the lack of damage to the Garding vehicle and that this same vehicle, traveling at a low speed, was "a good candidate to break a pedestrian's leg" and that her bumper matched Parsons' injuries.  (*Id*. at 118.)

Trooper Smart's findings were disputed by Garding's experts.[6]  In particular, David Rochford an independent accident reconstructionist refuted the allegations of Trooper Smart.  Rochford found that the Garding vehicle could not have been involved in the crash and detailed various inconsistencies throughout both the state's case and Smart's report.  (*See* Rochford Rpt., Ex. H)(Doc. 1-4 at 187-217.)  Further, Mr. Friedman found that Trooper Smart's conclusions were fundamentally

---

[6] *See e.g*., (Doc. 1-4 at 61-66)(Townes Rebuttal Report, Ex. F); *see also*, (*Id*. at 76-186)(Supplemental Friedman Report, Ex. G)(finding Trooper Smart's report and analysis: (1) is based on an incorrect understanding of Parson's injuries; (2) ignored much of the evidence while attempting to justify the results; and, (3) either misinterpreted or misunderstood evidence).

flawed because he based his calculations on the relatively minor leg injuries Parsons received.  But Friedman noted Trooper Smart misunderstood the injuries. He pointed out that Parsons received major injuries, including fractures to at least five bones in his head, and bilateral shearing of his carotid arteries, which were severe and life-threatening injuries.  (*Id*. at 80-82.)  Trooper Smart based his calculations on a belief that Parsons received relatively minor injuries. Friedman explained that a low-speed pedestrian impact where the pedestrian slowly slides off the hood, as posited by Trooper Smart, would not have resulted in the devastating injuries Parsons exhibited.  (*Id*. at 83.)  "The more likely explanation is that this massive set of injuries of the head/neck area are a result of a higher speed impact with a vehicle that was probably of a recent design."  (*Id*.)

### iii.    PCR Decision

The PCR court found that Streano made a strategic decision not to retain an accident reconstructionist and that this decision was reasonable.  The court further held Streano exercised sound trial strategy in relying heavily upon the cross-examination of witnesses to prove her defense.  (Doc. 1-19 at 32, ⁋ 59.)  The court noted Streano effectively cross-examined the State's witnesses on matters which called into question what vehicle was involved in the crash, called witnesses that countered the State's witnesses, and provided alternate suspects and theories for the crash.  (*Id*. at ⁋ 57.)  The PCR court also found Streano effectively cross-

examined Dr. Dale regarding the fibula fracture and that it "did nothing" to identify Garding's vehicle as the striking vehicle.  Streano obtained several concessions from Dr. Dale, including that there was nothing about Parson's injuries that identified Garding's vehicle and that any vehicle with a bumper at the same height could have been involved.  *Id*. at ⁋ 58.

The PCR court further found Trooper Smart's testimony to be more credible than any of Garding's expert witnesses.  (*Id*. at 33, ⁋ 64.)  The court determined the injuries to Parsons matched the trial testimony and Trooper Smart's analysis. Namely that "[a] low-speed collision would cause minimal injury to [Parson's] leg. The lack of injury to his torso shows that his body did not contact the striking vehicle and thus no damage would be caused to the vehicle."  (*Id*. at 33-34, ⁋ 65.) Further the Court noted that Garding's experts used an assumed speed of 35 miles per hour and a presumed impact point, which did not account for the relatively minor leg injuries and lack of a torso injury.  Instead, these facts pointed to Trooper Smart's finding that it was a low-speed collision.  (*Id*. at ⁋ 66.)

For these reasons, the PCR court concluded that Streano's performance was not so deficient as to deprive Garding of a fair trial,  (*id*. at 35, ⁋ 67)(citing *Strickland*), and additionally found there was no prejudice to Garding.  That is, there was no reasonable probability sufficient to undermine confidence in the outcome of the proceedings, the "[l]ikelihood of a different result is merely

conceivable, but isn't substantial." (*Id*. at ¶ 68.)

### iv.    Montana Supreme Court Decision

The Montana Supreme Court echoed the lower court's findings and that the examination of the trial court record led to the conclusion that Streano presented and "extensive and strong defense." *Garding*, 2020 MT 163, ¶ 17. Specifically, she countered or sought to undermine "virtually every" evidentiary contention introduced by the state and the jury was left to make credibility determinations in order to resolve evidentiary conflicts and reach a verdict. *Id*.

The Court  did not get into the mechanics of the accident reconstruction or opposing expert testimony.  Instead, it noted Streano presented the testimony of Dr. Bennett to counter Dr. Dale's testimony and he provided his expert opinion that Garding's vehicle, specifically her bumper, did not cause Parson's injuries. *Id*. at ¶ 18.  Similarly, Streano highlighted potential flaws in the investigation and the work of the forensic analysts.  The Court reiterated the cross-examination concessions Garding obtained from Dr. Dale that he could not definitely identify Garding's vehicle as the one that caused Parson's injuries and any vehicle with the same bumper height could have done so. *Id*.

The Court also discussed Streano's attack on Bordeaux's testimony and challenge to his credibility based upon his own self-interested motivation. *Id*. at ¶ 19.  Streano was able to "highlight several inconsistent statements [Bordeaux]

provided during his police interviews." *Id.* Further, she directly contradicted his testimony with that of McFarling who repeatedly stated Garding did not hit anything that night and that he had no reason to lie for Garding. *Id.* Streano "examined the inconsistencies" in Cornell's statements regarding who was driving- Bordeaux or Garding- and also prompted him to admit he was uncertain whether Garding had told him she hit a deer at the time he taped her light. *Id.*

Streano provided multiple alternative theories about what happened, including challenging Weiss' shifting account of the night in question and getting her to admit she had changed her story and did not recall the night's events due to her heavy intoxication. *Id.* at ¶ 20. Streano also highlighted that a jean fabric impression was found on Weiss' bumper and attacked the State's handling of the evidence. *Id.* Streano pointed to the potential involvement of another individual, Josh Harrison, who had bragged at a party that he had hit someone with his car on the night Parsons was struck. *Id.* Finally, the Court noted Streano elicited testimony that raised unanswered questions regarding the State's timeline of events and overall theory of the case, including: a phone call Garding made at approximately the same time Parsons was hit, the origin of glass in Parsons' clothing, and incomplete cell phone data that could have supported Garding's timeline of events and location. *Id.* at ¶ 21.

In light of this record, the Court found Garding presented a strong defense

and to determine otherwise would require the Court to engage in impermissible "second guessing. *Id.* at ⁋ 22. Or put another way, the Court could not consider a "Modified Plan A defense" or "Plan B defense" just because Streano's "Plan A defense" failed. *Id.* Due to trial counsel's efforts, the Court held Garding failed to establish that Streano's failure to hire an accident reconstructionist fell "outside the wide range of professionally competent assistance" and, thus, could not meet the first *Strickland* prong. *Id.* at ⁋ 23. Based upon its finding that Streano performed proficiently, the Court declined to consider the prejudice *Strickland* prong.

     **v.**    **Analysis**

    The Montana Supreme Court's determination that Streano performed proficiently resulted from an objectively unreasonable application of *Strickland*, pursuant to 28 U.S.C. § 2254(d). Garding is entitled to relief on this claim.

     **a. Deficient Performance**

    As set forth above, the PCR Court described Streano's decision not to hire an accident reconstruction expert a "strategic" one. (Doc. 1-19 at 32, ⁋ 59.) The Montana Supreme Court seems to have tacitly adopted this finding. But Streano's own affidavit and hearing testimony, coupled with that of Investigator Woods, belies this finding. The Circuit has observed that "[c]ounsel cannot justify a failure to investigate simply by invoking strategy… Under *Strickland,* counsel's investigation must determine strategy, not the other way around." *Weeden v.*

*Johnson*, 854 F. 3d 1063, 1070 (9ᵗʰ Cir. 2017).  In the same vein, a court should not seek to justify a failure to investigate by invoking trial strategy, particularly when the record suggests a contrary finding.

The Montana Supreme Court did not focus on the strategy inquiry and instead found that Streano's representation fell within the wide range of professionally competent assistance.  Both the PCR court and the Montana Supreme Court referenced *Harrington v. Richter*.  The PCR court noted *Harrington's* observation that "[i]t is sometimes better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."  (Doc. 1-19 at 27, ₱ 33)(citing *Harrington*, 562 U.S. at 109). The Montana Supreme Court observed this principle to be true in Garding's case and also noted there can be more than one way to provide reasonable professional assistance.  *Garding*, 2020 MT 163, f.n. 2.

In *Harrington v. Richter*, the Supreme Court rejected an IAC claim.  There, the Court reversed an en banc Ninth Circuit decision and upheld a state court ruling that defense counsel's failure to test blood evidence was a reasonable trial strategy.  *Richter*, 562 U.S. at 107-08.  If defense counsel had tested the blood, he would have discovered the mixture supported his client's version of events- a fact that was revealed during PCR proceedings.  *Id*.  But without the benefit of hindsight trial counsel faced two potential outcomes: a result that might have

supported the defense theory of the case or one that defeated it.  Faced with this "serious risk" of an adverse result, the Court held defense counsel was not obligated to "pursue an investigation that…might be harmful to the defense."  *Id*.

But in the present case, to reach a conclusion that the trial strategy employed was reasonable, Streano was first obligated "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  While attorneys are afforded considerable discretion to make strategic decisions about what to investigate, this discretion is afforded only *after* the lawyer has "gathered sufficient evidence upon which to base their tactical choices."  *Duncan v. Ornoski*, 528 F. 3d 1222, 1235 (9th Cir. 2008)(citing *Jennings v. Woodford*, 290 F. 3d 1006, 1014 (9th Cir. 2002).  The Circuit has repeatedly held that "[a] lawyer who fails to adequately investigate and introduce…[evidence] that demonstrate[s] [her] client's factual innocence, or that raises[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."  *Duncan*, 528 F. 3d at 1234, *citing Hart v. Gomez*, 174 F. 3d 1067, 1070 (9th Cir. 1999)(collecting cases).  "The failure to investigate is especially egregious when a defense attorney fails to consider potentially exculpatory evidence."  *Duncan*, 528 F. 3d at 1234-35, *citing Rios Rocha*, 299 F. 3d 796, 805 (9th Cir. 2002).

It is impossible to analyze the reasonableness of Streano's decision to forego

an investigation into accident reconstruction because she made no strategic considerations.  Furthermore, there is no reason to think that pursuing such an investigation could have potentially undermined the defense.  To be sure, Streano did a competent job of challenging the State's evidentiary contentions and witnesses.  To nearly every point made by the State, Streano presented a counterpoint.  But Streano also was presented with her client's vehicle, supposedly involved in a hit-and-run accident, that had sustained no damage.  Thus, there is no scenario under which Streano could have believed crash reconstruction investigation, and the corresponding expert testimony, could have inculpated her client.  Further, Garding had adamantly maintained her innocence throughout the proceedings.

Accordingly, this was not a situation, as the Montana Supreme Court claimed, where with the benefit of hindsight, once Streano's "Plan A" failed, it is convenient to suppose about the merits of a "Potential Plan B" or "Modified Plan A." *See Garding*, 2020 MT 163 at ¶ 22;  *see also Bashor v. Risley*, 730 F. 2d 1228, 1241 (9th Cir. 1984)(tactical decisions do not constitute IAC simply because, in retrospect, better tactics were known to have been available.)  In Garding's case, two things were true at the same time: the questionable investigation and witness credibility issues existed while the lack of damage to the vehicle also existed.  Mounting challenges to both would not have resulted in Streano "riding two

horses" and, thus, presenting an inconsistent defense theory.  *Cf. Correll v. Steer*, 137 F. 3d 1404, 1411 (9th Cir. 1998)(*Strickland* provides wide discretion to counsel who failed to develop an inconsistent defense).  Nor would pursuing both lines of defense have been pointless or harmful to Garding. *See Browning v. Baker*, 875 F. 3d 444, 473 (9th Cir. 2017)(recognizing that "the obligation to investigate, recognized by *Strickland*, exists when there is no reason to believe that doing so would be fruitless or harmful.") In fact, by failing to pursue this investigation and present expert testimony in support, the two investigating officers were allowed to provide their conclusions about the kinematics of the crash and the lack of vehicle damage.  Without countervailing testimony, the conclusions of Troopers Hader and Novak were given the imprimatur of expert testimony.

Thus, no matter the skill with which Streano challenged the State's case, the jury was left with the somewhat confusing, yet unrefuted, testimony of the officers. That is, that Parsons was either hit only in his left leg while the striking vehicle was turning, as testified to by Trooper Hader, or was struck in both legs and propelled forward, as testified to by Trooper Novak.  Under either scenario, according to the troopers' respective conclusions, there would be little damage to the Garding vehicle.  As set forth above, however, each of Garding's experts detailed how both scenarios presented impossibilities, violated the laws of physics, and were wholly inconsistent with the lack of damage to Garding's vehicle.

24

And while it is the case that in many situations, defense cross-examination will be sufficient and support a strategy that too much doubt exists regarding the State's theory to allow a jury to convict, *see Harrington*, 562 U.S. at 111, it is also the true that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Id.* at 106.  Further, while Streano did perform proficiently in challenging the State's theory of the case, "even an isolated error" can support an ineffective assistance claim if it is "sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  Her failure to investigate accident reconstruction constituted such an isolated, and serious, error.

Streano had a duty to perform an investigation and consult with experts.  Her failure to pursue an accident reconstruction/crash investigation, and procure the corresponding expert testimony, was deficient and fell below an objective standard of reasonableness under *Strickland*.  The state court's determination to the contrary resulted from an unreasonable application of the *Strickland* performance standard to the facts of this case.  28 U.S.C. § 2254(d)(1).  Even under the deferential standards of AEDPA and *Strickland* applying in tandem, a reasonable jurist could not determine that the failure to investigate and introduce the accident reconstruction evidence did not amount to deficient performance.  The Court has considered reasonable arguments against deficient performance and concludes

25

there to be none; Garding has established Streano performed deficiently.

### b. Prejudice

As set forth above, the Montana Supreme Court did not consider the *Strickland* prejudice prong. The PCR court gave passing reference to second prong, but did not provide meaningful analysis. It simply determined that "[t]here [was] not a reasonable probability sufficient to undermine confidence in the outcome of the proceedings." (Doc. 1-19 at 35, ¶ 68.) This Court disagrees.

Once a petitioner demonstrates counsel's performance was deficient, the Court next engages in the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

The *Strickland* court further instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with

26

overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695-96.  To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable.  *Richter*, 562 U.S. 86 at 112.

The evidence presented at trial against Garding was not overwhelming.  The testimony of Garding's ex-boyfriend, Bordeaux, was fraught with issues.  The same can be said of jailhouse informant Teuray Cornell.  The investigation into the hit-and-run had gone cold for months once Weiss was eliminated as a suspect.  In December of 2008, Cornell contacted law enforcement from the Missoula County Detention Center.  From the outset, it was clear that he wanted a deal in exchange for his information.  (*See* Hader test.)(Doc. 1-24 at 531:531; 581)(noting Cornell wouldn't cooperate until he was "home on his couch"); *see also,* (Crawford test.)(Doc. 1-25 at 429)(Cornell's cellmate testified Cornell was always trying to get out of jail using information he had.)

Cornell initially told Trooper Hader the day following the hit-and-run that he taped a light back onto Garding's vehicle after she or Bordeaux had allegedly struck a deer with the Blazer.  The problem with this information is that Trooper Hader actually stopped Garding's vehicle 10 hours after the hit-and run.  Trooper Hader observed no front-end damage to the vehicle, which would include a broken

27

or freshly-taped light.  Also, on the stand Trooper Hader reviewed a photo

Detective Blood took of Garding's vehicle two weeks after the hit-and-run.  It does

not show a freshly duct-taped light, but instead has "some kind of tape hanging on

it." (*Id*. at 600-01.)[7]

Cornell initially told law enforcement that Bordeaux was driving the vehicle.

(*See* Novak test.)(Doc. 1-25 at 216.)  He subsequently changed his story to claim

that Garding was the driver of the vehicle.  This change in story occurred after

Cornell was placed in a pod with Bordeaux at the Missoula County Detention

Center.  (*Id*. at 290-91); *see also* (Cornell Testimony)(Doc. 1-15 at 405-06).

Michael Crawford, Cornell's cellmate, confirmed that while Cornell and Bordeaux

were in the cell together, they were sitting down talking the entire time.  (*Id*. at

430).  Crawford also testified that after Bordeaux was moved out of their pod,

Cornell stated that he liked Bordeaux and would hate to see him released from

prison out of state and then thrown back into prison in Montana.  Cornell informed

Crawford he was going to change his story and tell the County Attorney that

Garding was the driver and not Bordeaux.  (*Id*. at 430-31.)  On the stand Cornell

admitted to providing untruthful information to law enforcement and he was

unable to recall exactly where he had obtained the information he did provide.

---

[7] This tape, as shown on the 1/15/08 photo, is described elsewhere as being "old and tattered" an
indication that it had been there for a substantial amount of time, certainly more than 2 weeks.
(See Rochford Report)(Doc. 1-4 at 190).

(Cornell test.)(Doc. 1-25 at 415-16.)  Of note, the State elected not to call Cornell as a witness; the defense called him.[8]

The testimony of Bordeaux, like Cornell's, was also problematic.  In the statement he gave to Detective Blood in January of 2008, during the stolen gun investigation, Bordeaux stated that the group left the Reno Bar in East Missoula around 12:30 and headed back to Missoula and that Bordeaux, Garding, and McFarling were at Red's Bar until closing.  After closing, they went to McFarling's house and spent the night.  (Bordeaux test.)(Doc. 1-25 at 86-88.) There is no mention of any return trip to East Missoula.

Bordeaux was then extradited out-of-state on warrants.  Upon his return to Montana in March of 2009, Bordeaux initially refused to speak to law enforcement.  Subsequently, his attorney reached out to law enforcement and Bordeaux provided a statement.  He was informed that this initial statement "wasn't going to cut it."  (Hader test.)(Doc. 1-24 at 591).

On May 27, 2009, Bordeaux provided another interview in which he claimed they hit something around 1:40 in East Missoula.  (*Id*. at 592.)  Bordeaux then claimed the group was at the Reno until approximately 1:30 a.m. and, while driving west back into Missoula, they hit something near the interstate underpass.

---

[8] Additionally, at some point prior to sentencing, Cornell apparently advised Streano that "he made the whole thing up from the very git-go."  (Sent. trans.)(Doc. 1-25 at 708:14-16.)

(Bordeaux test.)(Doc. 1-25 at 99-100.)  During the interview, Bordeaux was asked about this sequence of events and the location of the collision six times; Bordeaux stated they never drove east of the Reno.  He also denied going anywhere except from the Reno to Red's Bar.  (*Id*. at 101-02.)  Trooper Hader then informed Bordeaux that Parsons was hit 300 yards east of The Reno- the opposite direction of where Bordeaux had claimed the collision occurred.  (*Id*. at 104-05; 107.)  Bordeaux's story then changed and he stated that they had gone on a drug run that took them east of the Reno.  (*Id*. at 107-08.)  Bordeaux claimed that they ran over something but he didn't see what it was.  (*Id*. at 114-15.)  Notably, two days after providing this information, Bordeaux received a probationary sentence on the burglary charge stemming from the theft of McFarling's gun.  (*Id*. at 117.)

Bordeaux then left Montana and did not know Garding had been charged. (*Id*. at 119.)  The defense team went to Missouri to interview him.  The story that he told Garding's team placed the group driving into Missoula at approximately 1:00 a.m., 40 minutes before the hit and run occurred.  (*Id*. at 124.)  Bordeaux stated it felt like they "rolled over" something- the collision was not high impact- and that Garding would have stopped if she knew she hit something.  (*Id*. at 124-25.)

In March of 2011, Bordeaux was transported back to Montana facing revocation of his underlying burglary sentence.  He then gave a new statement in

30

which he stated he, Garding, and McFarling all knew they'd hit a person on the night in question; he also changed the sequence of the night's events. (*Id*. at 132-38.) Bordeaux claimed, for the first time that he, Garding, and McFarling had a pact to cover up the hit-and-run. Despite this pact, he still decided to steal McFarling's gun the following morning. (*Id*. at 143.) Two months before trial Bordeaux provided a new statement. (Hader test.)(Doc. 1-24. at 594.) Bordeaux claimed that a body flew up onto the hood of Garding's vehicle. Trooper Novak acknowledged Bordeaux had provided inconsistent statements. (Novak test.)(Doc. 1-25 at 311.) Suffice to say, the only two witnesses who placed Garding behind the wheel of the Blazer in East Missoula at 1:40 a.m. had credibility issues and were both concerned with their own interests.

As discussed at length above, the physical condition of the Garding vehicle was not consistent with having been involved in a collision. While the vehicle was generally in rather poor condition, there was no recent damage that would indicate it had struck a pedestrian. Trooper Hader stopped Garding's vehicle at 1:00 p.m. on January 1, 2008. He observed a crack in her windshield, but that noted the crack was old. (Hader test.)(Doc. 1-24 at 560). Trooper Hader did not note any front-end damage, including a broken or taped light. (*Id*.) Similarly, there was no impact damage to the Blazer's hood or windshield, the radio antenna located on the right fender was not bent, and there was no observable damage to the right roof support,

the right-side door, the passenger side window, or the right side mirror.[9]  Similarly, while Dr. Dale opined Parsons' head injury resulted from contact with the ground, Alice Ammen from the State Crime Lab provided counter testimony that supported a finding that Parsons actually contacted the striking vehicle's windshield. Ammen opined, given the large amount of glass she recovered from Parsons's clothing, she believed him to have struck a windshield and that the windshield glass was then transferred into his clothing.  (Ammen test.)(Doc. 1-24 at 633). Ammen explained the glass she recovered was clean, distinct from glass that had been deposited or run over on the highway.  (*Id*. at 635.)  Also, McFarling was adamant that Garding never hit anyone on the night in question and that he never entered into an agreement with Garding or Bordeaux to conceal the hit and run. (McFarling test.)(Doc. 1-25 at 33-36.)

Dr. Dale testified that there was nothing about the Garding vehicle that was consistent with Parsons' fibula fracture, which was located 11 inches above his heel, and there was nothing about the Garding vehicle that was consistent with Parsons' head injury.  (Dale test.)(Doc. 1-24 at 661; 668.)  Dr. Dale also conceded that any vehicle with a bumper 15 to 18 inches high would have caused similar injuries.  (*Id*. at 672, 675.)

---

[9] (*See also* Rochford Report)(Doc. 1-4 at 190.)

In support of the defense theory that Garding's vehicle was not involved in the hit-and-run, Dr. Bennett testified that the bruising on Parsons calves was inconsistent with Garding's square after-market bumper and was more consistent with a rounded bumper.  (Bennett test.)(Doc. 1-25 at 456-57.)  Dr.  Bennett opined that Garding's bumper did not cause the injuries.  But Dr. Bennett was offered as an expert in forensic pathology; he was not offered as a crash scene expert and was not an accident reconstructionist.  Dr. Bennett noted crash biomechanics and occupant kinematics are not his field of expertise. (*Id*. at 438.)

Trooper Hader was not an expert in crash scene and/or accident reconstruction.  He testified that his training in crash scene investigation, in addition to the law enforcement academy, consisted of two reconstruction courses. (Hader test.)(Doc. 1-24 at 512.) Trooper Hader explained his analysis of the crash. He believed it to be a "swerving type" collision. He based this conclusion upon the bruise he saw on Parsons' left calf, road rash on his flank, and Parsons' head injury.  Hader testified, "if you strike a- a square vehicle, even a round front-end vehicle, you're going to have some form of impact whether it's broken ribs or more bruising and that, and there was nothing that indicated that his body struck anything in that way." (*Id*. at 521.)  According to Hader this "swerving type" impact explained the lack of damage to Garding's vehicle.  (*Id*. at 522.)  Thus, the limited injury to Parsons body and swerving tire marks caused Hader to change the

scope of his investigation from looking for a vehicle that would have sustained

major front-end damage to a vehicle with relatively minor damage.  *(Id*. at 514-15;

522-23.)

Likewise, Trooper Novak was not an expert in crash scene reconstruction.

At the time of the hit-and-run he had been with the Montana Highway Patrol for a

year and a half.  (Novak test.)(Doc. 1-25 at 163.)  Like Trooper Hader, Trooper

Novak changed his focus as to the type of vehicle damage they would be looking

for, that is from a vehicle with major damage to a vehicle with minor front-end

damage.  (*Id*. at 211.)  Novak testified that initially Dr. Dale believed the striking

vehicle to be a "small car."  *Id*.  After Novak told Dr. Dale they were looking for

an SUV and that he believed the striking vehicle to be steering back towards the

road or slightly turning and that the collision was "more of a clip," Dr. Dale felt the

scenario could be consistent with the injuries observed on Parsons.  (*Id*.)

But Novak's understanding of the crash mechanics was less than clear: "My

opinion was that [Parsons] was hit while the vehicle was steering back into the

lane. My opinion is that he- the initial impact served to accelerate his body

forward, and his acceleration was such that he stayed on or near the hood of the car

as it continued to travel west." (*Id*. at 285).  When Novak was asked if he believed

Parsons was carried on the hood of the vehicle, he testified, "I can't really form an

opinion as to that. I think – there's – there's a likelihood he was. There's also a

likelihood that he was actually flying through the air. I- I can't say if he was on the hood on the vehicle of if he was actually simply flying through the air. I don't know. (*Id*.).  When questioned later by the State about the distance Parsons body traveled, Novak stated he couldn't  say for certain, but believed it to be unlikely that Parsons traveled 150 feet from the point of impact.  Novak agreed it was a possibility, but then qualified this statement by adding, "none of us really know." (*Id*. at 336.)

  Had Streano engaged the services of an accident reconstruction expert, he or she would have been able to effectively counter the testimony offered by Troopers Hader and Novak, as detailed above. (*See* Section III(1)(ii)).  Specifically a crash reconstruction expert and/or mechanical engineer would have established the following: (1) if involved in the collision, Garding's vehicle would have sustained readily observable damage, (2) the testimony offered by Trooper Hader and Trooper Novak regarding the pedestrian kinematics, when viewed against the design of the Garding vehicle and injuries to Parsons, violated the laws of physics, (3) Trooper Novak's trial testimony suggesting Parson flew forward but never contacted the body of the vehicle was an impossibility violating the laws of physics and impact mechanics, (4) Trooper Hader's theory of Parsons being struck only in the left leg and being projected forward 90 feet presented a physical impossibility, and (5) the troopers' theory that the lack of front-end damage to Garding's vehicle

was due to turning, finds no support in the applicable mathematics or geometrics.

Accordingly, such expert testimony would have established, within a reasonable degree of certainty, that Garding's vehicle could not have been the vehicle that struck Parsons.  This information would have had a significant effect on Garding's defense.  The troopers' testimony was the only evidence that was left virtually unchallenged; no counter to their testimony about the crash mechanics was presented. Without such expert testimony, the defense failed to present an alternate theory of the collision or to explain how the clipping/swerving theory violated the laws of physics.  Such expert testimony would have convincingly bolstered Garding's claim that she was not the driver of the vehicle that struck Parsons.  This evidence was necessary for the jury to fully understand the mechanics of the collision in relation to Parsons' injuries and would have exculpated Garding.

This weakness in the State's case is further underscored by virtue of the fact that the State entirely changed its theory of the crash in post-conviction proceedings.  Via the Smart Report, the State contended, for the first time, that the crash was actually a low-speed side collision.  This theory contradicts that of the two eye-witnesses that testified about the crash, Daniel Barry and Deborah Baylor. Barry testified he felt a rush of wind as the vehicle approached and that the striking vehicle hit Parsons struck Parsons "hard and fast."  (Barry test.)(Doc. 1-24 at 455-

36

56).  Barry reiterated the vehicle was coming "extremely fast."  (*Id*. at 466.)

Similarly, Baylor testified the vehicle was going "regular speed" at the time of

impact and then sped up. (Baylor test.)(*Id*. at 479.)  The posted speed limit for the

area of East Missoula where the crash occurred is 35 miles per hour.  Further, the

reports of Rochford and Friedman convincingly refute the theories advanced in the

Smart Report and affirm the findings advanced by Garding in the original expert

reports and crash tests filed in support of her PCR petition.  (*See* Rochford

Report)(Doc. 1-4 at 187-217); *see also* (Friedman Report)(*Id*. at 77-129.)

Accordingly, the expert crash reconstruction testimony provides compelling

support of Garding's innocence.  Had Streano made a reasonable investigation and

presented this information to the jury, it is reasonably likely that the decision

reached would have been different.  *See Strickland* at 695-96.  That is, the Court

finds it reasonable to infer that had this evidence been presented to the jury, there

is a strong possibility that at least one member of the jury would have found

reasonable doubt existed.  Further, Garding has met her burden of  establishing the

requisite prejudice: the likelihood of a different result is not just conceivable, it is

substantial.  *See Richte*r, 562 U.S. at 112.  It was objectively unreasonable for the

state courts to conclude otherwise.  Garding is entitled to habeas relief on this

claim.

//

## 2. *Brady* Claims: x-rays and 2005 Photos

Garding claims the State violated *Brady v Maryland* by failing to produce x-rays Dr. Dale took of Parsons' fibula fracture and 2005 photographs Dr. Dale reviewed following his trial testimony.

### i.    Clearly Established Federal Law

Under *Brady*, prosecutors are responsible for disclosing "evidence that is both favorable to the accused and material either to guilt or punishment." *United States v. Bagley*, 473 U.S. 667, 674 (1985)(internal quotation marks omitted). The failure to turn over such evidence violates due process. *Wearry v. Cain*, 577 U.S. 385, 392 (2016)(per curiam). The prosecutor's duty to disclose material evidence favorable to the defense "is applicable even though there has been no request by the accused, and encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

"There are three components to a true *Brady* violation: '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Benson v. Chappell*, 958 F. 3d 801, 831 (9th Cir. 2020)(*quoting Strickler*, 527 U.S. at 281-82.) "The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Benn v. Lambert*, 283 F. 3d 1040, 1053 n. 9 (9th Cir. 2002). Failure to disclose evidence

by the prosecution is prejudicial "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" of a different result exists when the failure to disclose "undermines confidence in the outcome of the trial." *Id*. at 678.

### ii.    Garding's Claims on PCR

Garding first argued that the State violated her right to due process, and an order of the trial court, by not disclosing x-rays that Dr. Dale had taken of Mr. Parson's lower leg during his post-mortem examination.  (Doc. 1-1 at 18-19.)

The State contended that the x-rays were listed in Dr. Dale's post-mortem report and that Dr. Bennett referenced the x-rays in his expert report for the defense.  The State further argued because the defense was on notice of the existence of the x-rays, it could have subpoenaed them from the Montana State Crime Lab and that the State was under no duty to obtain the x-rays, which were not in the State's possession, for the defense.  The State also contended the evidence was not suppressed and was not favorable to Garding because it was not impeaching or exculpatory.  (Doc. 1-3 at 4-8.)  The State moved for summary judgment on this claim.  (Doc. 1-11 at 3-7.)

Garding's next *Brady* claim surrounds photos that were not provided to the defense.  Following his testimony, but prior to the end of trial, Dr. Dale reviewed

an autopsy report from an unrelated 2005 vehicular homicide case.  On June 9, 2011, Dr. Dale created a CD of the photographs from the 2005 case and put them in his Garding/Parsons file in anticipation of potentially being recalled as a rebuttal witness.  (*See* sealed trans.)(Doc. 12 at 15-16.)  The photos detailed an automotive-pedestrian collision.  The striking vehicle was a Nissan passenger car and the victim-pedestrian sustained injuries to his legs that were similar to Parsons' injuries.  Because Dr. Dale was not recalled during the Garding trial, the photos stayed in his file and apparently remained unknown to either the State or the Defense until PCR proceedings in 2017.

In her Amended PCR Petition, Garding argued that these photos were exculpatory and that the State's failure to disclose at them, at trial or on appeal, constituted a *Brady* violation.  (Doc. 1-5 at 6-10).  Garding argued there was a reasonable probability the outcome of her trial would have been different if the photos were disclosed.  This argument was premised upon the fact that the leg injuries sustained by the victim in the 2005 photos was substantially similar to Parsons and, therefore, refuted the State's contention that the unique nature of Garding's bumper was responsible for Parsons injuries.  (*Id*. at 11-12, 14.)  Further, the 2005 striking vehicle sustained extensive damage to its windshield, thereby highlighting the lack of damage to Garding's vehicle.  (*Id*. at 12-13.)  Garding argued these photos would have opened up new defense theories to trial

counsel and bolstered her expert reports that it was not her vehicle involved in the accident, but rather a vehicle with a softer front-end bumper system.  (*Id*. at 15.)

The State countered by arguing that the 2005 photographs were not material for purposes of *Brady*, because they were not exculpatory, relevant, or independently admissible.  (Doc. 1-6 at 6-9.)  The State further argued that Garding received a fair trial and had the opportunity to advance the theories that she claimed the photos raised.  (*Id*. at 9-12.)

### iii.   PCR Decision

The PCR court granted the State's motion for summary judgment as to the x-ray claim.  There, the court found that the existence of the x-rays was disclosed via Dr. Dale's report and acknowledged by Dr. Bennett.  (Doc. 1-15 at 5.)  The x-rays were also discussed during the probable cause hearing held on March 2, 2011. (*Id*.)  Under the facts of the case, the court found no due process violation occurred where Garding failed to obtain evidence of which she was aware.  (*Id*. at 5-6.)

As to the 2005 photos, the PCR Court noted they contained insufficient information to determine relevancy and exculpatory value.  (Doc. 1-19 at 20-21, ⁋ 12.)  The court found the theory advanced by Garding based upon the photos was actually presented at trial, thus, there was no prejudice.  (*Id*. at 21, ⁋ 15.)  Further, the Court held the photos were not exculpatory, because they did not demonstrate Garding was not involved in the collision.  (*Id*. at 21-22.)  The Court determined

the photos were not material and Garding failed to demonstrate a reasonable probability of a different outcome had the photos been disclosed prior to trial. (*Id.* at 22.)  Accordingly, no *Brady* violation occurred.

### iv.    Montana Supreme Court Decision

The Montana Supreme Court denied Garding's *Brady* claim relative to the x-rays.  The Court first found that the x-rays were in possession of the State Crime Lab and both parties were "explicitly aware" of their existence, both Drs. Dale and Bennett referenced the x-rays in their reports submitted prior to trial.  *Garding*, 2020 MT 163 at ¶ 30.  In relation to Garding's argument that had the substance of the x-rays been disclosed she could have further impeached the credibility of Dr. Dale by pointing out that the bumper on Garding's vehicle would have caused more damage than only the fibular fracture shown on the x-rays, the Court found Garding's counsel questioned several witnesses about Parsons' injuries, including the fracture, in support of her contention that Garding's vehicle did not strike Parsons.  *Id.*  Further, the Court found that the prosecution did not suppress the evidence because Garding was not only aware of its existence, but actively used the x-rays at trial- during her direct examination of Dr. Bennett and to cross-examine other witnesses.  *Id.* at ¶ 31.  Citing the Ninth Circuit's decision in *Amado v. Gonzalez*, the court noted "defense counsel cannot ignore that which is given to [her] or of which [she] is otherwise aware."  *Id.*, *citing Amado*, 758 F. 3d 1119,

42

1137 (9th Cir. 2014). The Court affirmed the lower court's finding that no *Brady* violation occurred relative to the x-rays.

As to the photos, the Court first determined the prosecution cannot suppress evidence about which it is unaware- Dr. Dale independently obtained the photos for possible use in the future and placed them in his own file. *Id*. at ⁋ 35. Further, given the timeline of when Dr. Dale obtained the photos, it is unlikely Garding could have used the photos to impeach Dr. Dale as he was not recalled as a rebuttal witness. *Id*. Had Garding been presented the opportunity to attempt to impeach Dr. Dale, the photos were subject to relevancy objections. Finally, even if the photos were admitted, the Court determined it was impossible to conclude they would have been material to the outcome as "the theory espoused by Garding was already thoroughly presented, including by examination and criticism of Dr. Dale's opinions about the impact." *Id*. Accordingly, the Curt concluded the photos were not suppressed, nor were they material or exculpatory, and the PCR court did not err by holding no *Brady* violation occurred. *Id*. at ⁋ 36.

### v. Analysis

The Montana Supreme Court reasonably rejected Garding's *Brady* claims. Accordingly, this Court must afford deference under 28 U.S.C. § 2254(d).

### a. The leg X-rays

At the probable cause hearing held on March 2, 2011, Dr. Dale testified that

he took an x-ray of Parsons left leg during his postmortem exam and the fibula "had a very slightly displaced fracture 11 inches above the heel." (*See* Doc. 1-24 at 109-10.)  Streano questioned Dr. Dale about the fracture.  (*Id*. at 112; 117.)  At trial Dr. Dale again testified that took his own x-rays of Parsons' lower extremities. (Doc. 1-24 at 641, 650, 661).  Additionally, Dr. Bennett prepared a report which relied, in part, upon Dr. Dale's file and post-mortem exam. (Bennett test.)(Doc. 1-25 at 452; 461-62.)  Dr. Bennett testified about and was, thus, aware of the fibula fracture.  (*Id*. at 453.)

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes."  *Mike v. Ryan*, 711 F. 3d 998, 1012 (9th Cir. 2013). As a preliminary matter, the Court is not convinced that the physical x-ray was particularly favorable to Garding.  The parties were all well aware of the fact that the fibula fracture existed, there was testimony about the fracture, and the significance of this fracture, throughout the trial.  Exculpatory evidence includes any evidence that "if disclosed and used effectively, [ ] may make the difference between conviction and acquittal."  *United States v. Bruce*, 984 F. 3d 884, 895 (9th Cir. 2021)(*quoting Bagley*, 473 U.S. at 676).  In this same vein, the Court cannot say the defense having possession of the physical x-rays would have made the difference in the instant case, because the substance of the x-rays was well known and discussed.

Exculpatory information includes that which may be used to impeach prosecution witnesses.  *Giglio v. United States*, 405 U.S. 150, 152-54 (1972). Similarly, the impeachment value of the x-rays is limited.  As set forth above, Dr. Dale acknowledged there was nothing about the Garding vehicle that was consistent with the location of Parsons' fibula fracture. (*See* Doc. 1-24 at 661; 668.)  Thus, for purposes of *Brady*, Garding has not shown the physical x-rays were favorable.  That is, there is no indication that having the actual x-rays, rather than a medical summation of what the x-rays showed, would have provided exculpatory or impeaching evidence.  *See Benson*, 958 F. 3d at 831

While the actual printed x-rays were not contained in Dr. Dale's file and were, instead, at the crime lab, there is no indication that the State suppressed these documents.  "In order for a *Brady* violation to have occurred, the favorable evidence at issue must have been suppressed by the prosecution."  *See United States v. Olsen*, 704 F. 3d 1172, 1182 (9th Cir. 2013).  Garding argues that the Montana Supreme Court's finding that there was no suppression contravenes *Banks v. Dretke*, 540 U.S. 668, 695 (2004), which provides defense counsel is not required to "scavenge for hints of undisclosed *Brady* material."  (See Doc. 1 at 20.)

But the instant situation was not one where the prosecution lied or concealed evidence and put the burden on the defense to discover the evidence, as in *Banks*, where the prosecution failed to disclose evidence that would have allowed the

defense to discredit two essential prosecution witnesses.  *See Banks*, 540 U.S. at

675.   "Under *Brady's* suppression prong, if 'the defendant is aware of the essential

facts enabling him to take advantage of any exculpatory evidence,' the

government's failure to bring the evidence to the direct attention of the defense

does not constitute 'suppression.'"  *Cunningham v. Wong*, 704 F. 3d 1143, 1154

(9th Cir. 2013)(*quoting Raley v. Ylst*, 470 F. 3d 792, 804 (9th Cir. 2006). As set

forth above, the Court does not find the physical x-rays to be exculpatory.

Furthermore, Garding and her counsel "possessed the salient facts regarding the

existence of the records [she] claims were withheld."  *See Raley,* 470 F.3d at 804.

In *Cunningham*, the Court applied *Raley* and found that Cunningham's attorneys

possessed facts that would have allowed them to access medical records of an

individual that they knew had been shot and was subsequently treated by medical

personnel.  Accordingly, there was no suppression of this easily attainable

evidence.  *Cunningham*, 704 F. 3d at 1154.  The situation is similar in the present

case.

Streano was made aware of the existence of the physical x-rays at the

probable cause hearing, if not sooner.  Dr. Bennett was made aware that Dr. Dale

took his own x-rays during the postmortem exam when he obtained Dr. Dale's files

to review in preparation of writing his own expert report.  As in *Cunningham*,

Garding could have easily obtained the x-rays from the State Crime Lab; there was

no suppression.

Garding has not shown that the x-rays were favorable to her defense or that they were suppressed for purposes of *Brady*.  Accordingly, the Montana Supreme Court did not unreasonably deny this claim.

### b.  The 2005 Photographs

Garding claims that the state court erred in holding no *Brady* violation occurred when it found the State did not possess or suppress the 2005 photographs for purposes of *Brady*, and that its decision contravenes *Kyles v. Whitley*.  (Doc. 1 at 29-36.)  Respondent counters that the prosecutor's duty to disclose the information was not triggered because the photographs were neither favorable nor material, accordingly, the Montana Supreme Court reasonably denied the claims. (Doc. 11 at 63-75.)

The Court acknowledges that *Kyles v. Whitley*, 514 U.S. 419 (1995) imposes upon government a "duty to learn" of favorable evidence known to others acting on the government's behalf as part of their "responsibility to gauge the likely net effect of all such evidence" to the case before it.  *Kyles*, 514 U.S. at 437.  "Whether the Government has 'possession, custody or control' of a document turns 'on the extent to which the prosecutor has knowledge of and access to the documents sought by the defendant in each case."  *United States v. Posey*, 225 F. 3d 665 (9th Cir. 2000)(*quoting United States v. Bryan*, 868 F. 2d 1032, 1036 (9th Cir. 1989)).

But the prosecution "has no obligation to produce information which it does not possess or of which it is unaware." *United States v. Cano*, 934 F. 3d 1002, 1023 (9th Cir. 2019)(*quoting Sanchez v. United States*, 50 F. 3d 1448, 1453 (9th Cir. 1985)); *see also United States v. Aichele*, 941 F. 2d 761, 764 (9th Cir. 1991)("The prosecution is under no obligation to turn over materials not under its control."). There is no requirement that a prosecutor "comb the files" of every agency which "might have documents regarding the defendant in order to fulfill his or her obligations…" *Cano*, 934 F. 3d at 1023.

In the present case, Dr. Dale independently obtained the photographs and put them in his own file mid-trial, after he had already testified. Because Dr. Dale was not recalled as a rebuttal witness, the photos were not referenced or used at trial. As set forth above, the existence of the photos did not come to light until Garding's PCR proceedings, years after her trial. While Garding asserts there was an affirmative duty upon the State to learn of these photos and disclose them to the defense, the Court finds such a requirement untenable. *See Cano*, 934 F. 3d at 1023. There is no indication in the record before this Court that the State ever possessed these photos, had knowledge of the photos, or even had access to the photos until 2017. Accordingly, it would be counterintuitive for this Court to find the State somehow suppressed the photos, of which it was not aware, for purposes of *Brady*. The photos were not suppressed.

48

Further, the Montana Supreme Court's finding that the photos were immaterial and not exculpatory was reasonable.  The photos demonstrate that the 2005 crash involved a Nissan passenger car and a pedestrian.  (Sealed Trans.)(Doc. 12 at 23.)  As a result of the collision the windshield was broken and the victim's scalp and hair were embedded in the windshield.  (*Id*. at 26.)  Some of the injuries to the 2005 victim were similar to Parsons' injuries.  (*Id*.)  These similarities included the head injuries, (*id*. at 27-28), and the leg injuries.  (*Id*. at 39.)  There was also significant damage to the Nissan passenger car, including the crumpled hood and extensive windshield damage.  *Id*. at 28-29.

Garding argues that these photos were favorable because they could have been used to impeach Dr. Dale's trial testimony.  She further claims that the photographs provide evidence that Garding's Blazer did not cause Parsons injuries because, when viewing the 2005 photos, it is apparent that the injuries to Parsons' calves were not unique to the height or weight of Garding's after-market bumper. This, in turn, would have defeated the State's reliance upon Garding's bumper as the identifier of Parsons' injuries.  (Doc. 1 at 33)(citing portion of State's closing argument that "[i]f vehicles had DNA, this one is its bumper.").  Garding points out that the State relied upon Garding's unique bumper to bolster its theory of the case throughout trial and also in postconviction proceedings.  (*Id*. at 34.)  Garding also notes that when examined about the 2005 photos, Dr. Dale reiterated his belief

that Parsons' head injuries came from contact with the ground, but stated he could not "exclude the windshield as the origin of those injuries, which would be direct contact with the vehicle." (Sealed Trans.)(Doc. 12 at 43: 8-11.) Thus, according to Garding, the 2005 photographs could have been used to identify this weakness in Dr. Dale's testimony and further bolster Garding's defense.

This Court understands Garding believes the photos would have been helpful to further impeach Dr. Dale and support her case. But given the timing of when the photos were obtained by Dr. Dale and the fact that Dr. Dale was not recalled to testify as a rebuttal witness, it is unclear how Garding could have done so. Moreover, the photos were subject to relevancy objections. Assuming defense counsel had the photos and could obtain their admission, the photos may have been used to further question Dr. Dale. As set forth above, however, Garding was able to obtain concessions from Dr. Dale that any vehicle with a bumper of the same height as Garding's could have caused Parsons' injuries. Also, Dr. Bennett testified that he did not believe Garding's vehicle caused Parsons' injuries. Thus, in this context the impeachment value of the photos was cumulative. *See United States v. Marashi*, 913 F. 2d 724, 732 (9th Cir. 1990).

Moreover, the photos are not exculpatory, that is, they do not show that Garding was not guilty of vehicular homicide. They could have been used to further challenge Dr. Dale's belief that Parsons' head struck the pavement, rather

50

than the windshield, thus bolstering the defense theory of the case, but this still does not exculpate Garding.  Moreover, if this line of questioning had occurred, Dr. Dale would have likely utilized the other photos he had of a known fall-onto-pavement, obtained at the same time as the 2005 photos, to compare to Parsons injuries in support of his belief that Parsons' head injuries were a result of ground contact.  (*See* Sealed Trans.)(Doc. 12 at 32-3.)  Or, put another way, Garding has not shown that these photos "[made] the difference between conviction and acquittal."  *Bagley*, 473 U.S.

Moreover, Garding has not shown that she suffered prejudice based upon the failure to obtain these photographs.  In relation to the materiality, Garding must show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  She fails to do so here.  The Montana Supreme Court reasonably denied this *Brady* claim.  Accordingly deference must be afforded.

If anything the photographs and the x-rays underscore how critical it was for Streano to fully investigate and engage the services of an accident reconstructionist.  Had she done so, Garding would have been able to present evidence from her own witnesses that the injuries to Parsons were likely caused by a smaller passenger vehicle with a modern bumper.  These experts would have affirmatively excluded Garding's vehicle as the striking vehicle.  Further, defense

experts would have testified that Parsons' extensive head and neck injuries likely

came from contact with the body of the striking vehicle or its windshield, rather

than the ground.  All of these conclusions are set out in the various defense expert

reports outlined herein and contained within the record before this Court.  Relying

on photos of an unrelated crash obtained years after her trial to impeach

government witnesses that had already formed opinions and been impeached,

highlights the need for Garding to have presented such information, in the first

instance, during trial.  While the failure to do so constitutes ineffective assistance

on the part of defense counsel, it does not demonstrate a corresponding *Brady*

violation by the State.

### IV.    Certificate of Appealability

"The district court must issue of deny a certificate of appealability when it

enter a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254

Proceedings.  A COA should issue as to those claims on which the petitioner

makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253( c)(2).  The standard is satisfied if "jurists of reason could disagree with the

district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further."  *Gonzales v.*

*Thaler*, 565 U.S. 134, 140 (2012)(*quoting Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).

"[A] claim can be debatable even though every jurist of reason might agree, after a COA has been granted and the case has received full consideration, that the petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).  The outcome of Garding's *Brady* claims is not reasonably debatable; thus a COA will not issue.  As Garding prevails on her IAC claim, a COA is not warranted.

Accordingly, IT IS HEREBY ORDERED:

1.  Garding's Unopposed Motion to Substitute Party is GRANTED.  The Clerk of Court is directed to have the docket reflect that the Montana Department of Corrections is the proper Respondent.

2.  Garding's Claim 3 regarding Ineffective Assistance of Counsel is GRANTED.  Garding's *Brady* claims, Claims 1 & 2, are DENIED.

3.  A COA is DENIED as to Claims 1 & 2.

4.  The Clerk of Court is directed to enter judgment, by separate document, in favor of Garding and against Respondent on Claim 3 and in favor of Respondent and against Garding on Claims 1 & 2.

5.  Within thirty (30) days of the date of this Order, the State may move to vacate the state criminal judgment and renew proceedings against Garding in the trial court.  If the proceedings are renewed in state court, the State must promptly file notice in this action.

6.  If the State does not file notice on or before **April 21, 2022**, at 12:00

53

p.m., Respondents shall immediately and unconditionally release Garding from all custody based on the Judgment entered in *State v. Garding*, Cause No. DC-2010-160 (Mont. Fourth Jud. Dist. Court, Oct. 25, 2011), and Garding may not be retried.

DATED this 23rd day of March, 2023.


Dana L. Christensen, District Judge
United States District Court